# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GEORGE ABILA,

       Plaintiff,

vs.                                   No. CIV 14-1002 JB/SMV

SHAWN FUNK; LEZLIE DUCKETT; KAY
YOUNGMAN and TODD BANNISTER,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion and Memorandum in Support of Summary Judgment for Inhumane Conditions of Confinement, filed September 6, 2016 (Doc. 156)("MSJ"); and (ii) the County Defendants' Amended Motion for Partial Summary Judgment No. 1 -- Dismissal of Plaintiff's Substantive Due Process Claims, filed September 9, 2016 (Doc. 162)("Defendants' MSJ").  The Court held a hearing on October 25, 2016.  The primary issue is whether, as a matter of law, Defendant Shawn Funk, the warden at Eddy County Detention Center, and Defendant Todd Bannister, the health and services administrator in charge of medical and mental health care at Eddy County Detention Center, violated Plaintiff George Abila's rights to substantive due process protected by the Constitution of the United States of America, when -- for more than six months -- Funk and Bannister housed Abila in a small padded cell with no furnishings, no clothing, constant lighting, cold blowing air, and only a grated hole in the floor to use as a toilet.  The Court concludes that, from January 3, 2012, until June 21, 2012, the time period following Abila's return from the hospital after having attempted suicide, and during which Abila did not make any overt suicide attempts, the squalid conditions of Abila's padded cell, combined with Abila's lack of exercise and reception of only some,

undocumented recreation, amounts to shockingly inhumane living conditions. These conditions were not rationally related to a legitimate nonpunitive purpose, and the imposition of these conditions amounted to punishment and violated Abila's clearly established substantive due-process right to be confined in an environment that does not result in degeneration, or otherwise threaten his mental and physical well-being. Accordingly, the Court grants Abila's MSJ, which seeks judgment only as to that timeframe. The Court thus denies the Defendants' MSJ as it relates to that same time frame. In addition, because the Court determines that there are genuine issues of material fact pertaining to Abila's confinement before January 3, 2012, precluding it from entering summary judgment in relation to that time frame, the Court will deny the Defendants' MSJ in its entirety.

## FACTUAL BACKGROUND

Abila, and Funk and Bannister, have filed Motions for Summary Judgment. See MSJ; Defendants' MSJ. Funk and Bannister specifically incorporate the undisputed material facts that they proffer in the Defendants' MSJ as part of their response to Abila's MSJ. See County Defendants' Response to Plaintiff's Motion and Memorandum in Support of Summary Judgment for Conditions of Confinement ¶¶ 1-2, at 2, filed September 26, 2016 (Doc. 172)("Response"). Abila, in his Reply to Defendants' Response to Plaintiff's Motion and Memorandum in Support of Summary Judgment for Inhumane Conditions of Confinement ¶ 3, at 3, filed October 12, 2016 (Doc. 182)("Reply"), does not specifically dispute the proffer of undisputed material facts that Funk and Bannister make in Defendants' MSJ and incorporate into their Response. In this scenario, however, the Court deems it appropriate to credit the arguments Abila makes in the Plaintiff's Response to Defendants' Amended Motion for Partial Summary Judgment No. 1 -- Dismissal of Plaintiff's Substantive Due Process Claims, filed October 7, 2016 (Doc.

174)("Response to Defendants' MSJ").  Further, because the Response to Defendants' MSJ proffers its own additional facts, to which Funk and Bannister respond in the County Defendants' Reply in Support of Amended Motion for Partial Summary Judgment No. 1 -- Dismissal of Plaintiff's Substantive Due Process Claims, filed October 21, 2016 (Doc. 186)("Reply in Support of Defendants' MSJ"), the Court also deems it appropriate to credit the arguments that Funk and Bannister make in the Reply in Support of Defendants' MSJ.[1]  As a result, the Court cannot completely consider Abila's MSJ in the abstract of Defendants' MSJ, and thus presents the following undisputed material facts drawn from the arguments made pursuant to both motions.

Abila was booked at Eddy County Detention Center in Carlsbad, New Mexico, on August 8, 2011, and housed in general population.  See MSJ ¶¶ 1-2, at 3 (setting forth this fact); Response ¶¶ 1-2, at 2 (not disputing this fact); Defendants' MSJ ¶ 1, at 2 (setting forth this fact); Response to Defendants' MSJ ¶ 1, at 4 (not disputing this fact).  About a month later, on September 6, 2011, Abila swallowed a razor blade.  See MSJ ¶ 3, at 3 (setting forth this fact); Response ¶ 3, at 2 (not disputing this fact); Defendants' MSJ ¶ 2, at 2 (setting forth this fact); Response to Defendants' MSJ ¶ 2, at 4 (not disputing this fact).  He remained in general population until October 24, 2011.  See Defendants' MSJ ¶ 1, at 2 (setting forth this fact);

---

[1]While Funk and Bannister have made it difficult for the Court to rule only on Abila's MSJ, and they should have listed all facts as additional facts in their Response, see D.N.M. LR-Civ. 56-1(b), the situation is not a lot more difficult than if they had.  While Abila should have responded to these facts in his Reply, see D.N.M. LR-Civ. 56-1(b), Abila has effectively done so in its Response to Defendants' MSJ.  There is no sound reason for the Court to ignore the facts in the Defendants' MSJ and Abila's response to those facts in his Response to Defendants' MSJ just because they are listed in other documents; the parties have given the Court all the tools it needs to decide these two motions, and the Court will not concern itself with form over substance.

Response to Defendants' MSJ ¶ 1, at 4 (not disputing this fact).[2]  On October 24, 2011, Abila cut

his arms with a razor blade in a suicide attempt and needed stitches at the hospital.  See MSJ ¶ 4,

at 3 (setting forth this fact); Response ¶¶ 4, at 2 (not disputing this fact); Defendants' MSJ ¶ 4, at

3 (setting forth this fact); Response to Defendants' MSJ ¶ 4, at 4 (not disputing this fact).  Abila

was hostile with medical staff at the hospital and continued to threaten suicide.  See Defendants'

MSJ ¶ 4, at 3 (setting forth this fact); Response to Defendants' MSJ ¶ 4, at 4 (not disputing this

fact).  Although housed in "segregation" after the incident -- and placed on a watch for his own

safety, see Defendants' MSJ ¶ 4, at 3 (setting forth this fact); Response to Defendants' MSJ ¶ 4,

at 4 (not disputing this fact) -- on November 12, 2011, Abila again cut his arms, and needed

_____

[2]The Defendants' MSJ also asserts that "staff took [Abila] at his word" that the razor
blade was swallowed by accident.  Defendants' MSJ ¶ 3, at 3 (relying on Eddy County Detention
Center Incident Report (dated October 24, 2011), filed September 9, 2016 (Doc. 162-
3)(indicating that, during a subsequent suicide attempt, Abila was still housed in general
population)).  The Response to Defendants' MSJ disputes this fact by reference to Bannister's
characterization of the incident as a disciplinary issue in a memoranda related to the incident and
in his deposition testimony.  See Response to Defendants' MSJ ¶ 3, at 4 (relying on (i) Mental
Health Evaluation (dated September 7, 2011), filed October 7, 2016 (Doc. 174-1)(providing
Youngman's notes, which said, according to Bannister, it was "not a suicide attempt -- more of a
disciplinary issue"); and (ii) Deposition of Todd Bannister at 191:1-193:25, filed October 7,
2016 (Doc. 174-2)(taken February 4, 2016)(providing that often, in Bannister's estimation, an
inmate will swallow a razor blade they are trying to hide, making such occurrences disciplinary,
and not mental health, issues)).  According to the Reply, Abila has not shown that "staff did not
believe the issue was an accident."  Reply in Support of Defendants' MSJ ¶ 3, at 5.  The Court
concludes that the Response to Defendants' MSJ has not adequately disputed the fact that the
decision to keep Abila housed in general population was premised on Eddy County Detention
staff's belief that the incident was, indeed, an accident.  Accordingly, the Court deems the fact
that "staff took [Abila] at his word" that he swallowed the razor blade by accident is undisputed.
Defendants' MSJ ¶ 3, at 3.  See also D.N.M. LR-Civ. 56-1(b)("The Response must contain a
concise statement of the material facts cited by the movant as to which the non-movant contends
a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity
to those portions of the record upon which the non-movant relies, and must state the number of
the movant's fact that is disputed.  All material facts set forth in the Memorandum will be
deemed undisputed unless specifically controverted.").

medical attention and stitches at the Carlsbad Medical Center in Carlsbad, New Mexico.[3]  "Abila claimed he had managed to find and cut himself with a sharp piece of metal, despite the restrictions on what he could have in the segregation cell."  Defendants' MSJ ¶ 8, at 3 (setting forth this fact).  See Response to Defendants' MSJ ¶ 8, at 5 (not disputing this fact).  After he had cut his arms, "Abila resisted staff's attempts to save him, guarding his arms and refusing to allow them to staunch the bleeding."  Defendants' MSJ ¶ 9, at 3 (setting forth this fact).  See Response to Defendants' MSJ ¶ 9, at 5 (not disputing this fact).

Upon return to Eddy County Detention from the hospital, Captain Mike Ingram ordered Abila to be housed in a padded cell.  See MSJ ¶ 7, at 3 (setting forth this fact); Response ¶ 7, at 2 (not disputing this fact).  Padded cell 166, where Abila was housed, "had no furnishings, no sink, no mattress, and only a grated hole in the floor in which he was to defecate and urinate."  MSJ ¶ 8, at 3 (setting forth this fact).  See Response ¶ 8, at 2 (not disputing this fact).  During his transport into padded cell 166, Abila fought with staff and, in the process, blood was sprayed onto an officer's face.[4]  Abila had pulled out his stitches, and thus he was again taken to the

---

[3]The Response does not dispute this fact as the MSJ states it, except to add the word "segregation."  See Response ¶¶ 5-6, at 2.  The MSJ had originally provided that Abila was housed in "isolation," and not segregation.  MSJ ¶¶ 5-6, at 3 (setting forth this fact).  The Reply ¶ 3, at 3, adopted the wording from the Response, and thus the Court -- not knowing of any legal or factual distinction between "segregation" and "isolation" -- concludes that the fact it has provided in text is undisputed.  See also Defendants' MSJ ¶¶ 4, 10, at 3, 4 (setting forth this fact); Response to Defendants' MSJ ¶¶ 4, 10, at 4, 5 (not disputing this fact).

[4]See Defendants' MSJ ¶ 11, at 4 (setting forth this fact)(relying on Eddy County Detention Center Incident Report (dated November 13, 2011), filed November 9, 2016 (Doc. 162-10)(providing that "several officers had blood on them")).  The Response to Defendants' MSJ ¶ 8, at 5, disputes the phrasing of the asserted fact in Defendants' MSJ, because, they argue, it makes it sound as though Abila intentionally sprayed blood on the officer's face -- a fact Abila contends lacks evidence in support.  The Reply in Support of Defendants' MSJ concedes that the asserted fact that the spray was intentional lacks support in the evidence, and thus the Court deems the fact -- as the Court has presented it -- undisputed.  See Reply ¶ 5, at 5.  The Court has

hospital.  See MSJ ¶ 9, at 3 (setting forth this fact); Response ¶ 9, at 2 (not disputing this fact);

Defendants' MSJ ¶ 12, at 4 (setting forth this fact); Response to Defendants' MSJ ¶ 12, at 5 (not

disputing this fact).

Upon Abila's return to Eddy County Detention, Bannister ordered that Abila be placed in

a restraint chair.  See MSJ ¶ 10, at 4 (setting forth this fact); Response ¶ 10, at 2 (not disputing

this fact); Defendants' MSJ ¶ 13, at 4 (setting forth this fact); Response to Defendants' MSJ ¶ 13,

at 5 (not disputing this fact).  Abila pulled off his bandages before he was placed into the

restraint chair.  See Defendants' MSJ ¶ 13, at 4 (setting forth this fact); Response to Defendants'

MSJ ¶ 13, at 5 (not disputing this fact).[5]  Abila's wounds began to bleed again as staff struggled

to rebandage him and restrain him in the chair.  See Defendants' MSJ ¶ 14, at 4 (setting forth this

fact); Response to Defendants' MSJ ¶ 14, at 5 (not disputing this fact).  During the struggle Abila

threatened to hurt the staff when he got out of his restraints.  See Defendants' MSJ ¶ 15, at 4

---

looked at the evidence that the Defendants cite in support of the allegation that Abila
intentionally sprayed blood on officers, and it agrees that the evidence does not support an
allegation of intentionality.  See Eddy County Detention Center Incident Report (dated
November 13, 2011), filed September 9, 2016 (Doc. 162-10).

[5]In addition, the Defendants' MSJ asserts that Abila pulled off his bandages as he
traveled from the hospital to Eddy County Detention.  See Defendants' MSJ ¶ 13, at 4 (relying
on Eddy County Detention Center Incident Report (dated November 13, 2011), filed September
9, 2016 (Doc. 162-10)(providing that "Inmate Abila had removed his bandages and was
uncooperative in exiting the vehicle")).  The Response disputes this fact, arguing that Abila,
"upon seeing the restraint chair . . . waiting for him in the sally port," began to pull off his
bandages.  Response to Defendants' MSJ ¶ 13, at 5 (relying on Eddy County Detention Center
Incident Report (dated November 13, 2011), filed September 9, 2016 (Doc. 162-10)(providing
that the restraint chair was visible in the sally port upon Abila's arrival, and that "Inmate Abila
had removed his bandages and was uncooperative in exiting the vehicle")).  The Court considers
this fact to be disputed as to precisely when the bandages were removed, but the fact that Abila
ripped off his bandages and was uncooperative in being placed into the restraint chair, is deemed
undisputed.  See D.N.M. LR-Civ. 56-1(b).

(setting forth this fact); Response to Defendants' MSJ ¶ 15, at 5 (not disputing this fact).  At 2:45

p.m. on November 18, 2011 -- he had been released from the hospital on November 13, 2011 --

Ingram and codefendant Kay Youngman, mental health nurse, agreed to downgrade Abila to a

fifteen-minute "emotionally upset" watch.[6]  At 5:45 p.m. that day, Abila bit a chunk of flesh out

of his own arm and required bandaging.  See Defendants' MSJ ¶ 19, at 5 (setting forth this fact);

Response to Defendants' MSJ ¶ 19, at 6 (not disputing this fact).  In addition, later that day,

Abila attempted to choke himself using his dinner and, after staff attended to him and stopped

the choking, Bannister ordered that Abila be sedated.[7]

[6]The Defendants' MSJ provides that Youngman "agreed to downgrade Abila to a fifteen-minute watch."  Defendants' MSJ ¶ 18, at 5 (relying on Eddy County Detention Center M.H. Progress Notes (dated November 18, 2011), filed September 9, 2016 (Doc. 162-12)(providing that Youngman "agreed to downgrade to 15 min EU watch")).  The Response then argues that a note from Youngman indicates the agreement was to downgrade Abila to a "fifteen min[ute] EU watch," which means, according to Youngman's testimony, that Abila should have thus been moved into a hallway cell, and not kept in the padded cell.  See Response to Defendants' MSJ ¶ 18, at 6 (relying on Eddy County Detention Center M.H. Progress Notes (dated November 18, 2011), filed September 9, 2016 (Doc. 162-12)(providing that Youngman "agreed to downgrade to 15 min EU watch")).  The Reply does not specifically and adequately dispute the asserted fact as it is characterized by the Response to Defendants' MSJ, so the Court deems the fact undisputed in that fashion.  See Reply in Support of Defendants' MSJ ¶ 10, at 6.  See also D.N.M. LR-Civ. 56-1(b).

[7]The Defendants' MSJ indicates that a nurse recommended sedative medication for Abila.  See Defendants' MSJ ¶ 20, at 5 (relying on Eddy County Incident Report (dated November 18, 2011), filed September 9, 2016 (Doc. 162-13)(providing that "Nurse Fisher called Medical Supervisor Todd Bannister and got approval to administer a sedative to Inmate Abila")).  The Response to the Defendants' MSJ, however, argues that Bannister gave the order for the sedation.  See Response to Defendants' MSJ ¶ 20, at 6 (relying on Eddy County Incident Report (dated November 18, 2011), filed September 9, 2016 (Doc. 162-13)(providing that "Nurse Fisher called Medical Supervisor Todd Bannister and got approval to administer a sedative to Inmate Abila")).  The Reply in Support of Defendants' MSJ concedes that Bannister gave the order, but maintains that a nurse -- "Nurse Fisher" -- called Bannister and recommended the course of action before getting Bannister's approval.  Reply in Support of Defendants' MSJ ¶ 12, at 6.  For the purposes of resolving the MSJ and the Defendants' MSJ, the Court is convinced that the essential fact asserted is not disputed, and adopts the fact as it has been asserted in the Response to Defendants' MSJ.  See D.N.M. LR-Civ. 56-1(b).

