IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GEORGE ABILA,

     Plaintiff,

vs.                                                                    No. CIV 14-1002 JB/SMV

SHAWN FUNK; LEZLIE DUCKETT; KAY
YOUNGMAN and TODD BANNISTER,

    Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the County Defendants'[1] Motion for Partial

Summary Judgment No. III -- Dismissal of Plaintiff's Municipal Liability Claims, filed

September 6, 2016 (Doc. 154)("MSJ").  The Court held a hearing on October 25, 2016.  The

primary issue is whether municipal liability is available to the Plaintiff George Abila, as a matter

of law, where the Defendants argue that the undisputed facts demonstrate that there is no

evidence that Eddy County Detention Center -- by way of Defendant Shawn Funk, the warden at

Eddy County Detention Center -- established an official policy, followed an unwritten custom, or

knew of a pattern or practice which violated Plaintiff George Abila's rights when he was housed

in a padded, suicide prevention cell.  Because the Court determines that evidence exists

suggesting that the padded cells at Eddy County Detention were in constant use and were being

used for disciplinary purposes, in violation of written policy -- with that constant use of the

padded cells embodying evidence of an unconstitutional practice -- the Court concludes that

---

[1]Defendant Shawn Funk is the Warden of Eddy County Detention Center, thus leading
Plaintiff George Abila to seek municipal liability on the part of Eddy County, given the
pleading's allegations against Funk in his official capacity.  <u>See</u> <u>Monell v. New York City Dept.</u>
<u>of Social Services</u>, 436 U.S. 658, 690 n.55 (1978)("[O]fficial-capacity suits generally represent
only another way of pleading an action against an entity of which an officer is an agent . . . .").

County Defendants are not entitled to judgment as a matter of law.  Accordingly, the Court will

deny the MSJ.

## FACTUAL BACKGROUND

Abila was booked at Eddy County Detention in Carlsbad, New Mexico, on August 8,

2011, and housed in general population.  See MSJ ¶ 1, at 1 (setting forth this fact); Plaintiff's

Response to County Defendants' Motion for Partial Summary Judgment No. III -- Dismissal of

Plaintiff's  Municipal  Liability  Claims  ¶¶  1,  at  2,  filed  October  11,  2016  (Doc.

181)("Response")(not disputing this fact).  On October 24, 2011, Abila cut his arms with a razor

blade in a suicide attempt and needed emergency medical treatment.  See MSJ ¶ 2, at 2 (setting

forth this fact); Response ¶ 2, at 2 (not disputing this fact).  Abila was "eventually moved to a

segregation cell and on December 24, 2011, he tried to take his own life again, this time by

swallowing plastic and screws that he had removed from the door in his segregation cell."  MSJ ¶

3, at 2 (setting forth this fact).  See Response ¶ 3, at 2 (not disputing this fact).  Abila was then

placed "on suicide precautions in a padded cell."  MSJ ¶ 4, at 2 (setting forth this fact).  See

Response ¶ 4, at 2 (not disputing this fact).[2]

---

[2]The MSJ further asserts that Abila was placed in the padded cell "at the recommendation
of mental health staff and with the approval of security staff."  MSJ ¶ 4, at 2 (citing Mental
Health Progress Note at 1-2 (dated January 4, 2012), filed September 6, 2016 (Doc. 152-
20)(indicating that, after Abila returned from the hospital on January 3, 2012, he had a "high
potential for suicide" and that the plan was to move Abila to the padded cell); Memorandum
from Shawn Funk/Acting Warden RE Inmate George Abila (dated January 3, 2012), filed
September 6, 2016  (Doc. 152-21)(indicating that Abila was to be housed in the padded cell with
only a suicide suit, suicide blanket, and meals served in a rubber security tray)).  In accordance
with the Local Rules of Civil Procedure:

> The Response must contain a concise statement of the material facts cited by the
> movant as to which the non-movant contends a genuine issue does exist.  Each
> fact in dispute must be numbered, must refer with particularity to those portions
> of the record upon which the non-movant relies, and must state the number of the

> movant's fact that is disputed.  All material facts set forth in the Memorandum
> will be deemed undisputed unless specifically controverted.  The Response may
> set forth additional facts other than those which respond to the Memorandum
> which the non-movant contends are material to the resolution of the motion.  Each
> additional fact must be lettered and must refer with particularity to those portions
> of the record upon which the non-movant relies.

D.N.M. LR-Civ. 56.1(b).  Accordingly, the Response disputes the assertion in the MSJ that Abila
was housed in the padded cell "at the recommendation of mental health staff and with the
approval of security staff," arguing instead that the "Defendants' DOC 152-20, page 2, is void of
a date, therefore the exhibit does not support this fact," and that "Kay Youngman, the mental
health staff Defendants are referring to, denies that she agreed with his placement in the padded
cell."  Response ¶ 4, at 2 (citing Kay Youngman's Mental Health Progress Note (dated January
4, 2012) at 1-2, filed September 6, 2016 (Doc. 152-20)(noting that while there are two pages in
the filed document, only the first page is dated, and the second page -- authorizing the padded
cell -- does not have a date, or otherwise some numbering indicating that it is attached to the first
page)).  The Response also argues that "Ms. Youngman testified that had it been her decision,
she would have recommended a hallway cell or maybe a smaller unit with less people."
Response ¶ 4, at 2-3 (citing Deposition of Kay Youngman at 248:18-250:2, (taken February 10,
2016), filed October 7, 2016 (Doc. 174-5)(providing testimony that, despite the Mental Health
Progress Note, Youngman had no say in housing Abila in the padded cell, and that, had it been
her choice, such segregation would not have been her recommendation)).

D.N.M. LR-Civ. 56.1(b) also states:

> The Reply must contain a concise statement of those facts set forth in the
> Response which the movant disputes or to which the movant asserts an objection.
> Each fact must be lettered, must refer with particularity to those portions of the
> record upon which the movant relies, and must state the letter of the non-movant's
> fact.  All material facts set forth in the Response will be deemed undisputed
> unless specifically controverted.

D.N.M. LR-Civ. 56.1(b).  The County Defendants' Reply in Support of County Defendants'
Motion for Partial Summary Judgment No. III -- Dismissal of Plaintiff's Municipal Liability
Claims, filed October 21, 2016 (Doc. 188)("Reply"), provides that the second page "is
immediately preceded by the page dated January 4, 2012 and signed by Ms. Jorgenson (now
Youngman)."  Reply ¶ 4, at 1-2 (citing Kay Youngman's Mental Health Progress Note (dated
January 4, 2012) at 1-2, filed September 6, 2016 (Doc. 152-20)).  Further, the Reply argues that
Youngman testified that she completed this form and circled the recommendation that Abila be
placed in a padded cell, and did not thereafter take any action indicating that she disagreed with
the use of the padded cell at that time.  Reply ¶ 4, at 1-2 (citing Deposition of Kay Youngman at
257:1-258:19, (taken February 10, 2016), filed October 21, 2016 (Doc. 186-1)(providing
testimony from Youngman who, after being confronted with Kay Youngman's Mental Health
Progress Note, stated that she completed the form and circled the recommendation that Abila be

Eddy County Detention "has written policies on the use of restraints, including therapeutic seclusion that specifically reference nationally accepted corrections standards." MSJ ¶ 8, at 2-3 (setting forth this fact). See Response ¶ 8, at 3 (not disputing this fact). "The policy provides in part: [s]pecial treatment procedures of medical restraints and therapeutic seclusion shall be used with appropriate written clinical justification and in accordance with relevant laws and professional standards." MSJ ¶ 9, at 3 (setting forth this fact). See Response ¶ 9, at 3 (not disputing this fact). Eddy County Detention "has written policies on the treatment of suicidal inmates that specifically reference nationally accepted corrections standards." MSJ ¶ 10, at 3 (setting forth this fact). See Response ¶ 10, at 3 (not disputing this fact). That "policy provides in part [a] suicide prevention plan has been developed to protect the well being (sic) of the inmate's (sic) by utilizing proactive measures to decrease and/or prevent the opportunity for intentional self-injurious behavior which may result in bodily injury or death," and that "[t]he guidelines herein are not exhaustive and should serve only as a foundation on which the sound clinical judgment of the responsible mental health or medical professional is based." MSJ ¶ 11, at 3 (setting forth this fact)(alterations in original). See Response ¶ 11, at 3 (not disputing this fact).

---

placed in the padded cell on January 4, 2012, and that, on previous occasions, when she no longer believed an inmate should be housed in such conditions, she would go back and alter her Mental Health Progress Notes accordingly -- something that did not happen here).

The Court, having independently looked at the evidence that the MSJ, Response, and Reply provide, concludes that whether Abila was housed in the padded cell "at the recommendation of mental health staff and with the approval of security staff" is a disputed fact. The supposed recommender -- Kay Youngman -- has given conflicting testimony as to the situation giving rise to Abila's detention in that padded cell. Compare Kay Youngman's Mental Health Progress Note (dated January 4, 2012) at 1-2, filed September 6, 2016 (Doc. 152-20)(authorizing housing in the padded cell), with Deposition of Kay Youngman at 257:1-258:19, (taken February 10, 2016), filed October 21, 2016 (Doc. 186-1)(stating that Bannister or Funk made the decision, and not her). The Court thus deems that fact disputed.