Abila "was put into a restraint chair in padded cell 166, then remained in some kind of restraint continuously in the padded cell for nineteen days."  MSJ ¶ 11, at 4 (setting forth this fact).[8]  Abila's wrists developed sores from the restraints, causing Eddy County Detention

_____

[8]The Response disputes this fact, providing that the

County Defendants dispute [Plaintiff's Material Fact] No. 11.  The watch logs from this time period indicate that there were numerous times that Plaintiff was standing, laying, or showering without any mention of restraints.  See Eddy County Detention Center Watch Form at 1, filed September 26, 2016 (Doc. 172-1)("Logs")(showing that Plaintiff stood for certain time period); Logs at 2 (noting that Plaintiff was taken in and out of the chair); Logs at 3 (noting Plaintiff was lying down).

Response ¶ 11, at 2-3.  Abila objects to the Response's assertion on this point.  See Reply ¶ 11, at 2-3.  D.N.M. LR-Civ. 56-1(b) provides:

The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. LR-Civ. 56.1(b).  Here, in compliance with the local rules, Abila specifically points to the evidence on which the Response relies for asserting that there were numerous times that Abila was without some form of continuous restraint for the 19-day period -- that being the "watch log for November 13, 2011."  Reply ¶ 11, at 3.  Specifically, the Reply contends that absent from the Response's evidence is an attempt "to dispute the fact Plaintiff was held in restraints for so long" or "testimony from any guard saying they released him from his mechanical restraints at any time in that 19-day period, presumably an easy thing to provide if it were true."  Reply ¶ 11, at 3.  Instead, as Abila asserts, the Log

reveals that Plaintiff was removed from the restraint chair at 19:40 on 11/31/11.  Although the log does not say he was then placed into handcuffs and shackles as described by Sgt. Patterson, it does say at 23:05 a guard asked if his restraints were "all OK"?  In other words, the watch log Defendants provide as proof he was not in restraints actually confirms what Sgt. Patterson has testified to: he was transitioned from a restraint chair into mechanical restraints.

Sergeant Carrie Patterson to email Funk a plea for help requesting that the restraints be loosened. See MSJ ¶¶ 12-13, at 4 (setting forth this fact); Response ¶¶ 12-13, at 3 (not disputing this fact). Funk denied Patterson's request; "almost everything [Patterson] asked for [Abila] was a no." MSJ ¶ 14, at 4 (setting forth this fact)(first alteration in original)(second alteration added). See Response ¶14, at 3 (not disputing this fact). "On November 18, twice on November 21 and twice on November 22, 2011, mental health staff from CHC (now CCS), ECDC's contract mental health service provider, checked on Abila." Defendants' MSJ ¶ 21, at 5 (setting forth this fact).[9] On November 22, 2011, Abila struck himself in his head with his suicide restraint belt. See Defendants' MSJ ¶ 22, at 5 (setting forth this fact); Response to Defendants' MSJ ¶ 22, at 7 (not disputing this fact).[10] The following day, Abila began slamming his head into the wall until he

_____

Reply ¶ 11, at 3. Accordingly, the Court concludes that there is a material dispute of fact as to just how continuously Abila was mechanically restrained. See Defendants' MSJ ¶¶ 16-17, at 4; Response to Defendants' MSJ ¶¶ 16-17, at 5-6.

[9]The Response to Defendants' MSJ purports to dispute this fact by providing: "While the records appear to suggest that George was visited by Youngman several times, and an attempt was made by tele-psych Nurse Practitioner Lezlie Duckett, George allegedly refused to come to the computer, [thus] it is unclear what Defendants mean by 'checked on.'" Response to Defendants' MSJ ¶ 21, at 6-7 (relying on Mental Health Evaluation and Progress Notes, filed September 9, 2016 (Doc. 162-15)). Because the Reply in Support of Defendants' MSJ explains that "[c]hecked on means that staff viewed Plaintiff and that in some instances Plaintiff refused to cooperate with the medical provider," the Court concludes that fact asserted is clear, and that Abila has not specifically disputed the fact as the Reply in Support of Defendants' MSJ has clarified the allegation. Reply In Support of Defendants' MSJ ¶ 13, at 6.

[10]In the Response to Defendants' MSJ, however, Abila takes issue with the asserted fact to the extent that it demonstrates that Abila had "convince[d] the day shift to remove his restraints." Response to Defendants' MSJ ¶ 22, at 7 (relying on Deposition of Carrie Patterson at 83:11-84:15, 90:2-9, filed October 7, 2016 (Doc. 174-4)(taken July 25, 2016)(indicating that Abila had been in restraints for over two weeks, and that Patterson had asked to remove the restraints on prior occasions)). The Court concludes that the reasons leading to Abila's ability to harm himself do not alter the fact as it has been alleged, and thus adopts the presented fact as undisputed because the Response to Defendants' MSJ has not adequately and specifically

bled.  See Defendants' MSJ ¶ 23, at 5 (setting forth this fact); Response to Defendants' MSJ ¶ 23, at 7 (not disputing this fact).  At this point, "Sgt. Sarah Santana alerted a nurse, [and] then entered Abila's cell with a protective helmet."  Defendants MSJ ¶ 24, at 5 (setting forth this fact). See Response to Defendants' MSJ ¶ 24, at 7 (not disputing this fact).  While Santana was putting the protective helmet onto Abila, Abila charged at "Sgt. Voldahl," who "didn't like Plaintiff and would often do things to upset him on purpose."[11]

Abila was removed from Padded Cell 166 into "segregation" on December 5, 2011. Defendants' MSJ ¶ 26, at 6 (setting forth this fact).  See Response to Defendants' MSJ ¶ 26, at 8 (not disputing this fact).  On December 24, 2011, Abila, while in his cell, swallowed screws and plastic.  See MSJ ¶ 15, at 4 (setting forth this fact); Response ¶ 15, at 3 (not disputing this fact); Defendants' MSJ ¶ 27, at 6 (setting forth this fact); Response to Defendants' MSJ ¶ 27, at 8 (not disputing this fact).  Abila was put on a fifteen-minute watch -- instead of being immediately taken to the hospital -- per orders that Bannister made over the telephone, until Abila started coughing up blood and was transported to the hospital.  See MSJ ¶¶ 16, 17, at 4 (setting forth this fact); Response ¶¶ 16-17, at 3 (not disputing this fact); Defendants' MSJ ¶ 28, at 6 (setting forth this fact); Response to Defendants' MSJ ¶ 27, at 8 (not disputing this fact).  Abila's extensive confinement in segregation could have contributed to his desire to harm himself.  See MSJ ¶ 18,

_____

disputed it.  See D.N.M. LR-Civ. 56-1(b).

    [11]Response to Defendants' MSJ ¶ 25, at 7 (setting forth this fact).  See Defendants' MSJ ¶ 25, at 6 (not disputing the fact in text).  The Response to Defendants' MSJ also adds the fact that Abila charged a staff member who would "do things that upset him on purpose," and the Reply in Support of Defendants' MSJ makes no attempt to specifically refute the asserted fact. Response to Defendants' MSJ ¶ 25, at 7.  See Reply in Support of Defendants' MSJ ¶16, at 7. Accordingly, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56-1(b).

at 4(setting forth this fact); Reply ¶ 18, at 4 (restating this fact).[12]

Abila remained at the hospital until January 3, 2012, and, upon his return to Eddy County Detention, he was placed in padded cell 169.   See MSJ ¶ 19, at 5 (setting forth this fact); Response ¶ 19, at 4 (not disputing this fact).[13]   Padded cell 169 measured "5 feet, five inches by

---

[12]The Response purports to dispute this fact, because "Youngman was deposed as a treating provider, not as an expert witness.   Thus she is prohibited from testifying regarding causation."  Response ¶ 18, at 3-4.   The Defendants state that, should the Court deem the testimony admissible, the Response purports to continue to dispute this fact, because, according to Defendants, Youngman was "responsible for identifying inmates who may be harmed by incarceration," and she never identified Abila as falling into that category.  Response ¶ 18, at 3-4 (relying, by reference to evidence cited within Defendants' MSJ, on (i) CHC Agreement for Inmate Health Care Services at 7.1 (dated February 18, 2011), filed September 9, 2016 (Doc. 162-25)(providing that CHC shall identify to the Warden those inmates with mental or medical conditions that may be worsened by incarceration); and (ii) Deposition of Kay Youngman at 272:2-18, filed September 9, 2016 (Doc. 162-24)(taken February 10, 2016)(indicating that Youngman did not document any conversations with Bannister about moving Abila from the padded cell)).   In light of the nature of the testimony, the Court concludes that Youngman's observational testimony -- despite her musings as to a causal relationship -- does not create a disputed fact for the purposes of the parties' allegations on this particular point.  Nor does the Responses' proffer of evidence adequately and specifically dispute her observations.  The Court thus deems the asserted fact undisputed.  See D.N.M. LR-Civ. 56-1(b).

[13]See also Defendants' MSJ ¶¶ 29-30 (setting forth this fact), at 6; Response to Defendants' MSJ ¶¶ 29-30, at 8 (not disputing this fact as provided in the text).  The Defendants' MSJ, though, does not specifically identify Padded Cell 169, and also provides that the reasons for being housed in a padded cell were "suicide precautions."   Defendants MSJ ¶ 29, at 6 (relying on Mental Health Progress Note (dated January 4, 2012), filed September 9, 2016 (Doc. 162-20)(noting Abila's high potential for suicide, and suggesting a "move to padded cell # 166")).   The Response to Defendants' MSJ asserts that Abila was "no longer suicidal when he was released from the hospital."   Response to Defendants' MSJ ¶ 29, at 8.  The Response to Defendants' MSJ does not cite any evidence, however, to support that assertion.   Funk and Bannister, in their Reply, also make no attempt to specifically refute Abila's assertion that he was no longer suicidal at the time he left the hospital.  See Reply in Support of Defendants' MSJ ¶ 20, at 7.   Accordingly, the Court deems the fact that Youngman indicated in her report, that Abila had high potential for suicide upon his departure day from the hospital, as undisputed.  See D.N.M. LR-Civ. 56-1(b).

The Defendants' MSJ also asserts that Abila was placed in the padded cell "at the recommendation of mental health staff."  Defendants' MSJ ¶ 30, at 6 (relying on Mental Health Progress Note (dated January 4, 2012), filed September 9, 2016 (Doc. 162-20)(noting Abila's high potential for suicide, and suggesting a "move to padded cell # 166")).   Abila disputes this

7 feet, 7 inches," and did not have furnishings, a sink, a mattress, or a toilet, and contained only a grated hole in the floor for Abila's urination and defecation.  MSJ ¶¶ 20-21, at 5 (setting forth this fact).  See Response ¶¶ 20-21, at 4 (not disputing this fact).  Funk ordered that "Inmate Abila is to have the following items only!!! . . .  1. Green suicide suit 2. Green suicide blanket 3. Regular meals served in a rubber security tray, rubber cup, and rubber spork to be picked up 30 minutes after he is initially served his meals."  MSJ ¶ 22 (setting forth this fact).  See Response ¶ 22 (not disputing this fact); Defendants' MSJ ¶ 31, at 6 (referencing this fact).[14]  Accordingly, Abila had only those items and was often left completely nude in his cell.  See MSJ ¶ 23, at 5

---

fact, first because the evidence Funk and Bannister cite in support of their assertion -- Mental Health Progress Note (dated January 4, 2012), filed September 9, 2016 (Doc. 162-20) -- is void of a date; and second, because Youngman testified that "had it been her decision, she would have recommended a hallway cell or maybe a smaller unit with less people."   Response to Defendants' MSJ ¶ 30, at 8 (relying on Deposition of Kay Youngman at 248:18-250:2, filed October 7, 2016 (Doc. 174-5)(taken February 10, 2016)).  The Reply, then, provides that a date - - January 4, 2012 -- appears on the first page of the Mental Health Progress Note, which Youngman signed, and that this document indicates that Youngman circled "move[] to padded cell" as her recommendation for Abila's housing.  Reply in Support of Defendants' MSJ ¶ 21, at 7.  The Mental Health Progress Note, the Court observes, however, provides: "Move to padded cell # 166" and not Padded Cell 169.   Nonetheless, in accordance with its review of the Deposition of Kay Youngman, filed October 21, 2016 (Doc. 186-1), the Court agrees with Funk and Bannister that nothing in Youngman's treatment plan indicates that she disagreed with the use of a padded cell in Abila's case.  See Reply in Support of Defendants' MSJ ¶ 21, at 7.  The Court thus deems this fact disputed, with respect to whether a recommendation from a mental health professional had occurred.  See D.N.M. LR-Civ. 56-1(b).

[14]The Response to Defendants' MSJ ¶ 31, at 8-9, purports to dispute the fact the Defendants' MSJ ¶ 31, at 6, proffers, which was that Abila was placed in the padded cell because of his multiple suicide attempts.  The Reply concedes that the evidence does not specifically support that Abila was housed in the padded cell because of the multiple suicide attempts.  See Reply in Support of Defendants' MSJ ¶ 22, at 8.

Further, Defendants' MSJ ¶ 33, at 6, asserts that the restrictions were at the recommendation of "mental health staff."  Defendants' MSJ ¶ 33, at 6.  The Court, supra n.13, has already considered the evidence and deemed the fact whether a mental health professional recommended Abila's housing in the padded cell as disputed.

(setting forth this fact).[15]  Funk also mandated that Abila "would use the toilet in the cell he was currently in."  MSJ ¶ 24, at 5 (setting forth this fact).  See Response ¶ 24, at 5 (not disputing this fact).  That "toilet" was a grated hole in the floor that needed to be flushed from the outside and, given the grate, was "difficult to get feces . . . through the hole in[to] the ground."  MSJ ¶¶ 25-26, at 6 (setting forth this fact).  See Response ¶¶ 25-26, at 6 (not disputing this fact).  Sometimes the "bowel movements would stay on top of the grate."  Response ¶ 27, at 5 (setting forth this fact).[16]  The "toilet would have to be flushed several times to completely clear the contents."  Response ¶ 28, at 5 (setting forth this fact).  See MSJ ¶ 28, at 6 (not disputing this fact).[17]  Abila

---

[15]See Reply ¶ 23, at 4 (confirming that, by reference to Funk's orders regarding what Abila could have in his cell, Abila was left without clothing, and thus nude, sans suicide suit and blanket).  The Response purports to dispute this fact, arguing that Patterson "testified that Plaintiff would sometimes be nude in his cell underneath a blanket.  Sergeant Patterson's testimony demonstrates that this occurred but does not comment on the frequency of this occurrence."  Response ¶ 23, 4-5 (relying on Deposition of Carrie Patterson at 92:2-10, filed September 6, 2016 (Doc. 156-8)(taken July 25, 2016)).  As the Reply notes, however, the Defendants have not disputed that Funk ordered that Abila could only have a green suicide suit and suicide blanket inside of the cell.  See Reply ¶ 23, at 4.  Accordingly, the Court concludes that the Response has not meaningfully or adequately disputed the fact that Abila was "often nude" in his cell, and thus deems this fact undisputed.  See D.N.M. LR-Civ. 56-1(b).

[16]The MSJ asserts the fact that bowel movements would stay on top of the grate "often," whereas the Response asserts that occurred only "sometimes."  See MSJ ¶ 27, at 6 (relying on Deposition of Christine Gallegos at 56:3-5, filed September 6, 2016 (Doc. 156-14)(taken April 26, 2016)("Because the bowel movement would stay on top and, I mean, it had -- sometimes it had to be pushed down."))  The Court concludes that the differences in frequencies expressed by the terms "often" and "sometimes" creates a meaningful dispute, and that the evidence cited is not explicit as to frequency.  The Court will adopt -- at the least -- the undisputed fact as it has been provided by the non-movant Defendants, but notes that it is disputed whether the frequency was greater than just "sometimes."  See D.N.M. LR-Civ. 56-1(b).

[17]The MSJ also provides: "When the hole in Plaintiff's cell was flushed, 'it would just like bubble up, it just wouldn't -- it just would not go down completely.'"  MSJ ¶ 28, at 6 (quoting Deposition of Christine Gallegos at 55:24-56:15, filed September 6, 2016 (Doc. 156-14)(taken April 26, 2016).  In the Reply, however, Abila drops the "bubble up" aspect as not being the most important feature of the asserted fact, given that the undisputed fact already indicates that the cell lacked a dignified and sanitary toilet.  Reply ¶ 28, at 4 ("It matters not that

was forced to eat in close proximity to the grated hole.  See MSJ ¶ 29, at 6 (setting forth this fact); Response ¶ 29, at 5 (not disputing this fact).  Furthermore, because there was no sink in his cell, Abila would eat without sanitizing his hands.  See MSJ ¶ 30, at 6 (setting forth this fact).[18] Funk even wrote in an email to staff that "[i]f [Abila] receives anything other than what has been authorized by this memo the cameras will be reviewed and the person or persons giving him the unauthorized items will receive disciplinary action up to and including termination."  MSJ ¶ 31, at 6-7 (setting forth this fact).  See Response ¶ 31, at 6 (not disputing this fact).