Eddy County Detention also "has written policies on classification and separation of inmates that specifically reference nationally accepted corrections standards." MSJ ¶ 12, at 3 (setting forth this fact). See Response ¶ 12, at 3 (not disputing this fact). "The policy provides in part [i]t shall be the policy of the Eddy County Detention Center to classify inmates in a way that not only ensures the public safety, but also provides for safe, human inmate treatment by housing like inmates together to the extent possible." MSJ ¶ 13, at 3 (setting forth this fact). See Response ¶ 13, at 3 (not disputing this fact). In the nine years that correctional officer Narda Gallegos has been employed at Eddy County Detention, Abila "was the inmate with the longest stay in the padded cell." Response ¶ 14, at 4 (setting forth this fact).[3] See Reply ¶ 14, at 2 (not disputing this fact).[4]

_____

[3]The Response rephrases, in the above manner, the MSJ's asserted fact that "testimony in this case is that no other inmates have needed to be placed in the padded cell for the amount of time Abila needed to remain in the cell." MSJ ¶ 14, at 4. The conflict between the two proffers relates to the MSJ's use of the word "needed," which connotes something more particular than simply the length of time that Abila spent in the padded cell. The Reply does not specifically refute the Response's reasserted version of the facts. See D.N.M. LR-Civ. 56.1(b). Accordingly, the Court deems the fact asserted by the Response as undisputed.

[4]The Response purports to dispute the MSJ's last two assertions of undisputed material fact. See MSJ ¶¶ 15-16, at 4; Response ¶¶ 15-16, at 4-5. The MSJ asserts, first, that "there is no evidence which shows that ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled." MSJ ¶ 15, at 4 (citing no evidence). The Response disputes that there is no evidence showing that Eddy County Detention has a "'custom' of using the padded cell for punishment, in a manner that is unconstitutional, widespread, permanent, and well-settled." Response ¶ 15, at 4. The Response asserts that a former inmate, Jason Martinez, was placed in the padded cell for fighting; Defendant Todd Bannister has stated that there were two to three inmates in the padded cells "almost all the time"; corrections officer Arthuressa Shirley has stated that the "padded cells are occupied 'quite often'"; and Lieutenant Roger Maxwell has stated that "he wishes there were more padded cells, because sometimes he needs to put someone in the padded cell and they are all occupied." Response ¶ 15, at 4 (citing: (i) Deposition of Jason Martinez at 69:7-15, 94:12-20, (taken April 13, 2016), filed October 11, 2016 (Doc. 181-1)(providing testimony that Martinez was housed in a padded cell after "his third fight," and was housed in a padded cell on two separate occasions while at Eddy County Detention); (ii)

---

Deposition of Todd Bannister at 91:3-4, (taken January 8, 2016), filed October 11, 2016 (Doc. 181-2)(providing testimony that "we've got two to three people in padded cells nearly all the time"); (iii) Deposition of Arthuressa Shirley at 66:6-8, (taken January 7, 2016), filed October 11, 2016 (Doc. 181-3)(providing testimony that the padded cells were occupied "quite often"); and (iv) Deposition of Roger Maxwell at 43:6-14, (taken February 12, 2016), filed October 11, 2016 (Doc. 181-4)(providing testimony that the padded cells were occupied frequently enough that Maxwell, on occasion, had no room for inmates he sought to house in the padded cells)).

The Reply, then, refutes the Response's proffer of evidence by arguing that Abila's "citation to one former inmate's deposition, which frankly does not make clear that he was placed in a padded cell solely for fighting, is not enough to establish evidence of a custom or policy of using these cells in an unconstitutional manner." Reply ¶ 15, at 2. The Reply also contends that "there is no factual dispute that the jail used the padded cells within the facility. Plaintiff's interpretation of the law that the simple use of a strip cell is facially unconstitutional has been rejected by the Tenth Circuit." Reply ¶ 15, at 2-3. The Court understands the Reply's argument to be that, although the Response has proffered evidence that the padded cells were used at a high frequency in Eddy County Detention, that fact does not establish evidence that the frequent use "shows that ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled." MSJ ¶ 15, at 4. The Court agrees with the Reply, in part. After reviewing the evidence that the Response proffers, the Court concludes that there is some -- as opposed to "no" -- evidence that "shows that ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled." MSJ ¶ 15, at 4. Because the Reply does not meaningfully dispute the existence of evidence that Martinez was put in a padded cell after his third fight, or the evidence that the padded cells were frequently used, the Court will thus deem undisputed the fact proffered by the Response that some evidence exists that "shows that ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled." MSJ ¶ 15, at 4.

The MSJ then asserts that there is "no evidence which shows that County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights." MSJ ¶ 16, at 4 (citing no evidence). The Response disputes this asserted fact by first referencing, generally, the Plaintiff's Motion for Summary Judgment for Inhumane Conditions of Confinement, filed September 6, 2016 (Doc. 156)("Abila's MSJ for Inhumane Conditions"); Plaintiff's Response to Defendants' Motion for Partial Summary Judgment No. 1 -- Dismissal of Substantive Due Process Claims, filed October 7, 2016 (Doc. 174); and Plaintiff's Response to Defendants; Motion for Partial Summary Judgment No. II -- Dismissal of Procedural Due Process Claims, filed October 10, 2016 (Doc. 179). See Response ¶ 16, at 4. The Response also argues that "Defendants Funk and Bannister made the decision to place Plaintiff in the padded cell indefinitely," and the "Plaintiff wrote a grievance about his placement and continued stay in the padded cell, and Defendant Funk's response to Plaintiff's complaints at being in the padded cell, indicates, (at least in part), a punitive purpose for his cell assignment." Response ¶ 16, at 4-5 (citing (i) Deposition of Shawn Funk at 143:18-144:2, (taken February 5, 2016), filed October 11, 2016 (Doc. 181-5)(providing testimony that Funk and Bannister were involved in a collective

## PROCEDURAL BACKGROUND

Abila brings this suit against Funk and Bannister for their alleged failure to provide him

adequate confinement and medical care during his detention at Eddy County Detention.   See

_____

decision to house Abila in a padded cell for the duration of his detention); (ii) Deposition of Kay Youngman at 248:18-250:2, (taken February 10, 2016), filed October 7, 2016 (Doc. 174-5)(providing testimony from Youngman that Funk and Bannister would have been the ones who made the decision to initially house Abila in the padded cell); and (iii) Inmate Request Form (dated May 24, 2012), filed October 11, 2016 (Doc. 181-6)(providing Funk's response to Abila's inquiry why he was housed in a padded cell, which states: "You will remain on this protective status until you can comply with all lawful orders and directions and when you can treat staff with the same respect you are given")).   The Response also argues that Sergeant Jeannie Santana testified "that the padded cells were used often . . . at times they were occupied all the time . . . [and] although unusual, some inmates had been held in the padded cell for months."   Response ¶ 16, at 5 (citing Deposition of Jeannie Santana at 17:10-19:9, (taken February 12, 2016), filed October 11, 2016 (Doc. 181-7)(providing the quoted testimony)).   Last, the Response states that Abila's "expert, having reviewed the entire record reaches the conclusion that long term housing in the padded cell served no legitimate penological purpose and in fact amounted to punishment."   Response ¶ 16, at 5 (citing Affidavit of Phil Stanley ¶ 3, at 1, filed October 7, 2016 (Doc. 174-5)(indicating that, according to Stanley, Abila's confinement in the padded cell served no legitimate penological purpose)).

The Reply then attempts to refute the Response in support of the MSJ's assertion that there is "no evidence which shows that County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights."   Reply ¶ 16, at 3.   The Reply argues that the "Plaintiff has not created any real dispute of fact," by mere citation to testimony about the frequent use of the padded cells or by citation to the legal conclusion of Abila's expert -- which does not establish the constitutional minima -- and which also relies "heavily on policy evidence."   Reply ¶ 16, at 3-4.   Further, the Reply maintains, Abila's experience is a "single incident" and "is not evidence of a custom or policy."   Reply ¶ 16, at 3-4.   Accordingly, the Court is left to determine whether the Response has meaningfully disputed the assertion in the MSJ that there is "no evidence which shows that County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights," with its proffer of evidence. The Court, again, concludes that the Reply does not meaningfully dispute the existence of evidence that the padded cells were used often, perhaps for housing inmates for months at a time, and against the backdrop of the fact that Abila was housed in a padded cell for months at a time, there is evidence which suggests "that the County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights."   MSJ ¶ 16, at 4.   The Court thus deems that fact that the Response proffers in its dispute of the MSJ, that some evidence exists suggesting "that that County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights," undisputed.

Third Amended Complaint for the Recovery of Damages Caused by the Deprivation of Civil Rights and Tortious Conduct, filed March 17, 2016 (Doc. 102)("Third Amended Complaint"). The Complaint first alleges, as Counts I and II, a violation of substantive due process, under the Constitution of the United States of America and the Constitution of the State of New Mexico, because of the inhumane conditions of Abila's confinement and because of inadequate medical care.  See Third Amended Complaint ¶¶ 114-38, at 11-14.  Count III then alleges a violation of procedural due process by Funk, and Count IV alleges that Funk, in his official capacity,[5] maintained a custom and policy of violating constitutional rights.  See Third Amended Complaint ¶¶ 139-60, at 14-16.  The "County Defendants" now move for summary judgment, by the MSJ, requesting that the Court grant judgment in their favor with respect to Count IV, alleging that Funk, in his official policy, maintained a custom and policy of violating constitutional rights.  MSJ at 1-2.  As grounds, the MSJ recaps Abila's allegations, which the Defendants included in their proffer of undisputed material facts, and which the Court details below.