Abila was then ordered to stay in padded cell 169 for the duration of his detention at Eddy County Detention.  See MSJ ¶ 32, at 7 (setting forth this fact); Response ¶ 32, at 6 (not disputing this fact).  Funk and Bannister were involved in a collaborative decision to keep Abila in padded cell 169 for the remainder of his time at Eddy County Detention.  See MSJ at 12

_____

the feces bubbled up each and every time.  The important information from the fact involves the lack of a sanitary and dignified toilet.").

[18]See Reply ¶ 30, at 4-5 (specifically refuting the Response's objection to this fact).  The Response purports to refute the fact that Abila would eat without sanitizing his hands by reference to evidence that Abila "would have been allowed to wash his hands when he asked to."  Response ¶ 30, at 5-6.  That argument does not, however, specifically refute the fact that the MSJ alleges.

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.  The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.

D.N.M. LR-Civ. 56-1(b).  Accordingly, the Court concludes that the Response has not meaningfully and specifically disputed this fact, and the Court deems the fact undisputed.  See D.N.M. LR-Civ. 56-1(b).

(setting forth this fact).[19]   Funk "knew it was against ECDC policy to house an inmate in a

padded cell without a written order from a physician."  MSJ ¶ 34, at 7 (setting forth this fact).[20]

A physician, Kim Lark, had contracted with Eddy County Detention and could write that

requisite order.  See MSJ ¶ 35, at 7 (setting forth this fact); Response ¶ 35, at 7 (not disputing

this fact).  Lark was not contacted "regarding any order to place Plaintiff in the padded cell."

MSJ ¶ 36, at 7 (setting forth this fact).[21]   "Defendant Funk understood it was in violation of

_____

[19] The Response purports to dispute this fact by demonstrating that other Eddy County
Detention staff and personnel were involved in the decision, and that it was not only Funk and
Bannister making the "collaborative decision."  Response ¶ 33, at 11.  As the Reply provides,
such a dispute "is not meaningful to Funk and Bannister's liability as they admit they were at
least partially responsible for this decision."  Reply at ¶ 33, at 5.  Accordingly, the Court deems
this fact undisputed.  See D.N.M. LR-Civ. 56-1(b).

[20]See Reply ¶ 34, at 6 (providing the Eddy County Detention policy, and Funk's
testimony indicating his knowledge of the policy).  The MSJ provides that the "Defendants" and
not just Funk had knowledge of the Eddy County Detention policy.  MSJ ¶ 34, at 7 (relying on
Deposition of Shawn Funk at 201:9-13, filed September 6, 2015 (Doc. 156-5)(taken February 5,
2016)(discussing the Eddy County Detention policy in the context of Funk's testimony about his
knowledge)).  The Response purports to dispute this fact by indicating that the MSJ provides no
evidence regarding Bannister's knowledge of the Eddy County Detention policy and that, after
Funk acknowledged that he was aware of Eddy County Detention's policy that "if you're putting
someone [in the padded cell] for medical reasons, seclusion, that you need a physician's order . .
. ," he then stated that Abila "was also in there for security reasons."  Response ¶ 34, at 6-7
(providing that the Deposition of Shawn Funk at 201:9-13, filed September 6, 2015 (Doc. 156-
5)(taken February 5, 2016)(discussing the Eddy County Detention policy in the context of
Funk's testimony about his knowledge), does not at any time reference Bannister's knowledge).
The Court concludes that neither the MSJ nor Reply provides evidence to support that Bannister
had knowledge of the Eddy County Detention policy, but that Funk's testimony (see Response ¶
34, at 6-7) supports the asserted fact, and thus the Response has not meaningfully and
specifically disputed the fact with respect to Funk.  See MSJ ¶ 34, at 7; Reply ¶ 34, at 5-6.  See
also D.N.M. LR-Civ. 56-1(b).

[21]See Reply ¶ 36, at 6.  The Response purports to dispute this fact by arguing that it
mischaracterizes the evidence, stating that "Defendant Funk disputed an order was required
because Plaintiff was placed in the padded cell for a mixture of security and medical reasons.
Further, both Defendant Bannister and Defendant Funk testified that to the extent an order was
required, Lezlie Duckett, nurse practitioner, authorized the seclusion."  Response ¶ 36, at 7

ECDC policy to create a standing, or PRN[22] order for an inmate to be housed in therapeutic seclusion." MSJ ¶ 37, at 7 (setting forth this fact).[23] "[L]eaving an inmate in a padded cell for the length of time Plaintiff was subjected was inhumane," and the decision to house Abila in the "padded cell for such an extended period of time was tragic . . . ." MSJ ¶¶ 38-39, at 8 (setting forth this fact).[24]

From January 3, 2012, until June 21, 2012, Youngman "saw Abila over eighty times and stated in every record she created that Abila remained a suicide risk." Defendants' MSJ ¶ 34, at

───────────────

(relying on (i) Deposition of Shawn Funk at 202:9-203:13, filed September 6, 2015 (Doc. 156-5)(taken February 5, 2016); and (ii) Deposition of Todd Bannister at 60:12-16, filed September 26, 2016 (Doc. 172-2)(taken February 4, 2016)(indicating that Bannister testified that Lezlie Duckett gave a physician's order for Abila's seclusion)). The evidence does not meaningfully and specifically dispute the fact that Lark was not contacted about an order. Accordingly, the Court concludes this fact is undisputed. See D.N.M. LR-Civ. 56-1(b).

[22]Pro re nata, commonly used in medicine to mean as needed or as the situation arises. See Pro Re Nata, Wikipedia, https://en.wikipedia.org/wiki/Pro_re_nata (last accessed November 4, 2016).

[23]See Reply ¶ 37, at 6 ("This fact asserts that standing orders for use of the padded cell are forbidden by ECDC policy."). The Response purports to dispute this asserted fact by arguing that it mischaracterizes the evidence, because "Funk's testimony states that standing orders for therapeutic seclusion are prohibited by ECDC policy. . . . However . . . Funk also stated that Plaintiff was not placed in seclusion solely for therapeutic purposes." Response ¶ 37, at 7 (relying on Deposition of Shawn Funk at 108:17-109:2, 201:9-13, filed September 6, 2015 (Doc. 156-5)(taken February 5, 2016)). This evidence does not meaningfully and specifically dispute the asserted fact that Funk was aware of the existing Eddy County Detention policy. See D.N.M. LR-Civ. 56-1(b). Accordingly, the Court concludes this fact is undisputed.

[24]See Response ¶¶ 38-39, at 7-8 (purporting to dispute this fact). The Response purports to dispute this fact, because Youngman was deposed as a treating provider and not as an expert witness. See Response ¶¶ 38-39, at 7-8. As the Reply provides, however, Youngman is a fact witness, and the proffered factual testimony relates to her factual observations and her state of mind at the time of her treatment. See Reply ¶¶ 38-39, at 6-7. Accordingly, the Court concludes that the Response has not meaningfully disputed the proffered factual assertions Youngman made. See D.N.M. LR-Civ. 56-1(b).

7 (setting forth this fact).[25]   Abila "received medication from the mental health staff in hopes of rehabilitating him, but in April, 2012, he began to hoard the medication and CHC had to discontinue it."  Defendants' MSJ ¶ 35, at 7 (setting forth this fact).[26]  Youngman "never wrote a note recommending that security staff move Abila from the padded cell."  Defendants' MSJ ¶ 36, at 7 (setting forth this fact).[27]  If Youngman had engaged in a conversation about moving Abila from the padded cell, she would have made a record of it.  See Defendants' MSJ ¶ 37, at 7 (setting forth this fact); Response to Defendants' MSJ ¶ 37, at 10 (not disputing this fact).[28]  The contract healthcare service provider, "CHC," and its employees "were required by their contract with the jail to 'identify to the Warden those members of the jail population with medical or

_____

[25]See Response to Defendants' MSJ ¶ 34, at 9 (disputing the implication that Abila received any mental health care).  In the Response to Defendants' MSJ, Abila lodges a dispute with the implication that Youngman's records and visits amount to "actual mental health care [provision]."  Response to Defendants' MSJ ¶ 34, at 9 (relying on Affidavit of Karen Rea, filed October 7, 2016 (Doc. 174-8)(disparaging the records of medical care Abila received while at Eddy County Detention)).  The Court does not consider this objection to specifically and adequately dispute the asserted fact -- that Youngman saw Abila and made a record -- and, accordingly, the Court deems the asserted fact undisputed.  See D.N.M. LR-Civ. 56-1(b).

[26]See Response to Defendants' MSJ ¶ 35, at 9-10 (disputing this fact only to the extent it implies mental health care, that provision of the medication was meant to rehabilitate, and that the hoarding was a suicide attempt).  The Court notes Abila's objection, and his reasons for making it, but the objection does not adequately and specifically dispute the fact the defendant has asserted.  See D.N.M. LR-Civ. 56-1(b).

[27]The Response to Defendants' MSJ argues that Youngman, "by writing EU, emotional upset, in her reports," "was relaying that he should no longer be held in a padded cell, but in a hallway cell."  Response to Defendants' MSJ ¶ 36, at 10.  The Court notes Abila's objection, but concludes that the objection does not specifically dispute the fact Defendant has asserted.  See D.N.M. LR-Civ. 56-1(b).

[28]The Response to Defendants' MSJ further asserts that Bannister intimidated Youngman, and that, if she went against him, she might risk losing her job.  See Response to Defendants' MSJ ¶ 37, at 10.  The Reply in Support of Defendants' MSJ ¶ 28, at 8, fails to specifically and adequately dispute this asserted fact, and thus the Court deems it undisputed.  See D.N.M. LR-Civ. 56-1(b).

mental health conditions which may be worsened as a result of being incarcerated at the jail."
Defendants' MSJ ¶ 38, at 7 (setting forth this fact).  See Response to Defendants' MSJ ¶ 38 (not
disputing this fact).  Youngman "never identified Abila as a member of the jail population who
needed to be moved from his conditions for his mental health."  Defendants' MSJ ¶ 39, at 7
(setting forth this fact).[29]

"[I]n the nine years [Eddy County Detention guard Christine Gallegos] had been at the
jail, she had never seen any other inmate stay in the padded cell for a longer time than Plaintiff."
MSJ ¶ 40, at 8 (setting forth this fact).  See Response ¶ 40, at 40 (not disputing this fact).
Additionally,

> [n]ow that Eddy County Detention guard Jeannie Santana actually knew how long
> [Abila] was in there, that's terrible. . . .  Because a padded cell is not a very
> comfortable place to be.  And for that length of time, without communication with
> other inmates and somewhere to stretch out and walk around and watch TV, all
> that, that's terrible.

MSJ ¶ 41, at 8 (setting forth this fact).  See Response ¶ 41, at 8 (not disputing this fact).
Patterson indicated that the "Plaintiff's treatment in the padded cell '[made her] feel bad for him.
He went through a lot in there."  MSJ ¶ 42, at 8 (setting forth this fact).  See Response ¶ 42, at 8
(not disputing this fact).

Abila stayed in padded cell 169 from January 3, 2012, until June 21, 2012.  See MSJ ¶
43, at 8 (setting forth this fact); Response ¶ 43, at 8 (not disputing this fact); Defendants' MSJ ¶

---

[29]The Response to Defendants' MSJ purports to dispute this fact by arguing that
Youngman indeed had reservations about Abila's well-being with respect to the contract
requirement, yet does not point to a specific instance in the record where Youngman alerted the
warden of Abila's relevant status.  See Response to Defendants' MSJ ¶ 39, at 11.  Accordingly,
the Court concludes that the Response to Defendants' MSJ has failed to adequately and
specifically dispute the asserted fact -- that Youngman had not recorded an instance where she
alerted Funk about Abila.  See D.N.M. LR-Civ. 56-1(b).

40, at 7-8 (setting forth this fact); Response to Defendants' MSJ ¶ 40, at 11-12 (not disputing this

fact.[30]   Padded cell 169 "was uncomfortably cold and smelled horrible, as the smell of feces

---

[30]The Defendants' MSJ also asserts that:

Staff attempted to make him as comfortable as possible while under suicide restrictions, for example, Abila was removed from his cell to use a different restroom whenever possible, his cell was frequently cleaned, he was allowed out to watch television and sit in the booking area, occasionally wrote letters or read books, had played cards with guards and regularly spoke with them, [] was allowed to sanitize before meals, regularly showered, and frequently had his cell door open where he could see and even communicate with other inmates across the hall.

Defendants MSJ ¶ 40, at 7-8 (relying on (i) Deposition of Arthuressa Shirley at 47:18-48:13, 53:22-54:25, 64:14-65:4, filed September 9, 2016 (Doc. 162-26)(taken January 7, 2016)(discussing how she let Abila out of the cell to watch TV and read while handcuffed to a bench, as well as write letters); (ii) Deposition of Sarah Santana at 11:16-25, 16:1-14, 33:7-34:9, 61:7-62:16, filed September 9, 2016 (Doc. 162-26)(taken January 7, 2016)(discussing the same, and also that she would take Abila to a bathroom); (iii) Deposition of Roger Maxwell at 62:3-14, filed September 9, 2016 (Doc. 162-26)(taken February 12, 2016)(discussing giving Abila a shower and helping him write letters); (iv) Deposition of Narda Christine Gallegos at 38:3-17, 50:9-24, filed September 9, 2016 (Doc. 162-26)(taken April 26, 2016)(discussing taking Abila to a bathroom, and the pity the officers would show Abila); and (v) Deposition of Brandi Garza at 31:15-22, 37:21-38:4, filed September 9, 2016 (Doc. 162-26)(taken April 26, 2016)(discussing opening the door to the padded cell and speaking with Abila to keep him entertained)).   The Response to Defendants' MSJ specifically disputes the Defendants' MSJ's assertion by reference to a memorandum from Funk which "indicated that Plaintiff was only allowed to have a suicide blanket, a suicide suit, and his meals served on a rubber tray with rubber utensils. . . . [And] that Plaintiff was to use only the restroom in his current cell."  Response to Defendants' MSJ ¶ 40, at 11-12 (relying on Memo from Funk to All ECDC Staff (dated January 3, 2012), filed September 9, 2016 (Doc. 162-21)).  Accordingly, the Response to Defendants' MSJ argues that Funk's order contradicts the factual assertions, because, under the order, Abila could not have the supplies to write letters or play cards, could not leave the padded cell to use the restroom, or sanitize before his meals.  See Response to Defendants' MSJ ¶ 40, at 11-12.  The Reply in Support of Defendants' MSJ provides only that "[t]estimony of ECDC employees indicate that numerous employees violated Defendant Funk's order regarding the restrictions to be placed on Plaintiff."   Reply in Support of Defendants' MSJ ¶ 31, at 9.   The Court, in its review of the assertion in Defendants' MSJ and the evidence on which the Defendants' MSJ relies, is not convinced that the global order by Funk which forbade the conduct underlying the assertion adequately and specifically disputes the assertion.  The Defendants' MSJ uses qualifying words such as "whenever possible" and "as much as possible," and references testimony establishing the conduct's occurrence.  Defendants MSJ ¶ 40, at 7-8.  The Court notes Abila's objection, but

- 19 -

would come up from the hole in the floor and permeated the walls of the padded cell."  MSJ ¶ 44, at 9 (setting forth this fact).  See Response ¶ 44, at 8 (not disputing this fact).  The "Plaintiff had been complaining that the air conditioner was constantly blowing cold air on him."  MSJ ¶ 45, at 9 (setting forth this fact).  See Response ¶ 45, at 8 (not disputing this fact).  For that period of time from January 3, 2012, until June 21, 2012, when he was in the padded cell, Eddy County Detention staff kept a watch log about Abila.  See MSJ ¶ 46, at 9 (setting forth this fact); Response ¶ 46, at 8 (not disputing this fact).

With respect to the watch log, if Abila was "removed from his cell for recreation, that movement would be noted on the watch logs . . . ."  MSJ ¶ 47, at 9 (setting forth this fact).  See Response ¶ 47, at 8 (not disputing this fact).[31]  According to those watch logs, Abila received no

_____

concludes that Abila has not specifically and adequately disputed the limited nature of the assertion that Defendants' MSJ has made -- Abila sometimes left his cell and participated in those activities.  See D.N.M. LR-Civ. 56-1(b).