In Abila's Third Amended Complaint, "Abila alleges that Defendant Funk has," through his actions and orders to staff, "created a custom and policy of housing the mentally ill in segregation or solitary confinement."   MSJ ¶ 5, at 2 (setting forth this fact)(footnote omitted). See Response ¶ 5, at 3 (not disputing this fact)(setting forth the additional fact that Funk created the policy through "his actions and verbal orders to staff"); Reply ¶ 5, at 2 (not disputing the additional fact).  Abila also alleges that Funk "uses solitary confinement, specifically the padded cell at his facility to punish inmates and that such a policy is facially unconstitutional."  MSJ ¶ 6,

_____

[5]The MSJ argues that this claim against Funk, in his official capacity, is properly construed as a claim against Eddy County itself.  See MSJ at 2.

at 2 (setting forth this fact).  See Response ¶ 6, at 3 (not disputing this fact).  Abila has also alleged, however, that the Defendants violated their own existing written policies "in placing him in the padded cell, which he alleges was a violation of his rights."  MSJ ¶ 7, at 2 (setting forth this fact).  See Response ¶ 7, at 2 (not disputing this fact)(clarifying that Abila alleges the policies were written); Reply ¶ 7, at 2 (not disputing the Response's clarification).

1.      **The MSJ.**

The MSJ begins by arguing that "there is no evidence which shows that Eddy County Detention Center established an official policy, followed an unwritten custom, or knew of a pattern or practice which caused Defendants to violate George Abila's rights by placing him in a suicide prevention cell."  MSJ at 5.  There is no evidence, the MSJ argues, because Abila "may not hold the County vicariously liable under Section 1983 for the alleged torts of Defendants Funk and Bannister solely on the basis of its employer-employee relationship[.] . . .  Plaintiff must identify a municipal 'policy' or a 'custom' that caused the Plaintiff's alleged constitutional injury."  MSJ at 5 (citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997); Pembaur v. Cincinatti, 465 U.S. 469, 479-81 (1986); Monell v. N.Y. City Dept. of Soc. Servs., 463 U.S. 658, 691 (1978)("Monell")).  Further, according to the MSJ, "the disputed 'policy' or 'custom' must also be the cause and moving force behind the alleged deprivation of the Plaintiff's constitutional rights."  MSJ at 6 (citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. at 403).  Accordingly, the MSJ argues:

> In this case, ECDC's policy regarding the use of padded cells meets the applicable Fourteenth Amendment standards for the confinement of at-risk inmates.  *See Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)(equating Eighth Amendment and Fourteenth Amendment standards for determination of conditions of confinement claims); *Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir. 1981)(Fourteenth Amendment analysis examines whether pretrial detainees are punished by restrictions or there is some alternative administrative purpose to

restrictions).  Moreover, there is no evidence which shows that ECDC has a "custom" of using padded cells to confine inmates in a manner that is unconstitutional, widespread, permanent, and well settled.  Finally, there is no evidence which shows that ECDC's policies or customs were deliberately indifferent to George Abila's Fourteenth Amendment rights.

MSJ at 6.

The MSJ then explains that the "policies" under which a municipality "may incur liability" fall into two categories: "one type of 'policy' is characterized by formal rules and understandings which constitute fixed plans of action to be followed under similar circumstances consistently and over time," and "another type of 'policy' exists when a municipality takes a course of action tailored to a specific situation and not intended to control decisions in later situations."  MSJ at 7.  According to the County Defendants, only an "authorized decision maker" or official "whose edicts may fairly be said to represent official policy" can act to "give rise to municipal liability under § 1983."  MSJ at 7.  Ultimately, as the MSJ provides, "the Supreme Court held that municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  MSJ at 7 (citing Pembaur v. Cincinatti, 465 U.S. at 483)(internal quotations omitted).

The MSJ also explains that Abila "may . . . sue Defendants for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels."  MSJ at 8 (citing Monell, 463 U.S. at 690-91)(internal quotations omitted).  Such custom, the MSJ argues, entails "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  MSJ at 8 (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)).  Accordingly, the MSJ

provides that Abila must, to demonstrate a municipal custom, show "a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent . . . misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the . . . force."  MSJ at 8 (citing Fraire v. City of Arlington, 957 F.2d 1268, 1278 (5th Cir. 1992)).

　　　With respect to these standards, the MSJ then argues that Eddy County Detention's "policy regarding the use of padded cells meets the applicable fourteenth amendment conditions of confinement standards," because, "to determine whether a particular restriction imposed on a pretrial detainee comports with due process, a court must determine whether the restriction is punitive or reasonably related to a legitimate and nonpunitive governmental purpose."  MSJ at 8-9 (citing Bell v. Wolfish, 441 U.S. 520, 538-39 (1979)).  Here, the MSJ argues, "ensuring security and order at the institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both."  MSJ at 9 (citing Littlefield v. Deland, 641 F.2d 729, 731 (10th Cir. 1981)).  The MSJ also indicates that Eddy County Detention's "written policies governing suicide prevention and restraint are based not only on prevailing American Correctional Association and National Commission on Correctional Health Care standards, which may impose an even higher threshold than a constitutional rubric, but they articulate a non-punitive objective for restraints on inmates."  MSJ at 9 (citing Bell v. Wolfish, 441 U.S. at 535).  The MSJ ultimately maintains that Abila "agrees that the policies as written and adopted by ECDC are acceptable and consistent with the constitutional standards found in *Bell* . . . [and] thus Abila bears the heavier burden of showing an informal policy or custom of violating inmates' rights."  MSJ at 10.

Turning, then, to its argument regarding informal policy or custom, the MSJ argues that "there is no evidence that shows that ECDC has a 'custom' of using its restraints and maintaining conditions of confinement in a manner which is unconstitutional," nor that there is any "evidence that shows that City [sic] Defendants' policies or customs were deliberately indifferent to Plaintiff's Fourteenth Amendment right." MSJ at 12. Essentially, the MSJ argues that "proof of a single incident is not sufficient to impose liability under *Monell*," and that the "Plaintiff has not established that any other inmate was subjected to the same conditions he complains of under similar circumstances or over a similar period of time. In fact, the testimony in this case is that Plaintiff's situation was unique." MSJ at 11-12. According to County Defendants, here

> there is no evidence to support the claim that County's action or inaction reflects a conscious choice that was deliberately indifferent to George Abila. In fact, the evidence of this case establishes that there were extensive policies addressing the use of restraints, the padded cell, and treatment of suicidal inmates. . . . [H]is own case is the only example he provides of allegedly indifferent behavior.

MSJ at 12-13. The MSJ thus requests summary judgment dismissing Abila's "municipal liability claim against County Defendants." MSJ at 13.

### 2.      The Response.

The Response begins by stating that "the law regarding supervisory liability in the context of a jail was recently summarized by this Court in August." Response at 6 (citing Romero v. Bd. of Cnty. Comm'rs for Cnty. of Curry, 2016 WL 4483867 (D.N.M. 2016)(Browning, J.)). A salient point from that case, the Response contends, is that "supervisors are not liable unless there is an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise." Response at 7. The Response argues that, despite those limitations, "municipal culpability can be demonstrated with proof that a municipality's legislative body or authorized

decision maker has intentionally deprived a plaintiff of a federally protected right," and "that the action taken or directed by the municipality or its authorized decision maker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which plaintiff complains."  Response at 7.

Accordingly, the Response argues that,

in the context of this case, the municipal liability claim can be perfected in two ways.  Firstly, and most directly, Plaintiff can succeed by proving the final policy maker of ECDC, Warden Funk, deprived Plaintiff of a constitutional right. Plaintiff does not have to prove a pattern and practice of such violations, just a single decision by the warden himself.

Response at 7 (citing Simmons v. UINTAH Health Care Special Serv. Dist., 506 F.3d 1281, 1285 (10th Cir. 2007)).   The Response argues that there is evidence of municipal liability because Abila has shown that,

Funk personally participated in the decision to place Mr. Abila in the padded cell and keep him there without the most basic things required for a human existence. . . .  His personal decision to keep him in these appalling conditions is demonstrated by the response he wrote to Plaintiff's request to be let out of the padded cell.

Response at 8.   The Response then indicates Abila's incredulity at the MSJ's failure to extensively cover this theory of municipal liability, considering the County Defendants are more than aware of the "personal connection of the final policymaker to the constitutional violation." Response at 8.

 The Response last addresses the "second way Plaintiff can reach governmental liability," which is "by demonstrating a custom or practice [that] was the moving force behind the constitutional violation in question."  Response at 9.  The Response indicates that Abila does not dispute that Eddy County Detention has "drafted a set of policies designed to prevent the abuses seen in this case."  Response at 9.  The Response argues, however, that when "Funk took over as

- 13 -

head of the jail he allowed those policies to be disregarded, until eventually the jail lost its accreditation."  Response at 9.  Thus, according to the Response,

> it is the very fact that Funk knew of the correct standards and policies to employ, but willfully chose to disregard them, that make[s] up the backbone of Plaintiff's deliberate indifference claim.  Rather than follow policies designed to prevent the abusive use of restraint and seclusion, Defendant Funk created a custom of disregarding written policy.