[31]The MSJ further indicates, in full: "If Plaintiff was offered recreation or removed from his cell for recreation, that movement would be noted on the watch logs, and if no indication was made it should be assumed that recreation was not offered to Plaintiff."  MSJ ¶ 47, at 9 (quoting Deposition of Shawn Funk at 164:12-19, filed September 6, 2016 (Doc. 156-5)(taken February 5, 2016), in which he stated that "Watch log would have noted" and "there would have been indications of him moving from his cell," in response to questions about whether the jail files would have noted if Abila "had [gone] to recreation").  The Response points to Funk's Deposition and argues that "Funk did not testify regarding the proper assumptions to be made regarding watch logs.  Further, the idea that Plaintiff was not offered recreation during this time is disputed by witness testimony."  Response ¶ 47, at 8.  To refute that assertion, the Reply points to Patterson's testimony that "when she tried to get permission to give Plaintiff recreation she was told 'no.'"  Reply ¶ 47, at 7 (relying on Deposition of Carrie Patterson at 25:24-26:9, filed September 6, 2016 (Doc. 156-8)(taken July 25, 2016)).  The Court agrees that, where Funk has said that the Logs indicate when Abila was removed from his cell for recreation, the only assumption one can possibly draw from the lack of Log entries relating to recreation is that Abila did not receive recreation.  See Reply ¶ 47, at 7.  Yet, as the Response argues, Funk did not say that the offer of recreation would be noted on the Logs.  See Response ¶ 47, at 8.  Accordingly, the Court concludes that whether the staff offered Abila recreation is disputed.  See D.N.M. LR-Civ. 56-1(b).

exercise for 159 days -- although, he did receive some amount of undocumented recreation in the form of television, reading on a bench, and card games.  See MSJ ¶¶ 48-49, at 9 (setting forth this fact).[32]

Further, Patterson "would often ask Defendant Funk and Chief of Security Michael Ingram if she could allow Plaintiff recreation, but the response was 'always [] no, no, no, tomorrow, next week, next week.'"  MSJ ¶ 50, at 9 (setting forth this fact).  See Response ¶ 50, at 9 (not disputing this fact).  Patterson let Abila out of his cell once during his detention and was disciplined.  See MSJ ¶ 51, at 10 (setting forth this fact); Response ¶ 51, at 9 (not disputing this fact).  It was Funk's responsibility to ensure that inmates were allowed out for recreation.  See MSJ ¶ 52, at 10 (setting forth this fact); Response ¶ 52, at 9 (not disputing this fact).  On one

---

[32] See Response ¶¶ 48-49, at 9 (not disputing that Abila received no exercise for 159 days, but providing that "numerous witnesses testified . . . Plaintiff received some type of recreation outside of his cell")(relying on (i) Deposition of Arthuressa Shirley at 47:18-48:13, 53:22-54:25, 64:14-65:4, filed September 9, 2016 (Doc. 162-26)(taken January 7, 2016)(discussing how she let Abila out of the cell to watch TV and read while handcuffed to a bench, as well as write letters); (ii) Deposition of Sarah Santana at 11:16-25, 16:1-14, 33:7-34:9, 61:7-62:16, filed September 9, 2016 (Doc. 162-26)(taken January 7, 2016)(discussing the same, and also that she would take Abila to a bathroom); (iii) Deposition of Roger Maxwell at 62:3-14, filed September 9, 2016 (Doc. 162-26)(taken February 12, 2016)(discussing giving Abila a shower and helping him write letters); (iv) Deposition of Narda Christine Gallegos at 38:3-17, 50:9-24, filed September 9, 2016 (Doc. 162-26)(taken April 26, 2016)(discussing taking Abila to a bathroom, and the pity the officers would show Abila); and (v) Deposition of Brandi Garza at 31:15-22, 37:21-38:4, filed September 9, 2016 (Doc. 162-26)(taken April 26, 2016)(discussing opening the door to the padded cell and speaking with Abila to keep him entertained)); Reply ¶¶ 47-49, at 7 (not disputing the fact that, over "snippets of an eight-month period," Abila may have seen some, albeit undocumented, recreation.  In the Reply, Abila provides that he "uses the watch logs designed to make note of such activity as proof the activity did not occur," and that, with respect to the proffered instances of recreation, the "Plaintiff will demonstrate how the facts quoted by Defendants are misleading, but even if they were true they do not amount to recreation."  Reply ¶¶ 47-49, at 7.  Accordingly, the Court concludes that the present statement on this issue is accurate and deems it an undisputed fact.  See D.N.M. LR-Civ. 56-1(b).

occasion, Ingram told Patterson, in response to her request to take Abila out for recreation, that "he ain't going to get shit and don't be kissing the inmate['s] ass." MSJ ¶ 53, at 10 (setting forth this fact).[33]

Abila "contested his confinement in the padded cell and asked Defendant Funk why he could not be moved to another cell." MSJ ¶ 54, at 10 (setting forth this fact). See Response ¶ 54, at 10 (not disputing this fact). In response, Funk told Abila that he would "remain in the padded cell 'until [he could] comply with any and all lawful orders and directions and when [he could] treat staff with the same respect [he was] given." MSJ ¶ 53, at 10 (setting forth this fact).[34] Funk understood that Eddy County Detention's policy on padded cell use prevented staff

---

[33]See Response ¶ 53, at 9-10 (not disputing the fact in the text). The MSJ misstated that Funk, and not Ingram, had given this directive to Patterson. See MSJ ¶ 53, at 10. The Reply did not object to the Response's correction of this fact. See Reply, passim. Accordingly, the Court adopts the fact as undisputed with respect to Ingram being the speaker. See D.N.M. LR-Civ. 56-1(b).

[34]See Reply ¶ 55, at 7 (correcting the citation to the exhibit that supports the fact). With respect to the correct exhibit, the Response purports to dispute this fact by stating that Funk told Abila he would remain in protective status, not necessarily in a padded cell, until the conditions were met. See Response ¶ 55, at 10 (relying on Inmate Request Form, filed October 12, 2016 (Doc. 182-2)(dated May 24, 2012)). Abila specifically asked Funk, however, about his time in the padded cell. See Reply ¶ 55, at 7 (relying on Inmate Request Form, filed October 12, 2016 (Doc. 182-2)(dated May 24, 2012)). Accordingly, the Court concludes that it is undisputed that Funk was talking about Abila's time in the padded cell. See D.N.M. LR-Civ. 56-1(b).
     Abila also argues, in his Response to Defendants' MSJ, that his housing in the padded cell amounted to punishment and that, given Funk's stated reasons for keeping Abila in the padded cell, the padded cell was at least partially used for punishment. See Response to Defendants' MSJ ¶¶ 6-7, at 3 (relying on (i) Affidavit of Phil Stanley at ¶ 3, filed October 7, 2016 (Doc. 174-13)("In reviewing the entire record I conclude Mr. Abila's placement in the padded cell was done for punishment's sake"); and (ii) Inmate Request Form, filed October 12, 2016 (Doc. 182-2)(dated May 24, 2012)). The Reply in Support of Defendants' MSJ ¶¶ 6-7, at 3, purports to dispute this fact only by specific reference, again, to Abila's suicidal behavior. The Court considers the nature of the statements Funk made to Abila and, again, is convinced that he clearly gave Abila an ultimatum which had no relevance to his "suicidal" behavior. Accordingly, the Court deems it undisputed that, on the basis of Funk's own wording, Abila was housed in the padded cell during the time period from January 3, 2012, until June 21, 2012, at

from using the padded cell "to try to change the way they're acting if they're not being a physical threat of harm to themselves or others."  MSJ ¶ 56, at 10 (setting forth this fact).  See Response ¶ 56, at 10 (not disputing this fact).

Abila's "healthcare in ECDC was conspicuously inadequate, and inhumane."  Response to Defendants' MSJ ¶ 1, at 2 (setting forth this fact).  See Reply in Support of Defendants' MSJ ¶1, at 1-2 (not disputing this fact).[35]  Bannister was not bothered that Abila had been in his cell for six months with the lights on for twenty-four hours a day.  MSJ ¶¶ 57-58, at 11 (setting forth this fact).  See Response ¶¶ 57-58, at 10 (not disputing this fact).  Bannister was also not bothered, under the circumstances, by the fact that Abila had not stepped outside for six months.  See Response ¶ 59, at 10 (setting forth this fact).[36]  Further, in hindsight, Bannister would not do anything differently, and he would "make the same decision again about Plaintiff's housing."  MSJ ¶¶ 60-61 (setting this fact forward).  See Response ¶¶ 60-61 (not disputing this fact).  Abila suffers from post-traumatic stress disorder.  See Response to Defendants' MSJ ¶ 8, at 3 (setting forth this fact); Reply in Support of Defendants' MSJ ¶ 8, at 4 (not disputing this fact).  Bannister is an author of the Eddy County Detention's policies that were based on the National Commission on Correctional Healthcare standards regarding the use of restraints and seclusion.

_____

least, partially, for reasons other than the suicidal reasons that Funk and Bannister proffer in these motions.  See D.N.M. LR-Civ. 56-1(b).

[35]While not disputing the accuracy of the expert testimony underlying the asserted fact, the Reply in Support of the Defendants' MSJ provides that the asserted fact does not constitute a constitutional violation.  See Reply in Support of Defendants' MSJ ¶ 1, at 1-2.
     Abila also argues that holding him in a padded cell for six months served no penological interest, see Response to Defendants' MSJ ¶ 2, at 2, which Funk and Bannister dispute by reference to Abila's suicidal tendencies, see Reply in Support of Defendants' MSJ ¶ 2, at 2.

[36]MSJ ¶ 59, at 11 (not disputing this fact, but using the word "concerned" and not "bothered").

See MSJ ¶ 62, at 12 (setting forth this fact); Response ¶ 62, at 10 (not disputing this fact).[37]

In sum, Abila was housed in a small, "41 square foot padded cell, with no furnishings, no sink, and only a grated hole in the floor for urination and defecation." MSJ at 12 (setting forth this fact as a core undisputed fact).[38] See Response at 11 (not disputing this fact). Abila was housed in padded cell 169, in particular, from January 3, 2012, through June 21, 2012. See MSJ at 12 (setting forth this fact as a core undisputed fact); Response at 11 (not disputing this fact). Funk and Bannister were involved in a collaborative decision to keep Abila in padded cell 169 for the remainder of his time at Eddy County Detention. See MSJ at 12 (setting forth this fact as a core undisputed fact).[39] During his time in the padded cell, Abila received no exercise and

---

[37]Abila also argues that it was a violation of national standards and Eddy County Detention's policies to keep Abila in the padded cell for such a long period of time, see Response to Defendants' MSJ ¶ 4, at 3 (relying on Affidavit of Phil Stanley at ¶ 3, filed October 7, 2016 (Doc. 174-13)("It was a violation of national standards and ECDC's own policies . . . ."), which Funk and Bannister dispute, because, according to Funk and Bannister, the referenced policies and standards -- involving needing a medical provider to approve segregation -- did not apply to Abila's situation and they, therefore, complied with the policies and standards, see Reply in Support of Defendants' MSJ ¶4, at 3. Abila further argues that "the use of restraints while also housed in the padded cell for 19 days violated contemporary jail standards and any demonstrable penological interest," Response to Defendants' MSJ ¶ 5, at 3, which Funk and Bannister dispute by reference to Abila's particular, suicidal, situation, see Reply in Support of Defendants' MSJ ¶ 5, at 3. The Court, accordingly, deems these facts disputed. See D.N.M. LR-Civ. 56-1(b).

[38]The MSJ restates a few of the undisputed facts, naming them "core undisputed facts," because the core undisputed facts relate to the specific time period that the MSJ addresses, whereas some of the other undisputed facts -- which the MSJ provides to accurately present the narrative of Abila's stay at Eddy County Detention -- relate to a different time period. See Transcript of Hearing at 22:2-23:8, taken October 25, 2016.

[39]See Response at 11. The Response purports to dispute this fact by alleging that other Eddy County Detention staff and personnel were involved in the decision, and that it was not only Funk and Bannister making the "collaborative decision." As the Reply provides, such a dispute "is not meaningful to Funk and Bannister's liability as they admit they were at least partially responsible for this decision." Accordingly, the Court deems this fact undisputed. See D.N.M. LR-Civ. 56-1(b).

The MSJ contends that, at least on Funk's part, Abila was "kept in a padded cell as

only some, undocumented, amount of recreation.  See MSJ ¶¶ 48-49, at 9.[40]  For a period of time

during Abila's housing in the padded cell, he was not actively suicidal.  See Response to

Defendants' MSJ ¶ 10, at 3 (setting forth this fact); Reply in Support of Defendants' MSJ ¶ 10, at

4 (not disputing this fact).[41]

## PROCEDURAL BACKGROUND

Abila brings this suit against Funk and Bannister for their alleged failure to provide him

medical care during his detention at Eddy County Detention.  See Third Amended Complaint for

the Recovery of Damages Caused by the Deprivation of Civil Rights and Tortious Conduct, filed

March 17, 2016 (Doc. 102)("Third Amended Complaint").  The Complaint first alleges, as

---

punishment until he could comply with any and all lawful orders and directions and when [he
could] treat staff with the same respect [he was] given."  MSJ at 12 (setting forth this
fact)(relying on Inmate Request Form, filed October 12, 2016 (Doc. 182-2)(dated May 24,
2012)).  The Response disputes this fact by arguing that Funk's directive to Abila was not
"punishment" and that his housing in the padded cell was related to a "protective watch."
Response at 11 (relying on Inmate Request Form, filed October 12, 2016 (Doc. 182-2)(dated
May 24, 2012)).

[40]MSJ at 12 (setting forth as an undisputed core fact that "For 159 days . . . Plaintiff
received absolutely no recreation); Response ¶¶ 48-49, at 9 (not disputing that Abila received no
exercise for 159 days, but providing that "numerous witnesses testified . . . Plaintiff received
some type of recreation outside of his cell"); Reply ¶¶ 47-49, at 7 (not disputing that over
"snippets of an eight-month period" Abila may have seen some, albeit undocumented,
recreation).  In the Reply, Abila provides that he "uses the watch logs designed to make note of
such activity as proof the activity did not occur," and that, with respect to the proffered instances
of recreation, "Plaintiff will demonstrate how the facts quoted by Defendants are misleading, but
even if they were true they do not amount to recreation."  Reply ¶¶ 47-49, at 7.  Accordingly,
the Court concludes that the asserted fact in the text accurately states an undisputed fact.  See
D.N.M. LR-Civ. 56-1(b).

[41]Abila also contends that he endured severe pain and suffering, see Response to
Defendants' MSJ ¶ 9, at 3, which Funk and Bannister do not dispute, except to say that Abila has
not cited authority that conduct is unjustified by reference to a detainee's personal experience,
see Reply in Support of Defendants' MSJ ¶ 9, at 4.  The Court, however, concludes this
objection inadequate, as the pain and suffering is inherent in the undisputed fact that Abila
suffers from post-traumatic stress disorder.  See D.N.M. LR-Civ. 56-1(b).

Counts I and II, a violation of substantive due process, under the Constitution of the United States of America and the Constitution of the State of New Mexico, because of the inhumane conditions of Abila's confinement and because of inadequate medical care.  See Third Amended Complaint ¶¶ 114-138, at 11-14.  Count III then alleges a violation of procedural due process by Funk, and Count IV alleges that Funk, in his official capacity, maintained a custom and policy of violating constitutional rights.  See Third Amended Complaint ¶¶ 139-160, at 14-16.  Abila now moves for summary judgment, by his MSJ, requesting that the Court grant judgment in his favor with respect to Counts I and II, for inhumane conditions of confinement during the time period from January 3, 2012, until June 21, 2012.  See MSJ at 1.  In the alternative, Funk and Bannister move for summary judgment on Counts I and II, arguing that Abila's substantive due process claims must be dismissed in accordance with Funk and Bannister's qualified immunity.

**1.   The Plaintiff's Motion for Summary Judgment.**

Abila's MSJ argues that Funk and Bannister ordered Abila "housed in [] abusive conditions indefinitely.  They were inhumane, punishing, and in violation of Mr. Abila's Fourteenth Amendment, substantive due process rights."  MSJ at 2.  Accordingly, Abila moves for summary judgment against Funk and Bannister on Counts I and II -- for inhumane conditions of confinement -- because (i) "ECDC's denial of recreation to [Abila] was a clear violation of the constitution;" (ii) Abila's "confinement in an incredibly small padded cell, without a bed, toilet, sink, or adequate heating for eight months is a clear violation of his rights;" and (iii) although "[b]oth the denial of exercise and exposure to the deplorable conditions of the padded cells [Abila] was subjected to at ECDC are so sub-human that each, on its own, are [sic] violative of [Abila]'s constitutional rights . . . the combination of these two conditions is undoubtedly unconstitutional."  MSJ at 14, 16, 20.  Abila thus argues that he has met the burden under rule 56

of the Federal Rules of Civil Procedure and is entitled to summary judgment.

Abila first argues that Eddy County Detention's "denial of recreation and exercise is unconstitutional as a matter of law."  MSJ at 14.  Essentially, Abila argues that

> there can be no doubt that total denial of exercise for an extended period of time would constitute cruel and unusual punishment prohibited by the Eighth Amendment. . . .  In fact, even when inmates are denied recreation of more than five hours per week, over a very short period of time, this denial raises serious constitutional questions.

MSJ at 14 (internal quotation marks omitted).  Abila maintains that the standard in this context requires the Court to determine whether adequate exercise was enjoyed.  See MSJ at 14.  Abila explains that, in Campbell v. McGruder, 580 F.2d 521 (D.C. Cir. 1978),

> [t]he Court reasoned that a "pretrial detainee is presumed innocent . . . [and] a state cannot escape its caretaking responsibilities . . . [or] use security classifications as a license to harm pretrial detainees. . . ."  It therefore held the jail was required to provide an "opportunity for some form of recreation . . . to protect the mental and physical health of all pretrial detainees."