Response at 9-10 (citing Simmons v. UINTAH Health Care Special Serv. Dist., 506 F.3d at 1283).  The Response argues that, by disregarding that written policy, Funk has "demonstrated a sufficiently culpable state of mind; [sic] deliberate indifference."  Response at 10.

> To further demonstrate the custom, the Response maintains that

> written discovery has revealed that the padded cells in the jail were constantly in use.  Inmates have testified that they too were abused in the padded cells and that they saw other people suffering in them as well.  Although Plaintiff agrees he was most likely subjected to the longest time period in the cell, that does not mean others were not treated inhumanely too.

Response at 10.  Indeed, the Response argues that "the custom of using these cells was so ingrained; one guard testified he wished there were more padded cells to use, as they were often full when he needed to put another inmate in one."  Response at 11.  Further, the Response contends, "when looking at the relatively small size of the jail it becomes apparent the padded cells were being used excessively.  It defies common sense to believe two or three people a day are suicidal, or are in such emotional crisis as to need this kind of intervention."  Response at 11.

The Response concludes that "these facts, when viewed in the light most favorable to Plaintiff present enough evidence to support a practice of overuse and inhumane use of the padded cells."  Response at 11-12.  The Response maintains that Abila "has demonstrated Warden Funk, the administrator and final policymaker, for the jail was personally involved in violating Plaintiff's constitutional rights.  Funk's personal participation in the constitutional

violation exposes the governmental entity to liability."  Response at 11.  Further, the Response maintains that Abila "has demonstrated Warden Funk chose to ignore the written policies of the jail on a daily basis."  Response at 11-12.  Abila states that "[e]vidence exists that the padded cells were in constant use and were being used for disciplinary purposes, in violation of policy," and "this constant abuse of the padded cell is evidence of an unconstitutional practice, again, exposing the government to liability."  Response at 11-12.

    **3.**    **The Reply.**

The Reply first takes issue with Abila's "argument that Defendant Funk is a final policymaker for the Eddy County Detention Center."  Reply at 4.  The Reply asserts, in contrast, that it is the "clear intention of Eddy County not to vest final policy authority in the Eddy County Detention Center . . . jail administrator."  Reply at 5.  The Reply references the "Resolution of the Board of County Commissioners," contained in the Eddy County Detention Policy Manual, which states that "the Board of County Commissioners requires the jail administrator to submit proposed rules and regulations that describe[] all facets of facility operations, maintenance, and administration which shall be effective upon being adopted by the board."  Reply at 5.  Further, the Reply provides that, under New Mexico law, "[t]he common jails shall be under the control of the respective sheriffs, independent contractors or jail administrators hired by the board of county commissioners or other local public body or combination thereof, and the same shall be used as prisons in the respective counties."  Reply at 6 (citing NMSA 1978 § 33-3-1).  Accordingly, the Reply argues that the Board of County Commissioners, and not the jail administrator, is the final policymaker for the jail, and thus Abila "is left with the option to show that some unwritten policy or custom was the driving force behind the alleged violation of his civil rights, something he has not done."  Reply at 7.

In support of that contention, the Reply next argues that Abila "has presented no real evidence which shows that Eddy County Detention Center established an official policy, followed an unwritten custom, or knew of a pattern or practice which caused Defendants to violate George Abila's rights by placing him in a suicide prevention cell." Reply at 7. The Reply then reiterates the arguments that the Defendants made in the MSJ, which, according to the Reply, establish that Abila has failed to provide evidence "of an intent to use the padded cell in a manner that is unconstitutional, widespread, permanent, and well settled," particularly because, according to the Reply, Abila "has not established that any other inmate was subjected to the same range of conditions he complains of under similar circumstances or over a similar period of time." Reply at 9.

### 4.    The October 25, 2016, Hearing.

The Court held a hearing on October 25, 2016. See Transcript of Hearing, taken October 25, 2016 ("Tr.").[6]  Oral argument did not stray from the briefing's content, with the County Defendants beginning their argument by explaining that "this motion is primarily based on the fact that plaintiff hasn't -- after all of the discovery that's been conducted and the depositions taken -- shown any evidence of an official policy or a custom of misusing the padded cells within the facility." Tr. at 69:9-14 (Drennan). The County Defendants then turned to the first avenue of municipal liability that the Response raised -- "that a single decision by a final policymaker could be sufficient" -- and argued that Funk, as the Warden, "was never intended to be" the final policymaker, "nor was he the final policymaker in this case." Tr. at 70:3-8 (Drennan). The Court pressed the County Defendants why Funk was not high enough in the chain of command

---

[6]The Court's citations to the transcript of the hearing refer to the court reporters original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

to be a final policymaker, citing to the Court's previous caselaw holding that the Mayor of Albuquerque could constitute a final official.  See Tr. at 70:9-14 (Court)(referring to Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183 (D.N.M. 2004)(Browning, J.), aff'd by, 542 F.3d 802 (2008)).  The Defendants responded by reference to the argument they made in the Reply -- New Mexico state statute requires that "wardens . . . submit proposed rules and regulations to a board of county commissioners," and that, particularly in this case -- where the Eddy County Detention Policy Manual explicitly includes "language essentially stating that [the Board of County Commissioners] are the final policymakers" -- it is "abundantly clear" that Funk is not a final policymaker.  Tr. at 70:15-71:2 (Drennan).  The County Defendants then clarified why they were pressing this argument, and stated that it was pressing the argument because

> the complaint made it seem abundantly clear . . . we were looking at . . . some kind of custom claim. . . .  When we got the response to our briefing, it seemed that there might be an alternative argument, that Warden Funk should be viewed as a final policy maker, and that his sole decision in this case was enough.

Tr. at 71:18:72:5 (Drennan).  With respect to either of Abila's arguments, the County Defendants maintained that he has demonstrated neither avenue of municipal liability.  See Tr. at 72:9-11 (Drennan).

After the lunch break, the County Defendants reemphasized their argument that Funk was not the final policy maker and that, thus, the law foreclosed Abila from seeking municipal liability on the basis of his singular conduct.  See Tr. at 73:22-75:1 (Drennan).  Abila then took up argument, with the Court pressing him to explain how he had chosen Funk as the final policymaker in this case.  See Tr. at 75:6-19 (Coyte, Court).  Abila stated that the warden's status as the final policymaker has been "uncontroversial with any other case I've done," and that for him to have also joined the county commissioners would have been "duplicative," because,

"when you get the final policymaker by law, by statute, the guy who runs the jail, the one who does the day-to-day operations, the ones who create the policies," that is sufficient.  Tr. at 76:4-77:6 (Coyte).  In sum, then, Abila argued that Funk was the final policymaker, and that

> it makes sense, especially in our facts . . . where we have got a set of policies written by the former warden.  The former warden's testimony says: I entered this jail, and the policies were grossly inadequate . . . so [he] set about changing them to bring them into compliance . . . [t]hen the new warden took over and disregarded the policies.

Tr. at 77:7-25 (Coyte).  Further, "the county commissioners have no ability to dictate the day-to-day operations," and "the actual individual act against Mr. Abila by the warden [is] all beyond the scope of the county commission," and thus Funk's "acts or edicts may fairly be said to be -- represent official policy."  Tr. at 78:8-23 (Coyte).

> Abila then provided:

> In your opinion in the Romero matter that you recently wrote . . . it says an affirmative link between the constitutional deprivation and either the supervisor's personal participation -- or his exercise of control or direction, or his failure to supervise.  So there are three ways of doing it.  The supervisor actually creates the violation, which we have that as well, given the fact that the padded cell was constantly used and for punitive purposes.

Tr. at 79:18-80:8 (Coyte).   Abila argued that "two or three people were in the padded cell everyday . . . [t]here are not two or three suicidal people in that jail everyday.  That makes no sense.  One of the inmates described that he was put in there for punishment for fighting"  Tr. at 80:9-14 (Coyte).  Accordingly, Abila maintained:

> [W]e have enough people in padded cells.  We have people saying that they've been punished as a result of it, we have guards saying that they were trying to stop the use of the cell but were dissuaded or they couldn't make headway from the warden's custom.  So we have enough facts to say at least at summary judgment that we get to both theories that Mr. Funk did it on his own, with his own behavior, and that his policy or custom of violating his own policy has got us to the same result.

Tr. at 81:1-11 (Coyte).

The County Defendants then took back argument, and indicated that it was their impression that there was not any case law which explicitly held that suing the warden was sufficient for municipal liability.  See Tr. at 83:1-5 (Drennan).  The County Defendants then explained that Funk, as warden, could be named as a figurehead for a claim "based on [the] custom and policy requirement . . . but as far as this argument that a single act by a final policymaker is enough," he was not high enough in the food chain.  Tr. at 83:10-22 (Drennan). Again, the Court pressed the County Defendants to distinguish Funk's capacity as the warden from the Mayor of Albuquerque, with respect to their relevant food chains.  See Tr. at 83:23-84:11 (Court).  The County Defendants could not point to any authority, but indicated that it was their impression that "there is a difference when you're trying to base it on a single act, as opposed to this practice, pervasive custom, in which case I do think Defendant Funk could be a sufficient stand-in."  Tr. at 86:2-9 (Drennan).  The Court declined to give its inclination and took the matter under advisement.  See Tr. at 87:25-88:4 (Court).