Campbell v. McGruder, 580 F.2d at 546.

Abila maintains that the watch logs provide evidence that he received constitutionally inadequate recreation.  See MSJ at 16.  In addition, the MSJ argues that "Sgt. Carrie Patterson testified that she had taken him out for recreation once and 'had gotten in trouble for it.'"  MSJ at 16.  Accordingly, the MSJ argues that Abila's "inadequate exercise over the course of six consecutive months is a clear violation of his substantive due process rights."  MSJ at 16.

The MSJ then turns to Abila's argument that the "conditions [he] was subjected to in the padded cell are unconstitutional as a matter of law."  MSJ at 16.  Abila essentially argues that "[t]he Tenth Circuit [has] found conditions similar to those imposed on Plaintiff to have amounted to punishment and violated the Fourteenth Amendment."  MSJ at 17 (citing Littlefield v. Deland, 641 F.2d 729 (10th Cir. 1981)).  The MSJ also cites a case from the United States

Court of Appeals for the Second Circuit which provides that "causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted."  MSJ at 17 (citing LeReau v. MacDougall, 473 F.2d 974, 977-78 (2d Cir. 1972)). With respect to the fact that Abila was being housed in the padded cell because of suicidal concerns, the MSJ contends: "If conditions of confinement are bad enough, they can be described as punishment regardless of the motivations of jail staff."  MSJ at 18.  Moreover, pointing to Littlefield v. Deland once more, the MSJ asserts that "holding an inmate under conditions of detention this extreme for such an excessive period as fifty-six days is punishment and . . . cannot be imposed in accordance with the due process clause of the fourteenth amendment."  MSJ at 18.

The MSJ then reiterates the poor living conditions to which Abila was subjected, amounting to eight months of being housed in "an unfurnished cell," and being "forced to sleep on the cold floor, fully naked, or wearing only a suicide smock."  MSJ at 18.  In addition, according to Abila, the "cell measured only 41 square feet," the "air conditioner was constantly blowing," and Abila was "forced to live, eat, and sleep in close confines with a grated hole in the floor in which he was supposed to defecate and urinate."  MSJ at 18-19.  The MSJ also references the nineteen days for which Abila "was held in constant restraints."  MSJ at 20. Accordingly, the MSJ concludes that "the conditions Plaintiff was subjected to were so extreme they cannot be described as anything other than punishing. . . .  Funk and Bannister have violated Plaintiff's Fourteenth Amendment rights."  MSJ at 20.

The third argument which the MSJ makes is that "the cumulative effects of the lack of recreation and conditions Plaintiff was subjected to in padded cell 169 are unconstitutional as a matter of law."  MSJ at 20.  In support, the MSJ provides that "the denial of exercise and

exposure to the deplorable conditions of the padded cells Plaintiff was subjected to at ECDC are so sub-human that each, on its own, are [sic] violative of Plaintiff's constitutional rights."  MSJ at 20.  Abila refers to the Supreme Court of the United States of America's guidance that "the Eighth Amendment of the Constitution is intended to protect and safeguard a prison inmate from the environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict endless suffering, whether physical or mental."  MSJ at 20-21 (citing Estelle v. Gamble, 429 U.S. 97 (1976)).

Last, the MSJ contends that the conduct of Funk and Bannister amounted to deliberate indifference, which means that one has acted where he (i) "knew the inmate faced a substantial risk of harm" and (ii) "failed to take reasonable actions to abate that harm."  MSJ at 22 (citing Farmer v. Brennan, 511 U.S. 825 (1994)).  The MSJ asserts that "deliberate indifference is a hard thing to prove, but the facts associated with this case are extreme and the indifference is stark."  MSJ at 24.

## 2.  The Response to Abila's Motion for Summary Judgment.

The Response begins by reminding Abila that Funk and Bannister have also "asserted the defense of qualified immunity," and, thus, the "Plaintiff must first show that a specific constitutional right was violated. . . .  and that there was clearly established law that would have put Defendants on notice that they were violating his rights when they placed him under suicide precautions following his multiple attempts to end his life."  MSJ at 12.  The Response contends that "it is established that due process requires that a pretrial detainee not be punished prior to a lawful conviction"; that to decide "whether a particular restriction imposed on a pretrial detainee comports with due process, a court must determine whether the restriction is punitive or reasonably related to a legitimate and nonpunitive governmental purpose;" and that "[t]he Due

Process Clause protects against deliberately wrongful government decisions rather than merely negligent government conduct."  Response at 12-13.

The Response then argues that the "Plaintiff's access to recreation and exercise was not constitutionally inadequate," because "numerous witnesses testified that Plaintiff received recreation while housed in the padded cell, including playing card games with detention staff, writing letters, reading books, and watching television while outside of his cell."  Response at 15.  In addition, the Response provides that "the Court must not only consider whether Plaintiff's recreation and exercise were limited, but also the justification for limiting them."  Response at 15.  The Response argues that, because Abila was suicidal and "violent with staff on a number of occasions," the MSJ has not "shown that his rights were clearly established."  Response at 16.

The Response next contends that, "here, Defendants were responding to serious and repeated attempts by Plaintiff to end his life," and that "to ignore the inmate's suicidality would have made the jail derelict in its duties."  Response at 17-19.  Accordingly, the Response argues that the "Plaintiff cannot show that the measures were punitive in nature as opposed to a necessary response to Plaintiff's suicidal actions."  Response at 19.  Thus, according to Defendants, "neither the conditions of the cell nor the amount of recreation provided to Plaintiff was constitutionally deficient."  Response at 19.  In addition, according to Defendants, "their combination is not unconstitutional," so the Response argues that the "Plaintiff has failed to demonstrate a constitutional violation . . . that Plaintiff's rights to different conditions of confinement were clearly established" and that "the restrictions were motivated by punitive, rather than protective considerations."  Response at 23.  The Response concludes that "Defendants are entitled to qualified immunity."  Response at 23.

3.   **The Reply to the Response to the Motion for Summary Judgment.**

In his Reply, Abila provides that his MSJ

[r]elies on the depositional testimony of ECDC guards, former guards, or the defendants themselves to establish Plaintiff was subjected to extreme conditions of confinement and restraint for a prolonged period of time.  Plaintiff's Motion demonstrates he was denied recreation and exercise for over six months in violation of the Fourteenth Amendment.  It also asserts the conditions inside the padded cell were so extreme they amounted to the illegal punishment of a pretrial detainee.   In one notable period, Plaintiff was in some form of mechanical restraint continuously for 19 days.   Finally, the Motion argues that the combination of the conditions and lack of exercise rose to the level of a due process violation.

Reply at 1.   The Reply then generally repeats the undisputed facts, and explains that, "in attempting to dispute Plaintiff's facts, Defendants introduced the concept that Plaintiff was held for mental health reasons *and* security reasons."   Reply at 10 (citing Response ¶ 34, at 6).   The Reply indicates that there is nothing in the record which may "provide a description of what those security concerns were and why they did not result in the normal disciplinary process found in jails."   Reply at 10.   Accordingly, the Reply argues that the Defendants

do not adequately dispute the conditions Plaintiff was subjected to, which Plaintiff argues are so bad Defendants could cite no legitimate interest for him being housed in them.  Further, Defendants dispute Plaintiff did not receive recreation because he was infrequently allowed out of his cell to be cuffed to a bench.

Reply at 14.   The Reply then reiterates the import of Littlefield v. Deland, where a pretrial detainee spent "long periods of defecating into a hole in the floor, [had] no exercise, no substantive human interaction, cold meals, and no clothing," the United States Court of Appeals for the Tenth Circuit concluded that the conditions the pretrial detainee endured "were punishing, regardless of the motivation behind them."   Response at 9-10.   Accordingly, the Reply argues, "it has been clearly established that an inmate is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being."

Reply at 11.

The Reply then presents a new argument that Abila does not need to show that Funk and Bannister acted with deliberate indifference in order to succeed on his substantive due-process claim. Reply at 12. In support of such a lesser standard, Abila underscores the impact of the Supreme Court's holding in <u>Kingsley v. Hendrickson</u>, 125 S. Ct. 2466 (2015), which described the state of mind required to demonstrate an officer's use of excessive force on a pretrial detainee as being "an objective standard." Reply at 12. Accordingly, <u>Kingsley v. Hendrickson</u>, provides that a pretrial detainee can prevail by showing that a jailor's actions were not rationally related to a legitimate nonpunitive governmental purpose, or that the actions appear excessive in relation to that purpose. <u>See</u> Reply at 12. The Reply then argues that the Supreme Court had, on other occasions, maintained such an objective standard with respect to its review of prison conditions, in addition to excessive force claims. <u>See</u> Reply at 12. The Tenth Circuit, in <u>Littlefield v. Deland</u>, also applied an objective standard in finding that the "inmate's conditions were so atrocious that they could not be rationally related to a legitimate interest, and were objectively punishing." Reply at 13. The Reply thus argues that "the deliberate indifference standard associated with post convicted prisoners found in the Eighth Amendment context is, therefore not appropriately used here." Reply at 14. The Reply concludes that the "Defendants did not dispute the crux of Plaintiff's motion -- he was denied the ability to exercise for 159 days. The deplorable conditions of the padded cell and complete denial of recreation are, as a matter of law, unconstitutional and in violation of Plaintiff's substantive due process rights." Reply at 14.

**4. Defendants' MSJ.**

Funk and Bannister initially provide that Abila's Complaint "alleges that his placement and housing in segregation represented a violation [of] his substantive and procedural due

process rights."  Defendants' MSJ at 2.  Essentially, Funk and Bannister argue, "[t]he thrust of Abila's complaint is that ECDC staff should have known that being placed in a padded safety cell, or what Abila calls 'solitary confinement,' was damaging to his mental health and that the conditions in the suicide cell amount to a constitutional violation."  Defendants' MSJ at 2.  In response to these allegations, Funk and Bannister move for summary judgment with respect to Abila's substantive due-process claims, arguing that "[t]he defense of qualified immunity applies. . . . It was not clearly established that placing a suicidal inmate in a cell for his own protection, on the advice of a mental health professional, was a violation of Abila's substantive due process rights."  Defendants' MSJ at 2.  Funk and Bannister characterize Abila's claim as being that he was "over-supervised."  Defendants' MSJ at 12.

Funk and Bannister begin their argument by explaining that "Abila's housing was derived from his suicidal behavior and was a result of the jail's duty to protect the inmates in its charge. During his months in the safety cell, Abila was constantly supervised and regularly saw the jail's mental health providers."  Defendants' MSJ at 8.  Accordingly, the Defendants' MSJ argues that "[a] due process claim turns on deliberate indifference, and as a matter of law, Defendants were not deliberately indifferent to Abila's needs given the attention they paid him and the mental healthcare he received.  Further . . . Defendants are entitled to qualified immunity on that claim." Defendants' MSJ at 8.  Abila must thus demonstrate, the Defendants' MSJ argues, "that a specific constitutional right was violated" and that the "Government official's conduct violate[d] clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Defendants' MSJ at 9 (citing <u>Chavez v. Cnty. of Bernalillo</u>, 3 F. Supp. 936, 924-75 (D.N.M. 2014)(Browning, J.)).  The Defendants' MSJ argues that, because "Abila's

conditions of confinement were a reasonable response to his repeated and varied attempts to end his own life, and do not meet the punishing standard required to create a constitutional violation," Abila's claim must fail.  Defendants' MSJ at 10.

Further, the Defendants' MSJ provides that "the Due Process Clause protects against deliberately wrongful government decisions."   Defendants' MSJ at 11 (internal quotations omitted).  Thus, the standard is that "a prison official's 'deliberate indifference' to a substantial risk of harm implicates the Eighth Amendment."   Defendants' MSJ at 11.  Here, then, the Defendants' MSJ argues that "corrections facilities are required to take suicide threats and attempts seriously, and ECDC's compliance with the law cannot be equated with deliberate indifference."  Defendants' MSJ at 12.  This balancing act, the Defendants' MSJ explains, cuts in Funk and Bannister's favor as to whether they were deliberately indifferent to Abila's substantive due-process rights.  See Defendants' MSJ at 12-18.

Turning away from Funk and Bannister's response to Abila's suicide attempts, the Defendants' MSJ next addresses "whether the conditions of confinement are unconstitutional for a pretrial detainee, the inquiry [being] whether the conditions amounted to punishment." Defendants' MSJ at 18 (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).  Accordingly, the Defendants' MSJ addresses Littlefield v. Deland, arguing that the standard against which the Tenth Circuit analyzes a pretrial detainee's conditions of confinement involves:

> [D]etermining whether the disabilities imposed on plaintiff during his detention constituted punitive measures implicating due process or, conversely, were permissible regulatory restraints, the trier of fact must first consider whether detention facility officials expressed an intent to punish the pretrial detainee.  If they did not, the determination generally will turn on whether an alternative purpose to which (the restriction) may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned (to it).

Defendants' MSJ at 19.  Again, the Defendants' MSJ provides Abila's suicide attempts as the justification for his housing in the padded cell, which Funk and Bannister argue makes the conditions lawful.  See Defendants' MSJ at 19.  Further, the Defendants' MSJ distinguishes the facts of Littlefield v. Deland, where, for fifty-six days, prison officials placed

> a non-violent, severely mentally ill inmate who had demonstrated nothing more than 'bizarre behavior' in a strip cell for punishment . . . [which] had no windows, no lights, and no floor covering.  He was not allowed any clothing at all, and no bedding, forcing him to lie entirely naked on a bare concrete floor, was never allowed out of his cell, and engaged in throwing urine and feces back and forth with other inmates without any opportunity for personal hygiene.

Defendants' MSJ at 20 (alteration added).  Essentially, then, the Defendants' MSJ argues that "the undisputed facts of the case show that Abila was indeed subject to serious restrictions. However, the conditions of confinement do not rise to the level that has been generally accepted as unconstitutional by the Tenth Circuit."  Defendants' MSJ at 19.  Thus, Funk and Bannister argue, "Abila cannot show that he suffered a clearly established violation of his rights when ECDC staff placed him in a safety cell for six months at the express direction of mental health staff, even assuming he was required to use a floor toilet and have limited recreation for his safety."  Defendants' MSJ at 24.

The Defendants' MSJ also argues that "Abila did not receive inadequate access to medical care and defendants were entitled to rely on the judgment o[f] mental health professionals."  Defendants' MSJ at 25.  With respect to this argument, Funk and Bannister assert that they are entitled to qualified immunity, because they took Abila's suicide attempts seriously and "relied on mental health's staff's determination that he should remain in that cell." Defendants' MSJ at 27.  The Defendants' MSJ then concludes by requesting judgment as a matter of law with respect to Abila's substantive due-process claims.  See Defendants' MSJ at

28.

     **5.   Response to Defendants' MSJ.**

     The Response to Defendants' MSJ restates the arguments Abila made in his own MSJ: "The conditions endured were so bad Plaintiff has filed his own Motion for Summary Judgment. . . .  Plaintiff has alleged looking at the facts most favorably to the Defendants, their conduct was so indifferent, and the conditions so bad that no valid penological purpose can be assigned to them."  Response to Defendants' MSJ at 2.  Accordingly, Abila argues that the Defendants' MSJ

> claims the conditions imposed were a valid way of trying to save Plaintiff's life. The central core of their motion, that the living conditions were acceptable for this purpose, ignores testimony from several expert witnesses that describe them as inhumane and in violation of both national standards and ECDC's own policies.

Response to Defendants' MSJ at 2.

     The Response to Defendants' MSJ then proceeds to argue that, essentially, Funk and Bannister's conduct violated Abila's clearly established rights to humane confinement as a pretrial detainee pursuant to the Due Process Clause.  See Response to Defendants' MSJ 14-15. A constitutional violation occurred, the Response to Defendants' MSJ argues, because "the Tenth Circuit has held a prisoner is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being," and "the use of a cell devoid of furnishings with a grate in the floor as the only toilet, for 56 days was said to violate the due process clause in the context of a pre trial detainee."  Response to Defendants' MSJ at 15.  Funk and Bannister argue: "Any objectively reasonable officer or jail guard would know of their duties under the Fourteenth Amendment to make sure the people they detain are provided humane conditions and medical care if they are obviously suffering from a serious medical condition regardless of whether they knew exactly what that condition was."  Response

to Defendants' MSJ at 15.

The Response to Defendants' MSJ then turns to the objective standard for making an inhumane conditions claim that Abila outlined in his Reply to his own MSJ.  See Response to Defendants' MSJ at 15.  The objective standard's application, in this context, as Kingsley v. Hendrickson explained, means that, where "the conditions are objectively bad enough, as Plaintiff has claimed they are, the court would not need to examine whether officials were deliberately indifferent to those conditions.  It would be enough to hold the conditions were objectively punishing."  Response to Defendants' MSJ at 16.  Abila concedes, however, that the objective standard applies only "to the parts of [his] claims that do not reference medical care, such as the allegations he was housed in a tiny cell without access to recreation and with an open drain as a toilet."  Response to Defendants' MSJ at 16.  Because Abila relies, in part, on "the failure to provide medical care" as "one of the mutually enforcing conditions plaintiff was subjected to," the Response to Defendants' MSJ thus turns to the deliberate indifference standard that he must meet to show a failure to provide medical care.  Response to Defendants' MSJ at 16-17.