### 5.  The Court's Memorandum Opinion and Order Granting Summary Judgment in Favor of Abila on his Substantive Due-Process Claims.

The Court has already issued a Memorandum Opinion and Order in this case.  See Memorandum Opinion and Order, filed November 23, 2016 (Doc. 198)("Substantive-Due Process MOO").  The Court concluded that, in light of the undisputed facts, Abila is entitled to judgment as a matter of law, because he successfully states a claim that the detention conditions to which he was subjected at Eddy County Detention, during a near six-month period where he was not actively suicidal from January 3, 2012, until June 21, 2012, violated his clearly established substantive due-process right to humane conditions of confinement as a pretrial

detainee.  See MOO at 97.  It is against the backdrop of the Court's Substantive-Due Process

MOO, then, which the Court will judge Abila's argument in favor of municipality liability.  The

Court has already concluded that Funk, in his capacity as Eddy County Detention's Warden,

violated Abila's constitutional rights during his pre-trial detention.  See Substantive-Due Process

MOO at 78-97.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving
> party must satisfy its burden of production in one of two ways: by putting
> evidence into the record that affirmatively disproves an element of the nonmoving
> party's case, or by directing the court's attention to the fact that the non-moving
> party lacks evidence on an element of its claim, "since a complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily renders
> all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for
> which it bears the burden of proof at trial, the nonmovant "must go beyond the
> pleadings and designate specific facts to make a showing sufficient to establish
> the existence of an element essential to his case in order to survive summary
> judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah 2013)(Sam, J.)(emphasis

added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support

its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that

would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477

- 20 -

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[7]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary

_____

[7]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotations omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable

inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most

favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot

decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America

concluded that summary judgment was appropriate where video evidence "quite clearly

contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court

explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .

> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"   Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
>    That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.   Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted).   "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[8]] explained that the

---

[8]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury."  Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id. at
> 380.   In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

---

> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011),
United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483
F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will
assist the Court in its preparation of this Memorandum Opinion and Order.

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for the jury's resolution.  584

F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

### LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their

liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal

connection is satisfied if [the defendants] set in motion a series of events that [the defendants]

knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights." (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[9] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."   Garcia v. Casaus, 2011 WL 7444745, at *25 (D.N.M. 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. at 689).   Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.   See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.      Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."   Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).   "The traditional definition of acting under color of state law requires that the defendant in

---

[9]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States of America "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."   403 U.S. at 389.

a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to conclude that an action was taken under color of state law, the court must determine that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009) (Browning, J.).[10]

---

[10]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273. The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement. See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." 72 F.3d at 400. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment to the Constitution of the United States of America, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in

_____

1281.

- 30 -

> the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting WILLIAM LLOYD PROSSER ET AL., PROSSER AND KEETON ON TORTS § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt.b (1965)).

### 3.  **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"  Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  <u>See</u> <u>Garcia v. Casaus</u>, 2011 WL 7444745, at *25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676.  The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

<u>Dodds v. Richardson</u>, 614 F.3d at 1199.  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The

Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983

after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995,

1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200

n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the

third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at

404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same

logic applies when the plaintiff sues a defendant-supervisor who promulgated, created,

implemented or possessed responsibility for the continued operation of a policy that itself

violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit

reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

      **4.**     **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

Establishing an informal policy or custom requires the plaintiff to show that the misconduct was "widespread" -- i.e., that it involved a "series of decisions."  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  Although the existence or nonexistence of such a policy, practice, or custom is a question of fact for the jury, see Powers v. Hamilton Cnty. Pub. Defender Comm'n, 501 F.3d 592, 599 (6th Cir. 2007)("[T]he evidence showed at least a disputed question of fact as to the existence of its alleged policy or custom . . . ."); Surprenant v. Rivas, 424 F.3d 5, 21 (1st Cir. 2005)("O'Mara challenges the very existence of the interdicted policy, custom, or practice.  Proving the existence of a policy, custom, or practice normally entails questions of fact."  (citation omitted)); Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 1999)("In order to

avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation."); Gregory v. City of Rogers, Ark., 921 F.2d 750, 757 (8th Cir. 1990)("[A]ppellants have raised material questions of fact whether it was the custom of the Rogers Police Department that officers could use their discretion in deciding whether or not to arrest intoxicated individuals, despite the state statute requiring their arrest."); Fancher v. Barrientos, 2013 WL 8600085, at *4 (D.N.M. 2013)(Hansen, J.)("[A]t this time the record is unclear and it remain a question of fact as to which policy was in place."); Jacobs v. Dujmovic, 752 F. Supp. 1516, 1525 (D. Colo. 1990)("[T]he Jacobs have failed to meet their summary judgment burden of showing that it adopted a policy, custom or procedure that caused constitutional violations, or that there is a question of fact as to the existence of such a policy."), it is not a fact that can be baldly asserted at the pleading stage, see Young v. City of Albuquerque, 2014 WL 7473806, at *27 (D.N.M. 2014)(Browning, J.); Atwell v. Gabow, 2008 WL 906105, at *6 (D. Colo. 2008)(Kane, J.). Pleading a municipal policy, custom, or practice is like pleading the breach element of negligence -- which is also ultimately a question of fact for the jury.  The plaintiff cannot simply allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists.  With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified.  With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct -- no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible -- or use other evidence, such as a police officers' statements attesting to the policy's existence.   The Tenth Circuit has not

explicitly held that to be pleading requirements, but they have implied that district courts should analyze policies, practices, or customs under Monell as "legal conclusions" at the pleading stage -- which must evidence factual support, rather than conclusorily alleged -- and not "facts" in and of themselves, to be taken as true at face value:

> [T]he complaint alleges that the City of Denver Police Department had an official policy and plan to repress, vilify, and deny rights to Mexicanos, American Indians, and other "oppressed" national minorities, and that, pursuant to that plan, the Department formulated and issued a "get Martinez" policy and instructions. In furtherance of that policy, we are told, the Department kept a dossier on plaintiff, including reports, recordings, and other materials concerning his views, associations, and meetings. The Department also entered into a campaign to charge plaintiff and harass him and others advocating unpopular causes with unfounded prosecutions and to discourage him and others from asserting their rights. In or about October 1973, we are told, the Department, because of racial hatred and in order to chill the assertion of rights, obtained a warrant for the false and unfounded arrest of plaintiff, and, in or about November 1973, the Department "determined, in furtherance of its policy . . . as aforestated, to issue an order to all Denver Police Officers to 'shoot on sight' plaintiff."
>
> We think these allegations are clearly sufficient, as a matter of pleading, to satisfy the "policy" or "custom" requirement of Monell.

Martinez v. Winner, 771 F.2d 424, 443-44 (10th Cir. 1985)(citations to the complaint omitted). If a conclusory assertion that the Denver Police Department had such a policy in place would have sufficed to clear the rule 12(b)(6) bar, the Court sees little reason for the Tenth Circuit to have gone into this detailed recitation. The United States Courts of Appeals for the Seventh and Ninth Circuits have addressed this question squarely, and both have come down on the side that factual allegations giving rise to an inference that the policies exist must support the allegations of the existence of Monell policies. See McCauley v. City of Chicago, 671 F.3d 611, 618 (7th Cir. 2011)("In order to state a facially plausible equal-protection claim under Monell, the factual allegations in McCauley's complaint must allow us to draw the reasonable inference that the City established a policy or practice . . . ."); Svastics v. City of Beverly Hills, 178 F.3d 1300, at *1

(9th Cir. May 14, 1999)(unpublished)("The district court also properly dismissed the claims against the City because any allegations of an unconstitutional custom or policy, even after amendment of the complaint, remained too conclusory to support a claim pursuant to <u>Monell</u>."); <u>Strauss v. City of Chicago</u>, 760 F.2d 765, 767 (7th Cir. 1985)("A complaint that tracks <u>Monell</u>'s requirement of official policy with bare allegations cannot stand . . . .  The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions of Section 1983 liability devoid of any well-pleaded facts . . . ."  (footnote omitted)).

> [T]he mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies.  On the other hand, where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.

<u>Powe v. City of Chicago</u>, 664 F.2d 639, 650 (7th Cir. 1981).  The three district courts in the Tenth Circuit -- including the Court -- to have addressed the issue agree.  In <u>Atwell v. Gabow</u>, the Honorable Thomas K. Kane, United States District Judge for the District of Colorado, dismissed a series of <u>Monell</u> claims on this ground:

> From the inception of this litigation, I have admonished counsel regarding the import of <u>Monell</u> and its progeny for Plaintiffs' municipal liability claims and have explicitly ordered them to identify "***specific factual allegations*** supporting the conclusory allegations in the First Amended Complaint that Denver Health and/or Defendant Gabow acting in her official capacity made a policy decision, or engaged in a custom or practice of discrimination, for purposes of municipal liability.
>
> . . . .
>
> Plaintiffs do not identify a custom, policy or practice applicable to all of them that would render Denver Health liable under <u>Monell</u> for the discrimination each claims to have suffered, and none pleads actual facts giving rise to a plausible inference that such a policy, custom or practice existed.  Simply aggregating eight individual claims and calling them the result of a "custom or policy of discrimination" is insufficient, as are all of the other conclusory recitations of Canton or similar legal standards as "facts" supporting municipal liability.