To make a showing of deliberate indifference with respect to the failure to provide medical care, the Response to Defendants' MSJ provides that the

> Defendants will have violated this standard if their conduct disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights . . . or the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.

Response to Defendants' MSJ at 17.  Abila thus argues that he has met the standard, where there is clearly established law indicating that the conduct at issue violated Abila's constitutional rights to humane confinement as a pre-trial detainee.  See Response to Defendants' MSJ at 18.

- 37 -

In sum, the Response to Defendants' MSJ concludes by arguing that "it is clear most of the horrifying conditions of confinement Plaintiff was subjected to are undisputed.  The tiny cell, the open drain, the cold temperature, the cold food, the lack of clothing, (with the exception of a suicide smock), and the enormous amount of time spent in these conditions."  Response to Defendants' MSJ at 23.  Accordingly, the Response to Defendants' MSJ requests that the Court deny Defendants' MSJ.

   6.   **The Reply In Support of the Defendants' MSJ**.

The Reply in Support of the Defendants' MSJ begins with its argument regarding the undisputed facts.  See Reply in Support of Defendants' MSJ at 1-8.  The Reply in Support of Defendants' MSJ then returns to Funk and Bannister's claim of qualified immunity.  See Reply in Support of Defendants' MSJ at 9.  Funk and Bannister reiterate their argument that Littlefield v. Deland is inapplicable to these facts, and that Abila thus "bears the burden of showing a Supreme Court or Tenth Circuit case on point to show the law is clearly established."  Reply in Support of Defendants' MSJ at 9.  Funk and Bannister then "reiterate that any time a condition is reviewed, the Court must look to the justification for the condition," and that here, Abila has not overcome the fact that the "Defendants took" many lengths "to ensure that Plaintiff could not hurt himself, including medication, frequent review by mental health professionals, and housing conditions designed to eliminate access to potentially dangerous items in response to increasingly creative attempts to hurt himself."  Reply in Support of Defendants' MSJ at 10.

Funk and Bannister then contend that, even if the Court applies the objective reasonableness test that Kingsley v. Hendrickson used, Abila has failed to overcome their claim to qualified immunity.  See Reply in Support of Defendants' MSJ at 10.  Accordingly, Funk and Bannister first argue that the Court should apply the deliberate indifference standard, because the

Tenth Circuit has not as of yet applied an objective reasonableness standard like that of <u>Kingsley</u> <u>v. Hendrickson</u>.  <u>See</u> Reply in Support of Defendants' MSJ at 10.  In addition, Funk and Bannister argue that <u>Kingsley v. Hendrickson</u> was limited to its facts -- that being an excessive force scenario.  <u>See</u> Reply in Support of Defendants' MSJ at 10.  The Reply in Support of Defendants' MSJ also contends that the case law Abila cites in favor of an objective inquiry also entails a subjective analysis.  <u>See</u> Reply in Support of Defendants' MSJ at 11.  Last, Funk and Bannister argue that Abila's reliance on the Defendants' violations of their own Eddy County Detention policies would require the Court to conclude that, even under the objective reasonableness standard, the allegations are "insufficient to create a constitutional violation." Reply in Support of Defendants' MSJ at 11.  Thus, Funk and Bannister conclude that Abila's substantive due-process claim must fail because: (i) the conditions were suicide prevention measures; (ii) Abila was not denied medical care; (iii) even when viewed objectively, in the abstract of the state officials' intent, Abila fails to demonstrate a violation of his rights; and (iv) Abila cannot show that it was clearly established under existing case law that taking "extreme precaution with a suicidal inmate was a violation of his substantive due-process rights, and Defendants are entitled to qualified immunity."  Reply in Support of Defendants' MSJ at 11.

**7.  <u>The October 25, 2016, Hearing</u>.**

The Court held a hearing on October 25, 2016.  <u>See</u> Transcript of Hearing, taken October 25, 2016 ("Tr.").[42]  The Court began the hearing with argument related to the MSJ.  <u>See</u> Tr. at 3:22-23 (Court).  Abila began by recapping the "simple uncontroversial facts" underlying his MSJ, as well as explaining that the MSJ relates to a very specific time period and does not seek

---

[42]The Court's citations to the transcript of the hearing refer to the court reporters original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

to cover Abila's full stay at Eddy County Detention.  Tr. at 4:4-5:18 (Coyte).  Regarding the

possible time periods, Abila explained that there were a few specific time periods which the

Court needed to consider: (i) when Abila was initially arrested and booked into Eddy County

Detention, during which he was actively suicidal, spanning from July, 2011, until December,

2011; and (ii) when Abila returned from the hospital in January, 2012, and was housed in the

padded cell.  See Tr. at 4:15-5:10 (Coyte).  Abila argued that "the conditions on his return from

the hospital were extreme in a manner that would be considered torturous or excessive," and that

"those extreme conditions are undisputed."  Tr. at 5:12-16 (Coyte).  The MSJ, Abila argues,

relates only to that time period  where Abila was not actively suicidal, from January, 2012, until

June, 2012.  See Tr. at 10:15-23 (Coyte).

> Abila then conceded that, for the purposes of his MSJ:
>
> I'm going to accept that he's suicidal for a period of time.  I'm going to accept
> that he has security issues they claim.  But they don't actually give those out in
> any specificity. . . .  What I'm telling you is -- that's not disputed -- is he is in a
> cell with the lights on 24 hours a day; a hole in the floor to defecate into; no
> clothes; it was cold; the air blew on him constantly.  He didn't get outside of his
> cell except on occasions that are noted in a log, and those occasions indicate that
> he didn't get out for exercise at all.  And this is where one disputed fact . . . comes
> . . . the dispute they say is that he got some form of recreation.  And they claim he
> played cards and watched TV.  We dispute that, because we, the testimony they
> use to say that is that in the middle of the night a guard would take pity on him
> and handcuff him to a bench in the booking area.  Or in the middle of the night, a
> guard would, on a weekend shift, give him a candy bar.  But he didn't get cards in
> that period of time.  . . .  The cards came in the other cell . . . the normal cell that
> you talk about in October.

Tr. at 14:13-15:13 (Coyte).  In sum, then, Abila's argument is that, in the MSJ, "we talk about

[how] the exercise . . . alone may get you" a constitutional violation, "the toilet on its own and

the conditions in the cell," like "the size of it, the toilet that is an open drain, the lack of bedding

and all the rest, that might get you there," and also, taking the lack of exercise and the conditions

of the cell together, that "might get you there."  Tr. 8:1-6 (Coyte).  Then, turning to the MSJ's substance, Abila explained that "it is substantive due process."  Tr. at 26:8 (Coyte).  Accordingly, Abila recapped the arguments that he makes in the MSJ with respect to a pretrial detainee's substantive due-process rights.  See Tr. at 26:1-31:16 (Coyte).

Funk and Bannister then took up argument on the MSJ, and conceded that they did not "see any factual dispute here that keeps the Court from getting to the legal issue."  Tr. at 32:5-9 (Court, Drennan).  Funk and Bannister next argued that "the jail very carefully selected these restrictions based on Mr. Abila's appar[ent] suicidality."  Tr. at 33: 18-20 (Drennan).  To that point, though, the Court posited that "you probably got conditions that wouldn't survive the constitutional analysis for a violent prisoner, but they're being imposed upon somebody because of their mental condition."  Tr. at 33: 21-25 (Court).  Bannister and Funk responded that, in this area of the law, the Court's analysis in a given case "has to be . . . based on its specific facts."  Tr. at 34:1-5 (Drennan).  Regarding the standard that must be met to demonstrate a substantive due process claim, Funk and Bannister argued that it is "kind of a deliberate indifferent standard, and that, in the absence of an expressed intent to punish, a pretrial detainee must show that actions are not rationally related to a legitimate nonpunitive governmental purpose to succeed on that kind of substantive due process claim."  Tr. at 36:6-19 (Drennan).

Abila then said that he was going to use both of those prongs, "but I must recognize that deliberate indifference is hard to prove at summary judgment."  Tr. at 37:2-25 (Coyte).  Abila then briefly provided that "you don't get qualified immunity to torturing someone because it's so shocking."  Tr. at 39:4-6 (Coyte).  The Court indicated that "I'm troubled by the conditions here," Tr. at 39:11-12 (Court), and that it was inclined to grant Abila's motion as it related to the period of time beginning in January, 2012, see Tr. at 50:3-8 (Court).

Then turning to Defendants' MSJ, the Court clarified that the difference between the MSJ and Defendants' MSJ was that the Defendants' MSJ covers the entire period of time, whereas the MSJ was confined to one period.  See Tr. at 42:9-14 (Court).  Funk and Bannister did not spend much time rehashing the argument that had already been made, except to address the issue of Abila's medical care.  See Tr. at 44:11-12 (Drennan).  Regarding that issue, Funk and Bannister maintained that that the mental health care was satisfactory, and that Abila was seen by professionals who indicated that he presented an ongoing suicide risk.  See Tr. at 45:1-16 (Drennan).  Abila then took up argument, and stated that, regarding the issue of medical care, "the facts are clearly disputed," "in the first period before January," and that thus Defendants' MSJ should be denied to the extent it relies on the provision of mental health care.  Tr. at 46:8-19 (Coyte).  The Court then indicated that it would take Defendants' MSJ under advisement.  See Tr. at 42:9-14 (Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof

- 42 -

> concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[43] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted). Rule 56(c)(1) provides: "A party

---

[43]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[44]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

---

[44]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights."  (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[45] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. at 689).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

---

[45]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States of America "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

1.      <u>**Color of State Law**</u>.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." <u>Jojola v. Chavez</u>, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" <u>West v. Atkins</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." <u>Jojola v. Chavez</u>, 55 F.3d at 493.  Accordingly, at a base level, to conclude that an action was taken under color of state law, the court must determine that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1447 (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" <u>Jojola v. Chavez</u>, 55 F.3d at 493 (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. at 935-36 n.18; <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a

public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55

F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the

Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the

circumstances:

> The under color of law determination rarely depends on a single, easily
> identifiable fact, such as the officer's attire, the location of the act, or whether or
> not the officer acts in accordance with his or her duty. Instead one must examine
> "the nature and circumstances of the officer's conduct and the relationship of that
> conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)

(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.   Individual Liability.

Government actors may be liable for the constitutional violations that another committed,

if the actors "set in motion a series of events that the defendant knew or reasonably should have

known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's

constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth

Circuit has explained that § 1983 liability should be "'read against the background of tort

liability that makes a man responsible for the natural consequences of his actions.'" Martinez v.

Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part

by Monell v. Dep't of Soc. Servs., 436 U.S. at 663). "Thus, Defendants are liable for the harm

proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v.

Franco, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes

liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to

recover compensatory damages for all injuries suffered as a consequence of those deprivations.

The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009) (Browning, J.).[46]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  72 F.3d at 400.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the

---

[46]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.  The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement.  See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1281.

Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (quoting WILLIAM LLOYD PROSSER ET AL., PROSSER AND KEETON ON TORTS § 44, at 303-04 (5th ed.1984)). If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt.b (1965)).

### 3.   **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v.

Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have

abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8. Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4. **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.    Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule

of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven

circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address

the first prong before the second prong in cases involving a recurring fact pattern, where

guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely

only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at

2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[47]  "Courts should think carefully before

_____

[47]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was
not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified
immunity test before agreeing" with the plaintiff that the qualified immunity defense did not
protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law)
> question, we reverse without addressing the former (constitutional violation)
> question.  And we pursue this course because doing so allows us to avoid
> rendering a decision on important and contentious questions of constitutional law
> with the attendant needless (entirely avoidable) risk of reaching an improvident
> decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the
plaintiff's constitutional rights and stated that guidance on the particular constitutional issue
would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that
the scope of the Constitution's protection for a patient's hospital records can be adequately
decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions
to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at
1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions,
> the Court is troubled by this statement and the recent trend of the Supreme
> Court's hesitancy in § 1983 actions to address constitutional violations.  A
> Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil
> remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-
> 39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . .
> > and was enacted for the express purpose of "enforc(ing) the
> > Provisions of the Fourteenth Amendment." . . .  The predecessor of
> > § 1983 was thus an important part of the basic alteration in our
> > federal system wrought in the Reconstruction era through federal
> > legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to <u>the deprivation of any rights, privileges, or immunities secured by the Constitution and laws</u>, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more --

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[48]  The Tenth Circuit will remand a case

---

not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[48]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even

troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. [Three recent qualified immunity cases] the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565.  The Court does not think those

to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

> ## 2.      Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905,

---

presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

       On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken

beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."   663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489

U.S. 189, 197).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.

**1.      Exceptions to the General Rule.**

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

**2.      Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine.  A plaintiff must show that they were involuntarily committed to state custody to

- 67 -

establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

**3.      Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."  Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of

that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cnty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4.      What Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks omitted)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the
> Supreme Court in evaluating substantive due process claims: (1) the need for
> restraint in defining their scope; (2) the concern that § 1983 not replace state tort
> law; and (3) the need for deference to local policymaking bodies in making
> decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court found that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known

dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. Apr. 30, 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[49] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

---

[49]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

## LAW REGARDING PRETRIAL DETENTION CONDITIONS OF CONFINEMENT

The Supreme Court of the United States laid a foundation for the law on conditions of confinement for pretrial detainees in Bell v. Wolfish.  In that case, a group of pretrial detainees challenged their conditions of confinement within the Metropolitan Correctional Center in New York City, a federal short-term custodial facility.  See 441 U.S. at 523.  The Supreme Court rejected the United States Court of Appeals for the Second Circuit's standard, which required that pretrial detainees "be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.'" 441 U.S. at 531.  It selected a wholly different test, explaining that, "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."  441 U.S. at 535 (emphasis added).

The Supreme Court spent much of its opinion distinguishing permissible "disabilit[ies] imposed during pretrial detention" from the "punishment" that the Constitution prohibits.  441 U.S. at 535.  It explained:

> Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial.  Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain.  Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility.   And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

441 U.S. at 537.

The Supreme Court stated that a disability could constitute punishment if: (i) detention facility officials had an expressed intent to punish; or (ii) the disability bears no reasonable relationship to any legitimate government objective.  See 441 U.S. at 538; Hudson v. McMillian, 503 U.S. 1, 7 (1992); Blackmon v. Sutton, 734 F.3d 1237, 1241 (10th Cir. 2013).  It continues:

> Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Bell v. Wolfish, 441 U.S. at 539.  See id. at 540 ("Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.").

The Supreme Court rejected the plaintiffs' arguments that the Constitution prevents their jailers from: (i) placing two inmates in each cell; (ii) prohibiting the receipt of hardcover books, unless mailed directly from publishers, book clubs, or book stores; (iii) forbidding the receipt of packages of personal property and food; (iv) requiring inmates to leave their cells during cell searches; and (v) performing visual body cavity searches after contact visits with outside visitors. See 441 U.S. at 540-560.  It concluded that these practices were "reasonable responses by MCC officials to legitimate security concerns."  441 U.S. at 561.

In reaching these conclusions, the Supreme Court emphasized the importance of prison officials' judgment: "Prison administrators . . . should be accorded wide-ranging deference in the

adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  441 U.S. at 547.

The Supreme Court also recognized that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."  441 U.S. at 545.

In Blackmon v. Sutton, the United States Court of Appeals for the Tenth Circuit confronted a pretrial detainees claim that juvenile detention center officials violated his clearly established constitutional rights by placing him in a restraint chair for punishment.  See 734 F.3d at 1239.  The Tenth Circuit, evaluating the defendants' qualified immunity argument, noted:

> The jurisprudential terrain between arrest and conviction remains today only partially charted.  Over the last several decades, the Supreme Court has elaborated in considerable detail the standards of care prison administrators must satisfy to avoid inflicting "cruel and unusual" punishment on convicted prisoners in violation of the Eighth Amendment.  *E.g., Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994).  The Court has, as well, expounded on what force officers may and may not use to effect an arrest consistent with the Fourth Amendment and its prohibition of "unreasonable searches and seizures."  *E.g., Graham v. Connor*, 490 U.S. 386 (1989).  But at least so far the Court has done comparatively little to clarify the standards of care due to those who find themselves between these stools -- held by the government after arrest but before conviction at trial.  *See* Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. Pa. L. Rev. 1009 (2013).