> Plaintiffs' 42 U.S.C. §§ 1981 and 1983 claims against Denver Health or Gabow, Rossman and Alexander in their "official capacities" are therefore DISMISSED.

Atwell v. Gabow, 2008 WL 906105, at *6, *8 (emphasis in original).  In Granato v. City and County of Denver, 2011 WL 3820730 (D. Colo. 2011), the Honorable Marcia S. Krieger, now-Chief United States District Judge for the District of Colorado, ruled similarly:

> At a minimum, a party asserting a Monell claim must plead sufficient facts to identify the unconstitutional custom or policy that was promulgated and the means by which that custom or policy caused the constitutional violation.
>
> Here, Ms. Granato's allegations of an unconstitutional custom or policy maintained by Denver Health are entirely conclusory.  She offers only the "formulaic recitation" of a Monell claim, alleging that Mr. Khazanov "act[ed] and/or fail[ed] to act pursuant to City or State policy, custom, decision, ordinance, regulation, habit, usage or practice in [his] conduct," but never identifies precisely what particular custom or policy of Denver Health Mr. Khazanov was acting pursuant to . . . .  As cases like Twombly and Iqbal make clear, such conclusory pleadings are insufficient to state a claim.  Accordingly, Denver Health is entitled to dismissal of the Monell claim against it.

Granato v. City and County of Denver, 2011 WL 3820730, at *8 (alterations in original)(footnote and citation omitted).  Last, in Young v. City of Albuquerque, the Court dismissed a plaintiff's Monell claims on the same basis:

> [F]ar from asserting that the misconduct in this case was widespread, Young has not alleged any facts -- such as statistics, records of complaints filed with the city, or even anecdotal evidence -- that would indicate that the misconduct alleged in this case was more than an isolated incident.  In fact, Young cannot point to another instance in which a City of Albuquerque employee has deprived another individual of his or her property rights without due process.  A single incident is insufficient to establish the existence of a custom or practice.  See City of St. Louis v. Praprotnik, 485 U.S. at 127 (explaining that a custom requires that the alleged misconduct is "widespread" -- i.e., involving a "series of decisions").

Young v. City of Albuquerque, 2014 WL 7473806, at *27.  These cases all stand for the same thing: at the pleading stage, the existence of a Monell policy is a "conclusion" to be built up to, rather than a "fact" to be baldly asserted.

When there is no formal written policy and the § 1983 plaintiff is relying upon a practice or custom, some courts appear to look for a specific number of prior similar incidents -- often saying that two or three instances will not suffice.  See Wilson v. Cook Cnty., 742 F.3d 775, 780 (7th Cir. 2014)("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident -- or even three incidents -- do not suffice."); Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)(holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); Eugene v. Alief Ind. Sch. Dist., 65 F.3d 1299, 1304 (5th Cir. 1995)(holding that two incidents of alleged excessive force are insufficient to show policy or custom).  Other courts require only that the plaintiff plead that the policy exists, reasoning that the usual rule of pleading -- that courts are to accept all allegations as true at the motion-to-dismiss stage -- applies in the context of pleading a Monell policy, practice, or custom.  See Bartholomew v. Fischl, 782 F.2d 1148, 1152-53 (3d Cir. 1986)(holding that a plaintiff who pleaded "'a single instance of illegality'" had nonetheless sufficiently "pleaded the existence of an official policy or official conduct sufficient to support municipal liability"); Estate of Bailey by Oare v. York Cnty., 768 F.2d 503, 506-07 (3d Cir. 1985)(holding that courts are to accept allegations in the complaint as being true, including Monell policies, and writing that "a federal court reviewing the sufficiency of a complaint has a limited task").[11]  The Court does not believe a pre-determined numerical pleading standard is best, nor does the Court think that pleading the facts of the plaintiff's individual case, and adding the conclusion "policy, practice, or custom," suffice.  The plaintiff must plead what he or she

---

[11]These cases -- in addition to being from the United States Court of Appeals for the Third Circuit -- were decided well before Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.

knows -- whether it is a number of incidents or some other evidence -- that renders plausible the plaintiff's conclusion that there is a policy, custom, or practice in place. If a police officer says there is a policy, that allegation may be enough to plausibly suggest that the policy exists, even if the plaintiff can plead only one specific instance of conduct. If a police officer says he or she was told to do something down at the stationhouse, that allegation, too, may be enough. The expectation is that the plaintiff must tell the Court at the outset, in the complaint, (i) why he or she thinks a policy exists -- alleging specific facts; and (ii) what he or she thinks the policy is. The Court will then decide whether (i) plausibly suggests (ii). The plaintiff must tell the Court, however, what he or she has, or else the Court will disregard the alleged policy as a naked conclusion. See Griego v. City of Albuquerque, 100 F. Supp. 3d 1192, at 1213-16 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING MONELL CLAIMS

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

The Supreme Court of the United States has recognized that "municipalities and other bodies of local government are 'persons' within the meaning of this statute." St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988). The Supreme Court has articulated "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." St. Louis v. Praprotnik, 485 U.S. at 123 (citation omitted).

First, a majority of the Court agreed that municipalities may be held liable under §

> 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered.  Second, only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability.  Third, whether a particular official has final policymaking authority is a question of state law.  Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.

St. Louis v. Praprotnik, 485 U.S. at 123 (citations and internal quotations omitted).  The Tenth Circuit has explained that there are two elements that a plaintiff must show when "suing a county under section 1983 for the actions of one of its officers": (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force behind the constitutional deprivation."   Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)(citing Monell, 436 U.S. at 694); Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)(citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Apodaca v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447-48 (10th Cir. 1990); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir. 1988)).  Those elements apply when the plaintiff alleges that the acts of a final policymaker are the policy of the municipality.  See Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d at 1319 ("The defendants do not deny that Sheriff Sharp, as the supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment.  Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment.  If that decision -- the decision to enter the apartment--resulted in a constitutional violation, the County would be liable."  (citation omitted)).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1.     Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning,

J.)(citing <u>Johnson ex rel. Estate of Cano v. Holmes</u>, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.   <u>Special-Relationship Exception.</u>

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine.   A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.   See <u>Liebson v. N.M. Corr. Dep't</u>, 73 F.3d 274, 276 (10th Cir. 1996).   "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.   <u>Danger-Creation Exception.</u>

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."   <u>Uhlrig v. Harder</u>, 64 F.3d at 573.   The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."   <u>Currier v. Doran</u>, 242 F.3d 905, 923 (10th Cir. 2001).   See <u>Estate of B.I.C. v. Gillen</u>, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").   Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."   <u>Uhlrig v. Harder</u>, 64 F.3d at 573.   A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"   <u>Estate of B.I.C. v. Gillen</u>, 702 F.3d at 1187 (quoting <u>Gray v. Univ. Colo. Hosp. Auth.</u>, 672 F.3d 909, 916 (10th Cir. 2012)).   To

state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cnty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cnty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4.    **What Shocks the Conscience**.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor

intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks omitted)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574 (internal quotation marks omitted)).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a §

1983 claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."   265 F.3d at 1134.   The Tenth Circuit agreed with the district court's

conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known

dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking

standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M.

2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district,

superintendent, principal, and vice principal of a middle school -- violated the plaintiffs'

substantive due-process rights when they did not take sufficient action to prevent a student at the

school from "racking"[12] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded

that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The

Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the
> Defendants were aware of three instances of an unknown eighth-grade student
> racking various sixth-grade students within the span of a month, and failed to
> implement policies to improve hallway monitoring and stop this conduct from
> occurring in time to prevent [the plaintiffs' son] from falling victim to the same
> fate.  Further, the Defendants indicated to the sixth graders that it had policies in
> place to punish individuals that assaulted other students but did not, in fact, have
> such policies.
>
> While such behavior may be worthy of remedy under tort law, and
> perhaps worthy of punishment in the form of punitive damages, the Court's
> conscience is not shocked . . . .

---

[12]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations and
internal quotations omitted).

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See Reid v. Paulter, 2013 WL 3845042, at *50 (D.N.M. 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights are violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d at 1219 (quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment." Farthing v. City of

Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542

(citation omitted).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. 319, 334 (1976).  The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote, citations, and internal quotations omitted).

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process."  Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might

impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(holding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.").

## ANALYSIS

To succeed on the MSJ, the County Defendants must show that there are no relevant disputes of material fact, and that they are therefore entitled to judgment barring municipal liability as a matter of law.  The Court concludes that, in light of the disputed facts, the County Defendants are not entitled to judgment as a matter of law, because Abila has shown sufficient evidence to support finding municipal liability.  Accordingly, Abila has sufficiently responded to the County Defendants' MSJ, requiring this Court deny the County Defendants' MSJ.