Blackmon v. Sutton, 734 F.3d at 1240.  The Tenth Circuit has not yet decided, for example, "whether a single standard of care applies to all pretrial detainees -- or whether different standards apply depending where the detainee stands in his progress through the criminal justice system."  734 F.3d at 1240.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.   The Due Process Clause

encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Paulter, No. CIV 13-0337 JB/KBM, 2013 WL 3845042, at *50 (D.N.M. July 31, 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights are violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment."  Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d

1072, 1079 (10th Cir. 2007).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

    "[O]nce it is determined that the Due Process Clause applies, the question remains what process is due."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citation omitted).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .

> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted)(citations omitted)(internal quotation marks omitted).

> The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989) (holding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.").

## ANALYSIS

To succeed on his MSJ, Abila must show that there are no disputes of material fact and that he is therefore entitled to judgment as a matter of law.  The Court concludes that, in light of the undisputed facts, Abila is entitled to judgment as a matter of law.  Abila successfully states a claim that the conditions to which he was subjected at Eddy County Detention, during the period where he was not actively suicidal from January 3, 2012, until June 21, 2012, violated his clearly established substantive due-process right to humane conditions of confinement as a pretrial detainee.  Because qualified immunity shields government officials from liability only where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Funk and Bannister do not enjoy qualified immunity from Abila's claims.  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).

To succeed on the Defendants' MSJ, Funk and Bannister must show that there are no disputes of material fact and that he is therefore entitled to judgment as a matter of law.  The Court concludes that, to the extent that the Defendants' MSJ relates to the time period before January, 2012, there are material disputes of fact, particularly concerning Abila's suicide attempts, medical attention, mechanical restraint, and security risk, which all preclude the Court from entering summary judgment.  To the extent that the Defendants' MSJ argues that there was no violation of Abila's clearly established substantive due-process right to humane conditions of confinement as a pretrial detainee in the time period following January, 2012, the Court disagrees, and grants Abila's MSJ disposing of this issue with respect to the time period following January, 2012, and denies the Defendants' MSJ.

I.     **ABILA HAS ESTABLISHED THAT THE DEFENDANTS VIOLATED HIS SUBSTANTIVE DUE-PROCESS RIGHT TO HUMANE CONDITIONS OF CONFINEMENT.**

In 1994, the Supreme Court held that the Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement and adequate medical care.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  These conditions include adequate food, clothing, shelter, and medical care, but also a more general requirement to "take reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. at 832 (internal quotation marks and citation omitted).  "Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, . . . the Eighth Amendment standard provides the benchmark for such claims."  Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998)(citing Bell v. Wolfish, 441 U.S. at 535).   See Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992)(stating that pretrial detainees "are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment"); Garcia v. Salt Lake Cty., 768 F.2d 303, 307 (10th Cir. 1985).  In the context of pretrial detainees, then, "the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement."  Craig v. Eberly, 164 F.3d at 495.

Under both the Eight Amendment and the Due Process Clause, to establish a claim for "conditions of confinement, a plaintiff must satisfy two requirements," showing first that the deprivation is sufficiently serious, and second that the prison officials' deliberate indifference caused the deprivation.  Craig v. Eberly, 164 F.3d at 495.[50]  The standard under the Eighth

---

[50]In Craig v. Eberly, the Tenth Circuit considered a claim of inhumane confinement by a pretrial detainee, with the Tenth Circuit denying to grant summary judgment because there were

Amendment to prove deliberate indifference for individual defendants is well established -- a prison official cannot be found liable under the Cruel and Unusual Punishment Clause for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837.  In the pretrial-detainee context, however, the standard to prove deliberate indifference differs.  Kingsley v. Hendrickson explains that the standard to prove deliberate indifference, in the context of pretrial detainees, allows for an objective showing that the actions under scrutiny are not "rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose."  135 S. Ct. at 2473 (internal quotations omitted)("[A]s Bell itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.").

In Kingsley v. Hendrickson, 135 S. Ct. at 2473, the Supreme Court ruled that a pretrial detainee's Fourteenth Amendment due-process claim regarding the use of excessive force turns on the objective reasonableness of the use of force, and proof as to the defendants' mental state is not required.  See 135 S. Ct. at 2473.  The Supreme Court did not specifically decide whether that objective standard might suffice in cases involving mistreatment of detainees, as the defendants in that case had not disputed that they acted purposefully and knowingly.  See 135 S.

_____

material disputes of fact as to the nature and seriousness of the alleged deprivations in that case. See 164 F.3d at 495.  The Court notes this distinction, between that case and the present one, because the Court in Craig v. Eberly did not thus have an opportunity to consider the import of Littlefield v. Deland on the deliberate indifference standard.

Ct. at 2473.  Nevertheless, the Supreme Court in Kingsley v. Hendrickson noted that an objective standard had been applied in Bell v. Wolfish, 441 U.S. at 541-43, relative to a variety of prison conditions, including double bunking.   See 135 S. Ct. at 2473.   Bell v. Wolfish did not specifically state that an objective standard applied; rather, the Supreme Court in Kingsley v. Hendrickson characterized Bell v. Wolfish's "rationally related" and "appears excessive in relation to a legitimate nonpunitive governmental purpose" standard as being objective. Kingsley v. Hendrickson, 135 S. Ct. at 2473.  In dissent, however, Chief Justice Roberts, joined by Justices Scalia and Thomas, provided that

> Bell [v. Wolfish] endorsed this 'reasonable relation' inference in the context of a challenge to conditions of a confinement -- specifically, challenges to the State's policy of housing two people in each cell . . . and various security policies . . . . The conditions in which pretrial detainees are held, and the security policies to which they are subject, are the result of considered deliberation by the authority imposing the detention.  If those conditions and policies lack any reasonable relationship to a legitimate, nonpunitive goal, it is logical to infer a punitive intent.   And the same logic supports finding a punitive intent in statutes authorizing detention that lacks any reasonable relationship to a valid government interest.

Kingsley v. Hendrickson, 135 S. Ct. at 2478 (Roberts, C.J., dissenting)(taking issue, primarily, with the majority's extension of the Bell v. Wolfish standard to excessive force claims).  No Court yet, in the wake of Kingsley v. Hendrickson, has explicitly applied this standard to a claim, such as Abila's, alleging inhumane conditions of confinement.  But see Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016)(applying the "broad" wording of the Kingsley v. Hendrickson standard, which the Supreme Court was applying in the context of an excessive-force claim, to a failure-to-protect claim, because "[t]he Court did not limit its holding to 'force' but spoke to 'the challenged governmental action' generally").  The Supreme Court premised its

holding in Kingsley v. Hendrickson, however, with respect to pretrial detainees, on the longstanding Supreme Court precedent of Bell v. Wolfish, 441 U.S. at 541-43.

In sum, the Court concludes that Kingsley v. Hendrickson held that there does not exist a single "deliberate indifference" standard applicable to all § 1983 claims, whether pretrial detainees or convicted prisoners bring the claim. See Castro v. Cnty. of Los Angeles, 833 F.3d at 1070. See also Kingsley v. Hendrickson, 135 S. Ct. at 2478 (Roberts, C.J., dissenting)(confirming the Bell v. Wolfish standard for pretrial detainees making inhumane conditions of confinement claims). The parties to this case confirm the Court's conclusion. See Tr. at 36:6-19 (Drennan)(regarding the standard that must be met to demonstrate a substantive due process claim, it is "kind of a deliberate indifferent standard, and that, in the absence of an expressed intent to punish, a pretrial detainee must show that actions are not rationally related to a legitimate nonpunitive governmental purpose to succeed on that kind of substantive due process claim").

Accordingly, "the Due Process Clause protects a pretrial detainee from . . . punishment." Kingsley v. Hendrickson, 135 S. Ct. at 2473 (citations omitted). "[S]uch 'punishment' can consist of actions taken with an 'expressed intent to punish.'" Kingsley v. Hendrickson, 135 S. Ct. at 2473 (quoting Bell v. Wolfish, 441 U.S. at 538). In the absence of an expressed intent to punish, however, "a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Kingsley v. Hendrickson, 135 S. Ct. at 2473 (quoting Bell v. Wolfish, 441 U.S. at 535, 561). The Supreme Court, in Bell v. Wolfish, applied this latter objective standard to evaluate a variety of prison conditions, including a prison's practice of double bunking. See 441 U.S. at 541-43. "In doing so, it did not consider the prison officials'

subjective beliefs about the policy." Kingsley v. Hendrickson, 135 S. Ct. at 2473. Rather, the Supreme Court examined "objective evidence, such as the size of the rooms and available amenities, before concluding that the conditions were reasonably related to the legitimate purpose of holding detainees for trial and did not appear excessive in relation to that purpose." Kingsley v. Hendrickson, 135 S. Ct. at 2473.

To meet the first requirement, then, the alleged deprivation must be "sufficiently serious," which turns on the "severity of the alleged deprivations" and "their duration." Craig v. Eberly, 164 F.3d at 495. See Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998). When a claim involves numerous alleged inhumane conditions, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Wilson v. Seiter, 501 U.S. 294, 305 (1991). In this case, the undisputed facts demonstrate that, for a six month period, Abila was housed in a padded cell measuring "5 feet, five inches by 7 feet, 7 inches," which did not have furnishings, a sink, a mattress, or a toilet, and contained only a grated hole in the floor for Abila's urination and defecation. MSJ ¶¶ 20-21, at 5. It is further undisputed that the lights were on for twenty-four hours a day, as was the cold air, which blew on Abila constantly. See MSJ ¶¶¶ 45, 57-58, at 9, 11. Further, it is undisputed that Funk ordered that "Inmate Abila is to have the following items only!!! . . . 1. Green suicide suit 2. Green suicide blanket 3. Regular meals served in a rubber security tray, rubber cup, and rubber spork to be picked up 30 minutes after he is initially served his meals." MSJ ¶ 22. See Response ¶ 22. The watch logs also indicate that, for the 159-day period, Abila did not exercise, and did not receive recreation. See MSJ ¶¶ 48-49, at 9; MSJ at 12; Response ¶¶ 48-49, at 9; Reply ¶¶¶ 47-49, at 7. At best, Abila received only

some, undocumented recreation -- such as watching television and reading on a bench -- during this stretch of time. See Response ¶¶ 48-49, at 9. The Court is thus convinced that, in their totality, the undisputed deprivations which Abila suffered were "sufficiently serious" under Craig v. Eberly, 164 F.3d at 495. See Wilson v. Seiter, 501 U.S. at 305 ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.").

In the absence of express intent to punish, the second requirement -- proof of deliberate indifference -- may also be met by "showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Kingsley v. Hendrickson, 135 S. Ct. at 2473 (quoting Bell v. Wolfish, 441 U.S. at 535). Abila, in this case, argues that the conditions to which Funk and Bannister subjected him were not "rationally related to a legitimate nonpunitive governmental purpose," and that, with respect to the purpose Funk and Bannister proffer for imposing the conditions of confinement, their "actions appear excessive in relation to that purpose." Kingsley v. Hendrickson, 135 S. Ct. at 2473. Funk and Bannister, essentially, argue that Abila was suicidal and presented security risks, and, for the purposes of his MSJ, Abila concedes that these were legitimate nonpunitive governmental purposes, for the times when he was actively suicidal before January, 2012. See MSJ at 12; Response to Defendants' MSJ ¶ 10, at 3. The issue, then, is primarily whether Abila's confinement in a padded cell measuring "5 feet, five inches by 7 feet, 7 inches," without furnishings, a sink, a mattress, or a toilet, and contained only a grated hole in the floor for Abila's urination and defecation, for six months, is "rationally related to a legitimate nonpunitive governmental purpose," or otherwise "appear excessive in relation" to

- 84 -

these purposes.  MSJ at 12.  In addition, Funk told Abila that he "will remain on this protective status until [he] can comply with any and all lawful orders and directions and when [he] can treat staff with the same respect you are given."  MSJ ¶ 53, at 10.  The Court thus must analyze whether these conditions, alone or in combination with others, were "rationally related to a legitimate nonpunitive governmental purpose," or otherwise "appear excessive in relation" to the proffered suicidal and security purposes.  The Court further concludes that the most effective way to undergo this analysis is to take each condition on its own, and then consider if it is sufficiently inhumane on its own, before looking at that condition in combination with the others. The Court is also mindful that the Tenth Circuit has, with similar analysis -- but before Kingsley v. Hendrickson -- concluded that a pretrial detainee's substantive due-process rights were violated when he was exposed to conditions similar to those that Abila endured.  See Littlefield v. Deland, 641 F.2d at 729.  The Court thus considers this case the baseline set of facts, so it will compare the facts in the present case accordingly.  See MSJ at 14, 16, 20 (arguing that Abila's substantive due-process rights were either violated by his lack of exercise and recreation, his deplorable conditions of confinement, or by the combination of both his lack of exercise, recreation, and humane conditions of confinement.)

    In Littlefield v. Deland, the Tenth Circuit held that the conditions within a "strip cell"[51] were punishing, regardless of the motivation for housing an inmate in that cell -- noting, in that case, that the motivation was "partly retributive, partly precautionary."  Littlefield v. Deland, 641 F.2d at 731.  The Tenth Circuit, notably, applied the following standard:

_____

[51]"The 'strip cells' in which plaintiff was held for a substantial part of this period have no windows, no interior lights, no bunk, no floor covering, and no toilet except for a hole in the concrete floor which was flushed irregularly from outside the cell."  Littlefield v. Deland, 641 F.2d at 730-31.

> The trier of fact must first consider whether detention facility officials expressed an intent to punish the pretrial detainee.  If they did not, the determination generally will turn on whether an alternative purpose to which (the restriction) may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned (to it).

Littlefield v. Deland, 641 F.2d at 731 (internal quotations omitted).  That standard, the Court notes, is the same as what the Supreme Court recently applied in Kingsley v. Hendrickson.

In its application of the standard, the Tenth Circuit was similarly considering a pretrial detainee's § 1983 claim against various county officials.  See Littlefield v. Deland, 641 F.2d at 730.  "After an extended bench trial, the [trial] court awarded compensatory damages, court costs, and attorney's fees and reasonable expenses against the corporate County."  Littlefield v. Deland, 641 F.2d at 730.

> Plaintiff's theories are . . . that this kind and length of confinement without hearing deprived him of due process of law and that it subjected him to cruel and unusual punishment.  The trial court found that Salt Lake County deprived plaintiff of due process of law by confining him in such a strip cell for more than 56 days without notice, hearing or meaningful opportunity for reevaluation or review of his condition, or the necessity of his confinement under the conditions in which he was confined, in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

Littlefield v. Deland, 641 F.2d at 730.  The Tenth Circuit affirmed the trial court's judgment that "plaintiff's confinement amounted to punishment and therefore that the county's failure to provide plaintiff with any meaningful notice and hearing violated the due process clause of the fourteenth amendment."  Littlefield v. Deland, 641 F.2d at 730.

Further guiding this Court's conclusion are Littlefield v. Deland's strikingly similar facts.  In that case, the detainee

> [w]as placed in a "strip cell" a solitary cell long used by the county to punish disorderly pretrial detainees and to segregate prisoners with severe mental disorders.  For a period of nearly two months (fifty-six days) he was held there without notice or opportunity to be heard with respect to the nature or duration of

his confinement.  The "strip cells" in which plaintiff was held for a substantial part of this period have no windows, no interior lights, no bunk, no floor covering, and no toilet except for a hole in the concrete floor which was flushed irregularly from outside the cell.  During most of his fifty-six days of confinement, plaintiff was deprived of all his clothes and was given no bedding whatsoever.  He slept naked on the concrete floor.  Moreover, he was given no opportunity to engage in any recreation outside his cell during this long period and was not permitted to have any reading or writing materials.  Thus, to amuse himself this mentally ill prisoner was relegated to banter with inmates in nearby cells.  Some of these exchanges escalated into the throwing back and forth of urine and feces.  Because plaintiff was denied articles of personal hygiene, he had no means of washing his hands after these unsanitary exchanges, and yet was required to eat most of his food with his fingers.  Plaintiff's cell frequently stank of feces and urine.

Littlefield v. Deland, 641 F.2d at 730-31.  The Tenth Circuit provided:

The district court found no clear evidence of an expressed intent by facility officials to punish plaintiff.  The court did find, however, that the condition and manner in which he was maintained could hardly have been any worse than if he were being punished for adjudicated infractions of a serious nature. . . .  The court also concluded that the extreme deprivations to which plaintiff was subjected during his fifty-six days of confinement were partly retributive, partly precautionary . . . but, in any event, were unreasonably degrading and inhumane[,] a mere masquerade as essential custodial detention . . . and therefore clearly excessive in relation to the alternative purpose (of essential custodial detention) assigned (to it) . . . in manifest violation of plaintiff's rights of due process as a pretrial detainee.

Littlefield v. Deland, 641 F.2d at 731 (internal quotations and citations omitted).  The Tenth Circuit held "only that to hold a pretrial detainee under conditions of detention this extreme for such an excessive period as fifty-six days is punishment and, absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment." Littlefield v. Deland, 641 F.2d at 731.  Accordingly, the Court now takes the relevant undisputed facts and compares them individually to the Littlefield v. Deland baseline.