## I.   ABILA HAS IDENTIFIED SUFFICIENT EVIDENCE TO SHOW THAT THERE IS A GENUINE ISSUE FOR TRIAL AS TO MUNICIPAL LIABILITY.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241. See Vitkus v. Beatrice Co., 11 F.3d at 1539 ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1). The court resolves all reasonable inferences and doubts in the nonmoving party's favor, and construes all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The MSJ contends that "no evidence exists" to support the Third Amended Complaint's allegations that "ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled," MSJ ¶ 15, at 4, or that "County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights," MSJ ¶ 16, at 4. Further, the Reply contends that that the Board of County Commissioners is the final policymaker for the jail, and not the jail administrator, and thus Abila "is left with the option to show that some unwritten policy or custom was the driving force behind the alleged violation of his civil rights, something he has not done," see Reply at 7, as opposed to the Response's contention that Abila need only prove that "the final policy maker of ECDC, Warden Funk, deprived Plaintiff of a constitutional right. Plaintiff does not have to prove a pattern and practice of such violations, just a single decision by the warden himself," Response at 7. Thus, in response to the MSJ, Abila has presented evidence that, first, municipal liability is available, because: (i) evidence exists establishing that Funk and his staff were maintaining a policy -- in contravention to Eddy County Detention's written policies -- that caused violations of Abila's constitutional rights; and (ii) Funk was a final policymaker at Eddy County Detention, thus supporting municipal liability

solely for his singular violations of Abila's constitutional rights.  The Court addresses each of the

Response's arguments in turn, concluding that Abila has made a sufficient showing to rebut the

Defendants' MSJ.

> **A.      ABILA IDENTIFIES SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIM THAT EDDY COUNTY DETENTION HAS A CUSTOM OF USING THE PADDED CELL FOR PUNISHMENT IN A MANNER WHICH IS UNCONSTITUTIONAL, WIDESPREAD, PERMANENT, AND WELL-SETTLED, THEREBY RESULTING IN POLICIES AND CUSTOMS THAT WERE DELIBERATELY INDIFFERENT TO ABILA'S CONSTITUTIONAL RIGHTS.**

The Tenth Circuit, in an opinion that Judge Scott M. Matheson, Jr. authored, and Judges

Paul Kelly, Jr. and William J. Holloway, Jr. joined, has laid out municipal-liability law as it

pertains to official policies or customs:

> *. . . Municipal Liability*
>
> In contrast to individual supervisor liability, we have explained that nothing in Iqbal changed the "longstanding interpretation" of § 1983's standards for imposing municipal liability.  Dodds[ v. Richardson, 614 F.3d 1185, 1202 (10th Cir. 2010)].  That interpretation dates back to Monell v. Department of Social Services, 436 U.S. [at 691-92], which held that a plaintiff must identify "a government's policy or custom" that caused the injury.  In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.  See [Board of County Comm'rs v.] Brown, 520 U.S. at 403 . . . ; see also City of Canton v. Harris, 489 U.S. 378, 389 . . . (1989).  We briefly discuss each of the three elements: (1) official policy or custom, (2) causation, and (3) state of mind.
>
> **i. *Official Policy or Custom***
>
> In Monell, the Supreme Court stated that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  436 U.S. at 691 . . . .  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Id. at 694 . . . .

"The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469 . . . . A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. See Martin A. Schwartz, Section 1983 Litigation Claims & Defenses, § 7.06[A] (2013), available at Westlaw SNETLCD.

* * * *

### ii. *Causation*

To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." Schwartz, at § 7.12[B]. This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404 . . . .

[The plaintiff] must therefore "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. As with so-called supervisory liability discussed above, municipal liability in a § 1983 case cannot be established on a theory of vicarious liability. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. at 405 . . . . "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." Schwartz, at § 7.12.

### iii. *State of mind*

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Brown, 520 U.S. at 407 . . . ; see also City of Canton, 489 U.S. at 389 . . . .

The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by

> proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

> Barney v. [Pulsipher], 143 F.3d [1299,] 1307 [(10th Cir. 1998)] (citations and internal quotation marks omitted).

Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 769-71 (10th Cir. 2013).  See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1267-69.   The issues, then, are whether there is enough evidence that a reasonable jury could conclude that: (i) the Defendants had a well-settled custom or practice, or deliberately indifferent training or supervision; (ii) the Defendants' well-settled custom or practice is closely related to the violation of Abila's constitutional rights -- that is, it is the moving force behind the injury alleged; and (iii) whether the Defendants adopted this practice with deliberate indifference to its known or obvious consequences.  See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1267-69.  The Court concludes that there is enough evidence that a reasonable jury could find for Abila on each point. Accordingly, summary judgment is inappropriate.

As stated previously, pleading a municipal policy, custom, or practice is like pleading the breach element of negligence -- which is also ultimately a question of fact for the jury.  The plaintiff cannot simply allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists.  With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified.  With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct -- no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one

another, the smaller the required number will be to render the alleged policy plausible -- or use other evidence, such as a police officers' statements attesting to the policy's existence. The Tenth Circuit has not explicitly held these to be requirements, but they have implied that district courts should analyze policies, practices, or customs under Monell as "legal conclusions" at the pleading stage -- which must thus evidence factual support. See Martinez v. Winner, 771 F.2d at 443-44. While the Court and the parties are well beyond the pleading stages in this case, and the MSJ is not a motion to dismiss under rule 12(b)(6), that pleading guidance is still helpful to the Court's analysis of these Monell issues in the summary judgment context.

The MSJ argues that it is undisputed that Abila's allegation that "ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled," MSJ ¶ 15, at 4, lacks evidentiary support in the record. Abila in his Response, however, disputes that there is no evidence showing that Eddy County Detention has a "'custom' of using the padded cell for punishment, in a manner that is unconstitutional, widespread, permanent, and well-settled." Response ¶ 15, at 4. The Response identifies evidence (i) that a former inmate, Martinez, was placed in the padded cell for fighting; (ii) Bannister has stated that there were two to three inmates in the padded cells "almost all the time"; (iii) corrections officer Shirley has stated that the "padded cells are occupied 'quite often'"; and (iv) Maxwell has stated that "he wishes there were more padded cells, because sometimes he needs to put someone in the padded cell and they are all occupied." Response ¶ 15, at 4 (citing: (i) Martinez Depo. at 69:7-15, 94:12-20 (providing testimony that Martinez was housed in a padded cell after "his third fight," and was housed in a padded cell on two separate occasions while at Eddy County Detention); (ii) Bannister Depo. at 91:3-4 (providing testimony that "we've got two to three people in padded cells nearly all the time");

(iii) Shirley Depo. at 66:6-8 (providing testimony that the padded cells were occupied "quite often"); and (iv) Maxwell Depo. at 43:6-14 (providing testimony that the padded cells were occupied frequently enough that Maxwell, on occasion, had no room for inmates he sought to house in the padded cells)).  At the hearing, Abila reiterated that this evidence was sufficient to support his claim for municipal liability, because, in contravention of Eddy County Detention's written policy regulating the use of padded cells for punishment, "two or three people were in the padded cell everyday . . . .  There are not two or three suicidal people in that jail everyday.  That makes no sense."  Tr. at 80:9-14 (Coyte).

The Court is convinced that the evidence which Abila has identified gives rise to a plausible inference that Eddy County Detention staff, under the orders of Funk (whom the Defendants concede can be fairly said to be the final policymaking authority in this context, as warden of Eddy County Detention, see Tr. at 86:2-9 (Drennan)), maintained an informal custom of using these padded cells for punishment.  Abila has not only identified evidence coming from the testimony of a former inmate who specifically alleges that he was detained in the padded cell as a form of punishment, but also evidence in the form of guard testimony that the padded cells were consistently occupied -- to the point, even, that one of the guards wished for more padded cells because there were so infrequently vacancies.  See Response ¶ 15, at 4.  The Response does not rely on conclusory statements or vague assertions; instead, the Response has pointed to more "than a scintilla" of evidence that rampant use of the padded cells occurred, giving rise to a plausible inference that -- despite the written policy's regulations of the use of the padded cells for punishment -- the padded cells were being used for something other than the temporary restraint of suicidal inmates.  See Response at 9 (not disputing the fact that Eddy County Detention has "drafted a set of policies designed to prevent the abuses seen in this case.").  The

Court thus concludes that Abila, taking the evidence in the most favorable manner to the Plaintiff, has made a sufficient showing of evidence that a custom or policy of using padded cells in contravention with a written policy, under Funk's orders, existed at Eddy County Detention.

The MSJ has not challenged the next element, causation.  To the extent a custom or policy exists, the MSJ does not purport to challenge its causal effect pertaining to Abila's constitutional claims.  See MSJ ¶¶ 15-16, at 4-5.  The MSJ addresses, however, the third element, arguing that there is "no evidence which shows that County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights."  MSJ ¶ 16, at 4.  As the Court has explained, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Board of County Comm'rs v. Brown, 520 U.S. at 407.  Again, viewing the evidence in the light most favorable to Abila, a jury could reasonably conclude that there is a widespread pattern of constitutional violations with respect to Eddy County Detention's use of these padded cells, and that only deliberate indifference to the constitutional implications of using these padded cells for punishment, or otherwise in contravention with the written policies at Eddy County Detention, could allow this widespread practice to continue.