### A.  THE CELL'S CONDITIONS

Abila was similarly a pretrial detainee, being held "under conditions of detention [that] extreme for such an excessive period" of six months, which, "absent a determination of guilt,

cannot be imposed in accordance with the due process clause of the fourteenth amendment."
Littlefield v. Deland, 641 F.2d at 731.  It is undisputed that Abila was confined within a padded cell measuring "5 feet, five inches by 7 feet, 7 inches," without furnishings, a sink, a mattress, or a toilet, and contained only a grated hole in the floor for Abila's urination and defecation, for six months.  MSJ at 12.  Abila was forced to eat in that cell, wear nothing but a suicide smock, and endure constantly blowing cold air as the lights remained on for twenty-four hours of the day.
See MSJ at 18-19, 57-58.  In this case, where Abila's conditions of confinement closely mimic those of the detainee in Littlefield v. Deland -- yet, far exceed those conditions by respect to duration -- the Court is hard-pressed to diverge from the Tenth Circuit's guidance which suggests that Abila has demonstrated a violation of his substantive due-process rights to humane conditions of confinement based on these individual facts.

### B.  RECREATION AND EXCERCISE

Additionally, in 1999, the Tenth Circuit stated that a "total denial of exercise for an extended period of time would constitute cruel and unusual punishment."  Perkins v. Kan. Dep't of Corr., 165 F.3d 803 (10th Cir. 1999)(quoting Housley v. Dodson, 41 F.3d 597, 599 (10th Cir. 1994)).  In this case, the extent of the recreation Abila received is disputed.  It is undisputed, however, that Abila received no exercise, and that, whatever recreation he received, was undocumented and amounted to no more than watching television or reading as he was handcuffed to a bench.  Thus, the Court must also consider, as a factor in its analysis, the amount of uninterrupted time Abila must consequently have spent in the aforementioned conditions of his padded cell.

### C.  THE COMBINATION OF ALL OF THE CONDITIONS

Abila, again, argues that his substantive due-process rights were either violated by his

lack of exercise and recreation, his deplorable conditions of confinement, or by the combination of both his lack of exercise, recreation, and humane conditions of confinement.   The aforementioned facts are undisputed regarding the conditions of his confinement, and they are further undisputed with respect to the lack of exercise and reception of only some, undocumented recreation.   While the extent of the recreation is, indeed, disputed, the proffered accounts of what the undocumented recreation may have entailed during that six month time period -- maybe playing cards, watching television, or reading -- support the Court's conclusion that the deplorable conditions, analyzed against the backdrop of the lack of exercise and recreation, rise to a violation of Abila's substantive due-process rights.

In sum, in light of Littlefield v. Deland, the Court does not see how those conditions Abila was forced to endure could be rationally related to the supposedly nonpunitive governmental purposes Funk and Bannister have proffered.   It is undisputed that Abila was not actively suicidal after January 3, 2012.   See Defendants' MSJ ¶¶¶¶ 8, 20, 22, 23, at 3, 5 (setting forth Abila's suicide and self-harm attempts, all occurring prior to January 3, 2012).   Indeed, in Littlefield v. Deland, the Tenth Circuit, in its discussion of that pretrial detainee's mental health, commented that "his illness . . . not surprisingly had been exacerbated by his long and oppressive confinement."   Littlefield v. Deland, 641 F.2d at 731.

The Court is further not convinced that suicidal detainees are entitled to less constitutional protection -- or less desirable conditions -- than a violent detainee.   "Here, the district court found no clear evidence of an expressed intent by facility officials to punish plaintiff.   The court did find, however, that the condition and manner in which he was maintained could hardly have been any worse than if he were being punished for adjudicated infractions of a serious nature."   Littlefield v. Deland, 631 F.2d at 731 (internal quotations

omitted).  Thus, regardless of any hypothetically rational relation between Abila's confinement

and his protection from his own suicide -- a purpose and goal that Abila does not dispute, with

respect to when he was suicidal -- or elimination of his security risk, the Court is convinced that,

after Littlefield v. Deland, the conditions are, in combination, nonetheless, "excessive in relation

to" Funk and Bannister's proffered reasons.  Kingsley v. Hendrickson, 135 S. Ct. at 2473. The

Court reaches this conclusion, again, by reference to the baseline facts of Littlefield v. Deland.

See 641 F.2d at 731 ("[T]o hold a pretrial detainee under conditions of detention this extreme for

such an excessive period as fifty-six days is punishment and, absent a determination of guilt,

cannot be imposed in accordance with the due process clause of the fourteenth amendment.").

Cf. Caldwell v. Miller, 790 F.2d 589, 600 (7th Cir. 1986)(concluding that prolonged restriction

of exercise that threatens an inmate's physical health might violate the Eighth Amendment);

Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985)(concluding that allegations of unsanitary

physical conditions, denial of personal hygiene and lack of opportunity to exercise state valid

claims under the Eighth Amendment); Hoptowit v. Spellman, 753 F.2d 779, 783-84 (9th Cir.

1985)(concluding that poor lighting can support finding of Eighth Amendment violation); Ramos

v. Lamm, 639 F.2d at 568 (concluding that the state must provide bedding, heat, hot water and

hygienic materials); Benter v. Peck, 825 F.Supp. 1411, 1419 (S.D. Iowa 1993)(concluding that

even denial of prescription eyeglasses can violate the Eighth Amendment when the eyeglasses

represent a serious medical need).

## II.     FUNK AND BANNISTER'S CONDUCT ALSO RISES TO THE REQUISITE LEVEL OF DELIBERATE INDIFFERENCE THAT IS CHARACTERISTIC OF A CLAIM OF INHUMANE CONDITIONS OF CONFINEMENT BY A CONVICTED PRISONER.

Although the Court is convinced that the objective inquiry under Kingsley v.

Hendrickson governs the present case, and not the subjective "deliberate indifference" standard applicable to convicted prisoners with respect to the Eighth Amendment, the Court also notes that Funk and Bannister acted with deliberate indifference.  The harmful conditions in the cell were obvious, particularly by reference to the extended period of time that Abila was forced to endure them.  As the Tenth Circuit held in Littlefield v. Deland, "a pretrial detainee under conditions of detention this extreme for such an excessive period as fifty-six days is punishment and, absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment."  Littlefield v. Deland, 641 F.2d at 732.  Thus, even if the Kingsley v. Hendrickson standard is not applied in this context, the result would nonetheless be the same -- Abila has demonstrated a violation of his substantive due-process rights to humane conditions of confinement.

"The Eighth Amendment of the Constitution is intended to protect and safeguard a prison inmate from the environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict endless suffering, whether physical or mental." Battle v. Anderson, 564 F.2d at 393 (citing Estelle v. Gamble, 429 U.S. at 97).  Under the Eighth Amendment standard to prove deliberate indifference, a prison official cannot be found liable under the Cruel and Unusual Punishment Clause for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. at 837 (holding also, that a "standard of purposeful or knowing conduct is not, however, necessary to satisfy the mens rea requirement of deliberate indifference for claims challenging conditions of confinement . . . the very high state of mind prescribed by *Whitley* does

not apply to prison conditions cases")(internal quotations and citations omitted).  Accordingly,

Abila must demonstrate that the risk of harm was so obvious that Funk and Bannister would have

had to have known about it.  See Farmer v. Brennan, 511 U.S. at 841 ("Whether a prison official

had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in

the usual ways, including inference from circumstantial evidence . . . and a factfinder may

conclude that a prison official knew of a substantial risk from the very fact that the risk was

obvious.").  In Mitchell v. Maynard, 80 F.3d 1433 (10th Cir. 1996), the Tenth Circuit considered

the circumstances of an inmate where several of the specific conditions the inmate

> allegedly endured have been expressly held to state claims under the Eighth
> Amendment prohibition against cruel and unusual punishments.  In particular we
> are troubled by the lack of heat combined with the lack of clothing and bedding,
> the deprivation of exercise for an extensive period of time, the lack of hot water,
> the denial of toilet paper, the removal of his prescription eyeglasses, the lack of
> adequate ventilation and the denial of writing utensils.

Mitchell v. Maynard, 80 F.3d at 1443.  With respect to those conditions, "which supposedly

lasted for a period of days, weeks and months . . .  [t]he combination of these factors is a

significant departure from the 'healthy habilitative environment' the state is required to provide

its inmates."  Mitchell v. Maynard, 80 F.3d at 1442 (quoting Ramos v. Lamm, 639 F.2d 559, 568

(10th Cir. 1980)).  The Tenth Circuit then held that "Mr. Mitchell allegedly was denied many of

the basic necessities . . . by [the Warden]'s express order.  A reasonable jury could have

concluded [the director of the Oklahoma Department of Corrections] had knowledge of the

conditions and condoned them when he upheld [the Warden]'s denial of Mr. Mitchell's

grievance regarding the conditions . . . ."  Mitchell v. Maynard, 80 F.3d at 1442.  The Tenth

Circuit thus made an inference that such a departure from the "healthy habilitative environment"

a state is required to provide inmates can constitute deliberate indifference of a substantial risk of

harm by those parties authorizing the departure.  Mitchell v. Maynard, 80 F.3d at 1442.  See Farmer v. Brennan, 511 U.S. at 841 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

In this case, where the undisputed facts confirm that Abila was confined within a padded cell measuring "5 feet, five inches by 7 feet, 7 inches," without furnishings, a sink, a mattress, or a toilet, and contained only a grated hole in the floor for Abila's urination and defecation, for six months,  see  MSJ at 12, and where he was forced to eat in that cell, wear nothing but a suicide smock, and endure constantly blowing cold air as the lights remained on for twenty-four hours of the day,  see MSJ at 18-19, 57-58, the Court is convinced that there was a significant enough departure from Mitchell v. Maynard's "healthy habilitative environment" that the inference of a substantial risk of harm is obvious, see Farmer v. Brennan, 511 U.S. at 841 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").  Further, the Court, having analyzed the undisputed facts in light of the facts presented in Mitchell v. Maynard, cannot find a meaningful distinction between the two situations to warrant a departure from the Tenth Circuit's guidance and conclusions in that case. See Mitchell v. Maynard, 80 F.3d at 1442-43.  Accordingly, the Court concludes that Funk and Bannister have also acted with the deliberate indifference an inmate must demonstrate to establish a claim of post-conviction cruel and unusual punishment under the Eighth Amendment.

**III.   QUALIFIED IMMUNITY DOES NOT PROTECT THE DEFENDANTS'
CONDUCT WHICH VIOLATED ABILA'S CLEARLY ESTABLISHED
SUBSTANTIVE DUE-PROCESS RIGHT.**

It was clearly established when Abila was at Eddy County Detention that being housed in inhumane conditions and being confined to a solitary padded cell, with only some access to recreation and having no exercise, for a period of six months, violated Abila's constitutional right to substantive due process.  See Littlefield v. Deland, 641 F.2d at 732.  For instance, in 1999, the Tenth Circuit stated that a "total denial of exercise for an extended period of time would constitute cruel and unusual punishment."  Perkins v. Kan. Dep't of Corr., 165 F.3d 803 (10th Cir. 1999)(quoting Housley v. Dodson, 41 F.3d 597, 599 (10th Cir. 1994))(alerting prison officials, thereby, of the importance that provision of exercise and recreation hold under the Constitution).  Further, looking to a related body of case law, since 1976, the Supreme Court has held that "[p]rison officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of prisoners in their custody."  Perkins v. Kan. Dep't of Corr., 165 F.3d 803 (10th Cir. 1999)(citing Estelle v. Gamble, 429 U.S. at 104-06).  In 1979, the Supreme Court likewise made it clear that due process requires that a pretrial detainee not be punished before a lawful conviction.  See Bell v. Wolfish, 441 U.S. at 535.  Regarding another body of related case law, "[B]y 1997 it was clearly established law that the deliberate disregard of a patient's psychological needs can violate a detainee's constitutional rights no less than the deliberate disregard of his physical needs."  Blackmon v. Sutton, 734 F.3d at 1245.  Most importantly, by 1981, it was clearly established law that "a pretrial detainee under conditions of detention" as extreme as those in Littlefield v. Deland "for such an excessive period as fifty-six days is punishment and, absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment."  Littlefield v. Deland, 641 F.2d at 732.

In sum, a reasonable official would have known that depriving a detainee of exercise for an extended period of time, and leaving him in inhumane conditions as deplorable as those in this case, violates that detainee's constitutional rights.  See Littlefield v. Deland, 641 F.2d at 729-33.  The right was sufficiently clear that a reasonable government employee in the Defendants' shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  The Tenth Circuit has held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  The Court is convinced that, after its aforementioned analysis of the contours of Littlefield v. Deland, that there are no legal, factual, or procedural distinctions between this case and Littlefield v. Deland that make a constitutional difference under  Kerns v. Bader.  See 663 F.3d at 1188.  Specifically, the much greater time period that Abila was forced to endure his conditions underscores the clarity that a reasonable government employee would know that, in this case, the imposition of these conditions in this manner violated clearly established constitutional rights.  Accordingly, on these allegations, Abila adequately establishes a clearly established substantive due-process claim, and the Court will deny qualified immunity to Funk and Bannister.  The Court thus grants Abila's MSJ.

IV.     **MATERIAL DISPUTES OF FACT EXIST REGARDING THE NATURE OF ABILA'S CONFINEMENT BEFORE JANUARY 3, 2012, AND THE COURT THUS DENIES DEFENDANT'S MSJ.**

The Court, having granted Abila's MSJ, is left to consider Defendants' MSJ as it relates to Abila's confinement before January 3, 2012, as well as how it relates to the adequacy of his medical care for the balance of his time at Eddy County Detention.  Unlike Abila's MSJ, the Court concludes that there are disputed material facts precluding the entry of summary judgment

with respect to whether the conditions of Abila's confinement, before January 3, 2012, alone or in combination with others, were "rationally related to a legitimate nonpunitive governmental purpose," or otherwise "appear excessive in relation" to Funk and Bannister's proffered suicidal and security purposes.  For Abila's MSJ, the facts of his confinement, and the facts underlying the reasons for his confinement, were undisputed and, in accordance with <u>Littlefield v. Deland</u>, Abila was entitled to judgment because the conditions -- for the time period where he was not actively suicidal -- were not "rationally related to a legitimate nonpunitive governmental purpose," and were otherwise "excessive in relation" to Funk and Bannister's proffered suicidal and security purposes.  <u>See</u> Response to Defendants' MSJ ¶ 10, at 3 (setting forth the fact that Abila was not actively suicidal for the entire period of January 3, 2012, until his release in June, 2012); Reply in Support of Defendants' MSJ ¶ 10, at 4 (not disputing this fact).  On the other hand, there are material disputes of fact regarding the nature of Eddy County Detention's provision of medical care, <u>see</u> Response to Defendants' MSJ ¶ 34, at 9 (disputing the implication that Abila received any mental health care); the extent to which Abila was mechanically restrained for a period of nineteen days, <u>see</u> Response ¶ 11, at 2-3 (disputing that Abila was continuously restrained); and the extent to which he presented a security risk, <u>see</u> Defendants' MSJ ¶ 11, at 4.

In sum, the import of Abila's suicidal issues during his confinement before January, 2012, and the lack of medical care, the use of mechanical restraints, as well as the impersonal involvement and decisions made by certain individuals, is all of the disputed nature that must be considered and decided by a jury.  <u>See</u> Tr. at 43:4-46:19 (Court, Drennan, Coyte).  The Court, therefore, is, on this record, unable to grant summary judgment based on the parties' proffer of undisputed material facts.  The Court thus denies the balance of Defendants' MSJ.

For the period of time from January 3, 2012, until June 21, 2012, however, where Abila did not make any overt suicide attempts, the Court concludes that, in light of the undisputed facts relating to his conditions of confinement as a pretrial detainee, the conditions were not rationally related to a legitimate nonpunitive purpose, and were nonetheless excessive with respect to Funk and Bannister's proffered purposes in light of the undisputed facts.  Further, the Court concludes that, in the alternative, Funk and Bannister imposed the conditions with the more stringent "deliberate indifference" standard that is characteristic of prisoner claims brought under the Eighth Amendment.  In either case, Funk and Bannister are further not entitled to qualified immunity given the clearly established guidance of Littlefield v. Deland.  Accordingly, for the period of time to which Abila's MSJ relates, the Court concludes that Abila is entitled to judgment on his claim for inhumane conditions of confinement in violation of his substantive rights to due process.

**IT IS ORDERED** that: (i) the request for summary judgment in Plaintiff's Motion and Memorandum in Support of Summary Judgment for Inhumane Conditions of Confinement, filed September 6, 2016 (Doc. 156), is granted; and (ii) the County Defendants' Amended Motion for Partial Summary Judgment No. 1 -- Dismissal of Plaintiff's Substantive Due Process Claims, filed September 9, 2016 (Doc. 162), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Jack Bennett Jacks
Law Office of J.B. Jacks
Albuquerque, New Mexico

- 97 -

-- and --

Matthew Coyte
Coyte Law, P.C.
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Luis E. Robles
Lindsay Drennan
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

> *Attorneys for the Defendants*