In support of this element, the Response -- in addition to referencing the evidence that the padded cells were frequently used and therefore likely used for unconstitutional purposes -- provides evidence that "Defendants Funk and Bannister made the decision to place Plaintiff in the padded cell indefinitely," and the "Plaintiff wrote a grievance about his placement and continued stay in the padded cell, and Defendant Funk's response to Plaintiff's complaints at being in the padded cell, indicates, (at least in part), a punitive purpose for his cell assignment."

Response ¶ 16, at 4-5 (citing (i) Funk Depo. at 143:18-144:2 (providing testimony that Funk and Bannister were involved in a collective decision to house Abila in a padded cell the duration of his detention); (ii) Youngman Depo. at 248:18-250:2 (providing testimony from Youngman that Funk and Bannister would have been the ones who made the decision to initially house Abila in the padded cell); and (iii) Inmate Request Form (providing Funk's response to Abila's inquiry why he was housed in a padded cell, which states: "You will remain on this protective status until you can comply with all lawful orders and directions and when you can treat staff with the same respect you are given")).  The Response also argues that Sergeant Jeannie Santana testified "that the padded cells were used often . . . at times they were occupied all the time . . . [and] although unusual, some inmates had been held in the padded cell for months."  Response ¶ 16, at 5 (citing Santana Depo. at 17:10-19:9 (providing the quoted testimony)).

Accordingly, the Court cannot conclude that "no evidence" exists to support Abila's contention that the customs and policies at Eddy County Detention, with respect to their use of padded cells in contravention with written policy, were perpetrated with a deliberately indifferent state of mind.  Indeed, the use of the padded cells, for anything other than that prescribed in Eddy County Detention's own written policies, suggests to the Court a deliberate indifference to the constitutional harms which the policy was meant to eradicate.  The Court thus concludes that Abila has identified sufficient evidence for a reasonable jury to conclude that Eddy County Detention has a custom of using the padded cell for punishment in a manner which is unconstitutional, widespread, permanent, and well-settled, thereby resulting in policies and customs that were deliberately indifferent to Abila's constitutional rights.

**B.  ABILA IDENTIFIES SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIM THAT FUNK IS THE FINAL POLICYMAKER FOR EDDY COUNTY DETENTION AND THAT THUS HIS SINGULAR CONDUCT GIVES RISE TO MUNICIPAL LIABILITY.**

As the Court has stated, a municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d at 1218.  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged. See Graves v. Thomas, 450 F.3d at 1218.  In this case, the MSJ specifically argues, initially, that no evidence exists that a municipal policy or custom exists in support of the Third Amended Complaint's allegation against Funk in his official capacity.   The Response then argues, however, that,

> in the context of this case, the municipal liability claim can be perfected in two ways. . . .  Plaintiff can [additionally] succeed by proving the final policy maker of ECDC, Warden Funk, deprived Plaintiff of a constitutional right.  Plaintiff does not have to prove a pattern and practice of such violations, just a single decision by the warden himself.

Response at 7 (citing Simmons v. UINTAH Health Care Special Serv. Dist., 506 F.3d at 1285 ("[A] municipality is responsible for both actions taken by subordinate employees in conformance with preexisting official policies or customs and actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality.")).  Here, the Response argues that there is evidence that Funk deprived Abila of his constitutional rights because he has shown that

> Funk personally participated in the decision to place Mr. Abila in the padded cell and keep him there without the most basic things required for a human existence. . . .   His personal decision to keep him in these appalling conditions is

demonstrated by the response he wrote to Plaintiff's request to be let out of the padded cell.

Response at 8.

The question before the Court, then, is whether Funk, as warden, was a final policymaker who possesses final policymaking authority in a certain area, whose decision, "even if it is specific to a particular situation . . . decision constitutes municipal policy for § 1983 purposes." Pembaur v. City of Cincinatti, 475 U.S. at 484-85. The Tenth Circuit has explained what persons might be fairly considered as such final policymakers. In Randle v. City of Aurora, the Tenth Circuit provides that the notion of "final policymaking authority is a legal issue to be determined by the court based on local and state law." Randle v. City of Aurora, 69 F.3d 441, 447 (10th Cir. 1995). The Tenth Circuit then explored City of St. Louis v. Praprotnik, 485 U.S. 112 (1988), which

> set out the basic conundrum and line drawing exercise that lower courts face in ascertaining the existence of a municipal policy: If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose. In outlining the "elegant line" drawing exercise of assigning municipal liability, Justice O'Connor highlighted two guiding inquiries: (1) whether a subordinate's discretionary decisions are constrained by general policies enacted by others; and (2) whether the subordinate's specific decisions are reviewable by others.

Randle v. City of Aurora, 69 F.3d at 448 (referencing City of St. Louis v. Praprotnik, 485 U.S. at 126-27)(internal quotations omitted). Accordingly, the Tenth Circuit identified

> three elements that help determine whether an individual is a final "policymaker": (1) whether the official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final -- i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.

- 60 -

Randle v. City of Aurora, 69 F.3d at 448 (internal quotations omitted).  To determine whether Funk, given the Tenth Circuit's guidance, had final policymaking authority, the Court must thus first construe the relevant "legal chain of authority."  Randle v. City of Aurora, 69 F.3d at 448.

In New Mexico, "[t]he common jails shall be under the control of the respective sheriffs, independent contractors or jail administrators hired by the board of county commissioners or other local public body or combination thereof, and the same shall be used as prisons in the respective counties."  N.M. Stat. Ann. § 33-3-1.  The Reply, however, references the "Resolution of the Board of County Commissioners," contained in the Eddy County Detention Policy Manual, which states that "the Board of County Commissioners requires the jail administrator to submit proposed rules and regulations that describe[] all facets of facility operations, maintenance, and administration which shall be effective upon being adopted by the board." Reply at 5 (emphasis added).  Here, Abila alleges that Funk, as warden, maintained an unwritten custom with respect to the use of padded cells at Eddy County Detention.  Additionally, Abila alleges that he was placed in the padded cell upon Funk's orders and that only Funk was in a position to transfer him back into general population.  See Inmate Request Form (providing Funk's response to Abila's inquiry as to why he was housed in a padded cell, which states: "You will remain on this protective status until you can comply with all lawful orders and directions and when you can treat staff with the same respect you are given").  This evidence suggests that, despite the role that the Board of County Commissioners might play in approving rules and regulations, Funk was in charge of the day to day decisions at Eddy County Detention -- i.e., Funk was not "meaningfully constrained by policies not of that official's own making," Funk's decisions were "final -- i.e., are [not] subject to any meaningful review," and "the policy decision

purportedly made by the [Funk] is within the realm of [his] grant of authority" at state law. Randle v. City of Aurora, 69 F.3d at 448.  See Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d 1190, 1269-70 (D.N.M. 2010)(Browning, J.)("Here, White was the moving force behind the request without consent of J. Kerns' private medical records.  White concedes that, as Sheriff of Bernalillo County, he is the official policymaker for law-enforcement policies for the Bernalillo County Sheriff's Department."), reversed in part and vacated in part, 663 F.3d 1173 (10th Cir. 2011).  See also Myers v. Okla. County Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1319 (10th Cir. 1998)("The defendants do not deny that Sheriff Sharp, as the supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment. Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment.  If that decision -- the decision to enter the apartment -- resulted in a constitutional violation, the County would be liable.")(citation omitted).

The Court thus concludes that Abila has defeated, by identifying sufficient evidence in the record, the MSJ's contention that "no evidence exists" to support the Third Amended Complaint's allegations that "ECDC has a 'custom' of using the padded cell for punishment, particularly of mentally ill inmates, in a manner which is unconstitutional, widespread, permanent, and well-settled," MSJ ¶ 15, at 4, or that "County Defendants' policies or customs were deliberately indifferent to Abila's Fourteenth Amendment rights," MSJ ¶ 16, at 4.  Further, while the Reply contends that the Board of County Commissioners -- and not Funk, the jail administrator -- is the final policymaker for the jail, and that Abila "is left with the option to show that some unwritten policy or custom was the driving force behind the alleged violation of his civil rights, something he has not done," Reply at 7, as opposed to the Response's contention

that Abila need only prove that "the final policy maker of ECDC, Warden Funk, deprived Plaintiff of a constitutional right," Response at 7, Abila has identified sufficient evidence in the record such that a reasonable jury could find that Funk was indeed a final policymaking authority for Eddy County Detention.   Thus, in response to the MSJ, Abila has presented sufficient evidence that municipal liability is available, because: (i) evidence exists establishing that Funk and his staff were maintaining a policy -- in contravention to Eddy County Detention's written policies -- that caused violations of Abila's constitutional rights; and (ii) Funk was a final policymaker at Eddy County Detention, thus supporting municipal liability solely for his singular violations of Abila's constitutional rights.   The Court, accordingly, concludes that Abila has made a sufficient showing to rebut the contentions in the County Defendants' MSJ.

**IT IS ORDERED** that the County Defendants' Motion for Partial Summary Judgment No. III -- Dismissal of Plaintiff's Municipal Liability Claims, filed September 6, 2016 (Doc. 154), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Jack Bennett Jacks
Law Office of J.B. Jacks
Albuquerque, New Mexico

-- and --

Matthew Coyte
Coyte Law, P.C.
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Luis E. Robles
Lindsay Drennan
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendants*